```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION

 3               Docket No. 6:08-cr-118

 4   . . . . . . . . . . . . . .
     UNITED STATES OF AMERICA    :
 5                               :
                                 :        Orlando, Florida
          Plaintiff             :        April 14, 2009
 6                               :        9:00 a.m.
                                 :
             v.                  :
 7                               :
     JUDE LACOUR                 :
 8   CHRISTOPHER TOBIN           :
     AKHIL BARANWAL              :
 9   JAMES PICKENS               :
     GUENNET CHEBSSI             :
10                               :
             Defendants         :
11   . . . . . . . . . . . . . .

12              VOLUME 9 - pages 1 - 279
                TRANSCRIPT OF JURY TRIAL
13        BEFORE THE HONORABLE DAVID D. DOWD,JR.
                UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16   For the Plaintiff:  Karen Gable
                         Daniel Irick
17   For the Defendant Jude LaCour:  Pro se

18   For the Defendant Christopher Tobin:  Michael Nichola

19   For the Defendant Akhil Baranwal:  Robert Leventhal

20   For the Defendant James Pickens:  Grady C. Irvin, Jr.

21   For the Defendant Geunnet Chebbsi:  A. Brian Phillips

22   Court Reporter:     Sandra K. Tremel, RMR/CRR

23                     407-245-3110

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.
```

```
1                          I N D E X

2

3    WITNESS              DIRECT     CROSS      REDIRECT   RECROSS

4    Jacinta Batson          3        8

5    Russell Miles          11       18

6    K. Wulfekuehler        23       37

7    Jack Freedman          43       49

8    Noreen Valentine       55       90          107

9    James Graumlich       121      142

10   Carmine Catizone      167      201          265        267

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2                (jury present -- 9:02 a.m.)

 3          THE COURT:  Please call your next witness.

 4          MR. IRICK:  The United States calls Jacinta

 5  Batson.

 6                    (WITNESS SWORN)

 7                  DIRECT EXAMINATION

 8  BY MR. IRICK:

 9  Q    Good morning, Miss Batson.

10  A    Good morning.

11  Q    Would you please state your full name and spell your

12  name for the record.

13  A    Jacinta Batson.  J-A-C-I-N-T-A, B as in boy,

14  A-T-S-O-N.

15  Q    And who do you work for?

16  A    The Food and Drug Administration.

17  Q    And what do you do at the Food and Drug

18  Administration?

19  A    I'm a chemist with the Food and Drug Administration.

20  Q    Speak up or the scoot microphone closer to you.

21          THE COURT:  Tell me again what do you do for the

22  Food and Drug administration?

23          THE WITNESS:  I'm a chemist.

24          THE COURT:  Chemist.  Thank you.

25  BY MR. IRICK:
```

Direct Examination - Jacinta Batson                    4

 1   Q    How long have you been employed as a chemist at the

 2   Food and Drug Administration?

 3   A    Over seven years.

 4   Q    How long have you been a chemist?

 5   A    About nine years.

 6   Q    What is your educational background?

 7   A    I have a bachelor's of science and a master's of

 8   science both in chemistry.

 9   Q    Where did you go to school?

10   A    Rice State University in Dayton, Ohio.

11   Q    Have you ever testified as an expert?

12   A    Yes.

13   Q    Was it in federal court?

14   A    Yes.

15   Q    And what were you qualified as an expert in?

16   A    Fourier transform infrared spectroscopy.

17   Q    Say that more slowly and spell some of those.

18   A    It's fourier, F-O-U-R-I-E-R, transform, T as in Tom,

19   R-A-N-S-F-O-R-M; infrared, I-N-F-R-A-R-E-D; spectroscopy.

20   Q    And is that usually known as FTIR?

21   A    Yes, it is.

22   Q    Why do you do FTIR?  What is the purpose of that?

23   A    FTIR spectroscopy is used as a analytical technique

24   in forensic science to analyze a variety of different

25   materials.  It involves using an instrument called

 1    infrared spectrometer to generate a chemical fingerprint

 2    of the compound that is in question.  This chemical

 3    fingerprint is then used to identify as well as

 4    differentiate between different chemicals, much in the

 5    same way like a human fingerprint is used to identify and

 6    differentiate between other people.

 7             THE COURT:  I would appreciate it if you would

 8    slow down just a little bit.

 9             THE WITNESS:  Okay.  Sorry.

10    BY MR. IRICK:

11    Q    Is that the analytical tool that you used in this

12    case?

13    A    Yes, it is.

14    Q    How many drugs would you say you analyzed using that

15    tool over the course of your career?

16    A    Close to over 1,000.

17             MR. IRICK:  Your Honor, may I approach the

18    witness?

19             THE COURT:  Yes.

20    BY MR. IRICK:

21    Q    Would you please take a look at what's before you as

22    Government's Exhibit 117B.  Do you recognize that?

23    A    Yes.

24    Q    What is it?

25    A    It's the sample that was submitted for analysis.

1   Q     Is that the sample that you performed a chemical

2   analysis on?

3   A     Yes, it is.

4   Q     And did you perform a FTIR spectroscopy on that?

5   A     Yes, I did.

6   Q     And based upon that testimony, what did you conclude?

7   A     The results of the analysis concluded that the

8   tablets in question here were consistent with Phentermine

9   hydrochloride.

10   Q     And do you have the pill bottle in front of you?

11   A     Yes.

12   Q     And was your analysis consistent with the labeling on

13   the pill bottle?

14   A     Yes, it is.

15   Q     So, pill bottle says Phentermine.

16   A     Yes.

17   Q     Is this what you found the drugs to contain?

18   A     Yes.

19   Q     Thank you.

20         If you would take a look at Government's Exhibit

21   118C, as in Charlie.  Do you recognize that?

22   A     Yes.

23   Q     What is it?

24   A     It's the sample that was submitted for analysis.

25   Q     Is that the sample upon which you performed an

1   analysis?

2   A    Yes, it is.

3   Q    Did you perform a FTIR spectroscopy on that sample?

4   A    Yes, I did.

5   Q    And based upon that test, what did you conclude?

6   A    Based on the test results, I found that the capsule

7   contents were consistent with Phentermine hydrochloride.

8   Q    Do you have the pill bottle in front of you?

9   A    Yes, I do.

10  Q    And what is the pill bottle label?

11  A    Phentermine.

12  Q    And is that consistent with your findings?

13  A    Yes, it is.

14  Q    Thank you.  If you will take a look at Government's

15  Exhibit 120C as in Charlie.  Do you recognize that?

16  A    Yes.

17  Q    What is it?

18  A    It's a sample that was submitted for analysis.

19  Q    Is that a sample upon which you performed an

20  analysis?

21  A    Yes, it is.

22  Q    And did you again perform a FTR spectroscopy on that

23  sample?

24  A    Yes, I did.

25  Q    Based upon that test, what were your conclusions?

```
 1   A    The conclusions were that the capsule contents

 2   submitted for analysis were consistent with the presence

 3   of Phentermine hydrochloride.

 4   Q    And, again, do you have the pill bottle?

 5   A    Yes.

 6   Q    And what is the drug listed on the pill bottle?

 7   A    Phentermine.

 8   Q    And was your test conclusions consistent with the

 9   labeling on the pill bottle?

10   A    Yes, they were.

11        MR. IRICK:  Thank you.  No further questions,

12   Your Honor.

13        THE COURT:  Thank you.

14   Cross-examine.

15        MR. LEVENTHAL:  I have no questions, Your Honor.

16        MR. NICHOLA:  No questions, Your Honor.

17        MR. IRVIN:  Briefly, Your Honor.

18        THE COURT:  Yes.  Go ahead.

19                   CROSS-EXAMINATION

20   BY MR. IRVIN:

21   Q    Miss Batson, Exhibit 117B, C and 120, would you put

22   those three on the ledge there.

23   A    117B.

24   Q    Whatever the exhibits you just dealt with.

25   A    Oh.
```

1    Q    You did a chemical analysis of those exhibits, is

2    that correct?

3    A    Yes, I did.

4    Q    And that was done utilizing some electronic device or

5    something?

6    A    An instrument, an instrument.  It's a infrared

7    spectrometer.

8    Q    It's an electronic instrument?

9    A    Yes.

10   Q    Were you able to do that physically if you wanted to

11   without using the electronic equipment?

12   A    No.

13   Q    The old way that you used to do it, was there an old

14   way to do it before you got involved with the electronics?

15   A    No.

16   Q    Okay.  That's the only way that you're able to come

17   to that conclusion?

18   A    Yes.

19   Q    And the evolution over time used the infrared or

20   whatever it is, the FTIR or whatever it is?

21   A    Uh-huh.

22   Q    Change with the times?

23   A    No.  It's the technique that's been used for a long

24   time.

25   Q    About how long?

1   A     Maybe over the last 40 year.

2   Q     Last 40 years?

3   A     Yes.

4   Q     Okay.  Before that they were able to do the same

5   thing to make the same type of analysis but a different

6   way?

7   A     No.

8             MR. IRVIN:  Okay.  Thank you?

9             THE WITNESS:  You're welcome.

10                       CROSS-EXAMINATION

11  BY MR. PHILLIPS:

12  Q     Miss Batson, good morning.

13  A     Good morning.

14  Q     In performing your infrared testing, did you test for

15  who the manufacturer of the underlying Phentermine was?

16  A     No.

17  Q     Do manufacturers put tags in their batches of

18  material that they produce so they can later track it for

19  inventory purposes?

20            MR. IRICK:  Objection.

21            THE COURT:  Overruled.

22            THE WITNESS:  Can you repeat the question?

23  BY MR. PHILLIPS:

24  Q     Certainly.  Do -- well, let's start with a threshold

25  question.

1    Are there more than one manufacture -- is there more

2    than one manufacturer of Phentermine -- legal

3    manufacturer?

4    A    I'm pretty sure there is.

5    Q    Okay.  Are you aware that some manufacturers will put

6    a chemical tag, inert tag in their product to be able to

7    later track it for inventory purposes?

8    A    No, I'm not.

9         MR. PHILLIPS:  Nothing further, Your Honor.

10                    CROSS-EXAMINATION

11   BY MR. JUDE LACOUR:

12   Q    Good morning, Miss Batson.

13   A    Good morning.

14   Q    Just to clarify, you testified that everything that

15   you analyzed was what it said it was, correct?

16   A    The items that were presented today, yes.

17        MR. JUDE LACOUR:  No further questions, Your

18   Honor.

19        THE COURT:  Thank you.  Anything further?

20        MR. IRICK:  No, Your Honor.

21        THE COURT:  You may step down.  Thank you.

22        MS. GABLE:  We next call Russell Miles.

23        THE COURT:  Thank you.

24                   **(WITNESS SWORN)**

25                   DIRECT EXAMINATION

```
 1   BY MS. GABLE:

 2   Q    Good morning, sir.  Please state your full name.

 3   A    Russell Paul Miles.

 4   Q    And how do you spell your last name, Mr. Miles?

 5   A    M-I-L-E-S.

 6   Q    Mr. Miles, how old are you today?

 7   A    28.

 8   Q    And what do you do -- currently do for a living?

 9   A    I'm a firefighter.

10   Q    How long have you been a firefighter for?

11   A    Almost four years.

12   Q    I want to -- well, do you have any -- can you give

13   the jury a brief description of your educational

14   background?

15   A    Sure.  I have a bachelor's degree from the University

16   of Maryland in sociology.

17   Q    I want to turn your attention back to the period of

18   2004, 2005.  Did you have occasion to work at a place

19   called Family Health Pharmacy?

20   A    Yes.

21   Q    Who was the owner of that pharmacy?

22   A    Was Mrs. Guennet Chebssi.

23   Q    And what was the position that you had in that

24   pharmacy?

25   A    I was a pharmacy technician.
```

1   Q    Did you have any training as a pharmacy technician?

2   A    No.

3   Q    When you went to work for Ms. Chebssi, where was the

4   pharmacy located?

5   A    It was on University Boulevard in Hyattsville,

6   Maryland.

7   Q    What type of pharmacy was it?

8   A    Regular pharmacy, I guess.

9   Q    Had you ever worked in a pharmacy before this time?

10  A    No.

11  Q    What period of time did you work in the Family Health

12  Pharmacy?

13  A    It was from the fall of 2004 starting at

14  approximately September or October, something like that,

15  until the winter of 2005, approximately January, February,

16  something like that.

17  Q    When you worked as a pharmacy tech at Ms. Chebssi's

18  pharmacy, what were your responsibilities?

19  A    I primarily help to put medication into pill bottles,

20  and put labels on said pill bottles, then put them into

21  FedEx envelopes.

22  Q    Now, can you describe how it is that you -- did

23  you -- was Ms. Chebssi at this time working for an

24  Internet pharmacy?

25  A    I don't know if I could say she was working for them,

1    but we were filling prescriptions via the Internet, yes.

2    Q    With respect to that, can you tell the jury what you

3    did in regarding to obtaining those Internet orders and

4    filling them?

5    A    Okay.  I'd go to a website and pretty much print out

6    various prescriptions for the medication that we were

7    filling, and then once they were printed out, like I said

8    before, I would put the certain amount of medications into

9    the pill bottles, and then put the labels for that

10   particular patient onto the bottle and then put the bottle

11   into the FedEx envelope.  And there was another label that

12   went on to the FedEx envelope.  I'd put that on the

13   envelope, and I'd repeat.

14   Q    What was the name of the website that you logged on

15   to?

16   A    I believe it was E-pharmacy or E-pharmacist,

17   something like that.

18   Q    Now, did -- was this a separate computer set up

19   specifically to obtain the Internet orders?

20   A    Yes.

21   Q    And when you logged on to the E-pharmacist website,

22   was there any information that you had to provide to the

23   website?

24   A    No, not that I remember.

25   Q    What kind of drugs did you fill from this website?

1   A     We did Phentermine.

2   Q     And during the time period that you worked there,

3   what percentage of the orders did you place in the

4   bottles, the pills in the bottles, what percentage of that

5   was Phentermine?

6   A     99 to 100 percent.

7   Q     Did you maintain any kind of patient profiles for

8   these customers that you filled orders for on the

9   Internet?

10  A     No.

11  Q     Did you ever see Ms. Chebssi conduct any kind of drug

12  utilization with you on these orders?

13  A     No.

14  Q     Did you -- were there times where you prefilled the

15  bottles with the pills?

16  A     Occasionally, yes.

17  Q     When the drugs were shipped out of the pharmacy, do

18  you recall where they were shipped to?

19  A     They went all over the country.

20  Q     When you placed the -- you said that you downloaded

21  the prescriptions and placed the pills in the bottles.

22  Did Ms. Chebssi review your work?

23  A     How do you mean?

24  Q     Did she check the bottles to make sure the right

25  number of pills were in the bottles, that the labels were

1    correct?

2    A    No, she never checked to make sure the right number

3    of pills were in there, and I don't remember her checking

4    over the labels, no.

5    Q    When you were first hired to work as the pharmacy

6    technician for Ms. Chebssi, what did she tell you to do in

7    terms of your job as a technician?

8    A    She told me that my job would be pretty much filling

9    the bottles and putting the labels on the pill bottles.

10   Q    Did you ever observe Ms. Chebssi on the telephone

11   talking to any of the physicians associated with the

12   orders that you were filling?

13   A    No, I never observed her.

14   Q    When you downloaded the orders and put the pills in

15   the bottles, did Ms. Chebssi provide you with any

16   instructions as to what you should check for?

17   A    I don't remember.

18   Q    I'm sorry.  Didn't hear the answer.

19   A    I don't remember.

20   Q    Did she ask you to make any verifications of the

21   orders?

22   A    I believe just to make sure that it's Phentermine on

23   the prescription, but that's the only thing I remember.

24   Q    Did Ms. Chebssi have any kind of walk-in business at

25   the Family Health Pharmacy?

1    A    Yes.

2    Q    Approximately how many customers walked into the

3    pharmacy each day?

4    A    I'll say anywhere from 10 to 25.

5    Q    Did you ever see Ms. Chebssi interact with her

6    walk-in customers?

7    A    Yes.

8    Q    Did you ever -- in connection with your filling of

9    the Internet orders, did you ever have occasion to talk to

10   an insurance company on the phone?

11   A    No.

12   Q    Did you have an occasion to speak with any doctor on

13   the telephone?

14   A    No.

15   Q    Did you have an occasion to speak with any doctor's

16   office on the telephone?

17   A    No.

18   Q    Who at the pharmacy was responsible for ordering the

19   pharmacy stock of Phentermine?

20   A    It would be Mrs. Chebssi.

21   Q    I may have asked you this, but, did Ms. Chebssi

22   maintain a separate computer that she used for her walk-in

23   customers at Family Health Pharmacy?

24   A    Yes, she did.

25   Q    And do you know whether or not she maintained any

```
 1   patient profiles for those walk-in customers on that

 2   computer?

 3   A     I believe she did.

 4   Q     And do you know whether or not she conducted drug

 5   utilization reviews for those customers whose profiles she

 6   maintained on her computer for her walk-in business?

 7   A     I don't know.

 8            MS. GABLE:  Thank you, Mr. Miles.  I have no

 9   further questions.

10            THE WITNESS:  Thank you.

11            MR. LEVENTHAL:  I have no questions.

12                      CROSS-EXAMINATION

13            MR. NICHOLA:  Very brief.

14   BY MR. NICHOLA:

15   Q     Mr. Miles, are you familiar with Dr. Tobin?

16   A     Dr. Tobin, no.

17            MR. NICHOLA:  No further questions.

18            MR. IRVIN:  No questions, Your Honor.

19                      CROSS-EXAMINATION

20            MR. PHILLIPS:  I have questions, Your Honor.

21            THE COURT:  Very well.

22                      CROSS-EXAMINATION

23   BY MR. PHILLIPS:

24   Q     Good morning, Mr. Miles.

25   A     Good morning.
```

```
1    Q    Mr. Miles, before you testified today, you met with,

2    did you not, with agents for the government?

3    A    Yes.

4    Q    And you also met with my private investigator, did

5    you not?

6    A    Yes.

7    Q    In fact, we met personally this morning in the

8    hallway outside?

9    A    Yes.

10   Q    What did I tell you?

11   A    To tell the truth.

12         MS. GABLE:  Excuse me.  Objection.  Relevance.

13         MR. PHILLIPS:  Goes to bias, Your Honor.

14         THE COURT:  Go on.  He answered.

15   BY MR. PHILLIPS:

16   Q    Mr. Miles, how did you first come to know about

17   Family Health Pharmacy?

18   A    Well, Mrs. Chebssi was filling prescriptions for my

19   grandmother and my grandfather and my parents would go

20   into talk with her about the prescriptions and obviously

21   through that they got to know Mrs. Chebssi, and I believe

22   they had spoken to her about how I was looking for a part

23   time job at the time and Mrs. Chebssi offered me an

24   opportunity to work for her.

25   Q    You went to work for her in roughly September of '04?
```

1    A    Yes.

2    Q    Was the Jive Network process already running?  Was

3    the Phentermine already being dispensed when you got

4    there?

5    A    I believe so.

6    Q    It was still being dispensed when you left in, say,

7    January of '05?

8    A    I believe so, yes.

9    Q    Did Maryland require that pharmacy techs be licensed

10   when you were working?

11   A    I don't know.

12   Q    Were you licensed when you were working?

13   A    No.

14   Q    Describe for the jury, if you would, what kinds of

15   training, and I mean the nuts and bolts that Ms. Chebssi

16   gave you when you first reported for duty day one.

17   A    Well, she told me you're going to be filling, putting

18   the medications into the pill bottles and she said, you

19   know, you put the pills into this machine which will sort

20   it for you and --

21   Q    What's that machine called, do you know?

22   A    I don't know.

23   Q    The pill counting machine of some sort?

24   A    Yeah.

25   Q    What else did she tell you?

1   A    And aside from that she said you're going to put the

2   labels on to the pill bottles and for the other labels on

3   to the FedEx envelopes.

4   Q    You worked roughly what hours?

5   A    About 9 to 5.

6   Q    Monday to Friday?

7   A    Yes.

8   Q    Did she give you any specific instructions about the

9   counts, number of tablets or pills that were in the

10  bottle?

11  A    I believe she said number would either be 30, 60 or

12  90.

13  Q    Did she instruct you to make sure that's how many

14  were in there?

15  A    Yes.

16  Q    Okay.  You have to answer out loud so the court

17  reporter --

18  A    Okay.

19  Q    Did Ms. Chebssi come to work everyday?

20  A    Yes.

21  Q    Was there ever a day you were there and she wasn't?

22  A    No.

23  Q    Not during your tenure at least?

24  A    Correct.

25  Q    You testified on direct examination that you did not

1   see Ms. Chebssi on the phone with any of the physicians.

2   A    Yes.

3   Q    Did you ever see her on the phone with any of the

4   regulatory agencies:  DEA, Maryland Board of Pharmacy,

5   Maryland Division of Dangerous Drugs or whatever it's

6   called?

7   A    I don't know.  She was on the phone with various

8   people, but I don't know who she was speaking with.

9   Q    You don't have any recollection of that, though?

10  A    No.

11  Q    Did she ever discuss with you the communications she

12  had with the doctors or with the regulatory agencies?

13           MS. GABLE:  Objection.  Calls for hearsay.

14           THE COURT:  Sustained.

15  BY MR. PHILLIPS:

16  Q    When you came in the mornings and got on the

17  computer, was Ms. Chebssi already at the work?

18  A    Yes.

19  Q    It's fair to say, is it not, that if there was a

20  log-in to be done on the computer she'd already done it by

21  the time you got there?

22  A    Yes.

23  Q    It's not like you went into Google and Google pulled

24  pills for today and a website came up and you started the

25  filling, right?

```
 1   A    Correct.
 2           MR. PHILLIPS:  Your Honor, I have no further
 3   questions.
 4           THE COURT:  Thank you.  Mr. LaCour.
 5           MR. JUDE LACOUR:  No questions.
 6           THE COURT:  Thank you.  Anything further?
 7           MS. GABLE:  No, Your Honor.
 8           THE COURT:  Thank you.  You may step down.
 9           THE WITNESS:  Thank you.
10           MR. IRICK:  United States calls Kirstin
11   Wulfekuhler.
12                      (WITNESS SWORN)
13                    DIRECT EXAMINATION
14   BY MR. IRICK:
15   Q    Good morning?
16   A    Good morning.
17   Q    Would you please state your full name and spell your
18   name for the record.
19   A    Kirstin Jane Wulfekuhler, K-I-R-S-T-I-N; J-A-N-E,
20   W-U-L-F-E-K-U-H-L-E-R.
21   Q    Where do you live, Miss Wulfekuhler?
22   A    I'm living in Sonoma, California.
23   Q    How long have you lived there?
24   A    Just over a year.
25   Q    And before that, where did you live?
```

1   A    I lived in Italy for two years, and then before that

2   San Roman, California.

3   Q    And what do you do for a living?

4   A    I work in a hotel.

5   Q    How long have you done that?

6   A    A year.

7   Q    Before that?

8   A    I was in retail.

9   Q    Are you familiar with the drug Phentermine?

10  A    I am.

11  Q    When did you first start taking Phentermine?

12  A    Probably maybe eight years ago.

13  Q    And how did you first obtain Phentermine?

14  A    I went to a diet center.

15  Q    When you went to a diet center did you receive a

16  prescription for Phentermine?

17  A    I did.

18  Q    Was it a prescription from a doctor?

19  A    Yes.

20  Q    Were you examined by that doctor?

21  A    Yes.

22  Q    And were you given a total weight loss plan as part

23  of that?

24  A    Yes.

25  Q    Were you weighed?

1    A    Yes.

2    Q    And was your blood pressure taken?

3    A    Uh-huh.  Yes.

4    Q    After you received the Phentermine the first time,

5    was there follow-up by the doctor or the clinic?

6    A    Yes.

7    Q    How long did you receive Phentermine that first time?

8    A    Maybe six months.

9    Q    When did you start ordering Phentermine online?

10   A    Probably -- I'm trying to think because of the years.

11   I stopped about four years ago, so probably four years

12   before that.  So 1999, I guess.

13   Q    And why did you start ordering Phentermine online?

14   A    Because my mom thought I was addicted, so she called

15   the diet place to --

16            MR. IRVIN:  Objection.  Hearsay.

17            THE COURT:  Objection sustained.  Jury is to

18   disregard the answer.

19            MR. IRICK:  I don't think she answered the

20   question.

21            THE COURT:  Put another question to her.

22   BY MR. IRICK:

23   Q    When did you -- why did you start taking Phentermine?

24   A    I started to lose weight.

25   Q    Okay.  And when you ordered online, did you have an

1   examination by a doctor?

2   A    No.

3   Q    Did you talk to a doctor at all related to online

4   orders?

5   A    No.

6   Q    Did you have any kind of physical examination by any

7   kind of medical practitioner?

8   A    No.

9   Q    Did you send any medical records to the online

10  companies?

11  A    No.

12  Q    When you ordered online, did you provide the name of

13  a doctor as a primary care doctor?

14  A    No.

15  Q    Were you ever contacted by any of the pharmacies or

16  the pharmacists that filled the drugs for you?

17  A    Not the pharmacist.

18  Q    Excuse me?

19  A    No.

20  Q    Any contact at all with the pharmacist?

21  A    No.

22  Q    If you would take a look, there's a screen in front

23  of you.  This will come up on the screen.  If you would

24  take a look at Government's Exhibit No. 106 which is Bates

25  number 391757.  Do you see a date there of August 14 of

1    2004?

2    A    Yes.

3    Q    Is that a time when you were ordering online?

4    A    Yes.

5    Q    And what name appears there?

6    A    Kristen Wulfekuhler.

7         MR. IRVIN:  Speak into the microphone.

8         THE WITNESS:  I'm sorry.  Kirstin.

9    BY MR. IRICK:

10   Q    Pull the mic towards you.

11        Is that your name?

12   A    Yes.

13   Q    Do see below there a product name?

14   A    Yes.

15   Q    What is that?

16   A    Phendimetrazine.

17   Q    Is that a drug you ordered.

18   A    Yes.

19   Q    You see a quantity above that?

20   A    Yes.

21   Q    Is that the quantity that you ordered?

22   A    Yes.

23   Q    Do you see address below, your name where it appears

24   a second time?

25   A    Yes.

```
 1   Q    Is that your address?

 2   A    Yes.

 3   Q    378 Country Brook Loop?

 4   A    Yes.

 5   Q    Is that address you had delivered the online orders

 6   of drugs?

 7   A    Yes.

 8   Q    You see a doctor name?

 9   A    Yes.

10   Q    What doctor name that?

11   A    Dr. Margaret Mcintosh.

12   Q    Do you ever speak with that doctor?

13   A    No.

14   Q    Were you ever examined by that doctor?

15   A    No.

16   Q    Any contact at all with that doctor?

17   A    No.

18   Q    Below that you see Midland Pharmacy?

19   A    Yes.

20   Q    Any contact with Midland Pharmacy?

21   A    No.

22   Q    If you could scroll farther down the page.  Do you

23   see a phone number and e-mail?

24   A    Yes.

25   Q    Do you recognize that phone number?
```

1   A     Yes.

2   Q     What is that?

3   A     Do you want -- it's my old phone number.

4   925-277-0561.

5   Q     Is that a phone number you would input into the

6   computer when you ordered online?

7   A     Yes.

8   Q     And same with that e-mail, do you recognize that?

9   A     Yes.

10  Q     Is that e-mail used for ordering online?

11  A     Yes.

12  Q     I believe there's also a date of birth.  Is that your

13  date of birth?

14  A     Yes.

15  Q     If you will take a look at Government's Exhibit 106B.

16  If we could toggle that with this one.  106B 391449.  Do

17  you recall how you received the orders?

18  A     Through FedEx.

19  Q     And if you will take a look at 106 which is the top

20  document.  There's a tracking number.

21  A     Uh-huh.  Yes.

22  Q     If you would take a look at 106B, there's also a

23  tracking number.  Are those numbers the same?

24  A     Yes.

25  Q     And on 106 there's a process date, you see that?

1    A    Yes.

2    Q    What date is that?

3    A    September 2004.  The 22nd.

4    Q    September 22nd?

5    A    Yes.

6    Q    Is that the same as the ship date on 106B?

7    A    I don't see the ship date.  Yes -- no.  No, I'm

8    sorry -- oh, yeah it is.  Yes.

9    Q    Is it the same date?

10   A    It is.

11   Q    September 22, 2004?

12   A    Yes.

13   Q    You see the recipient?

14   A    Yes.

15   Q    On 106B is that your name and address?

16   A    It is my name and address.

17   Q    Thank you.

18        If you could leave 106 up but also look at 106C which

19   is 393178.  Do you see a cart ID on 106?

20   A    Yes.

21   Q    Do you see a number at the top of 106C?

22   A    Yes.

23   Q    Are those numbers the same?

24   A    Yes.

25   Q    Now a little more than halfway down this page is the

1    question of 106C and it says, your primary care physician

2    name and contact information.  You see that?

3    A    Yes.

4    Q    Do you recognize that name and contact information?

5    A    I do.

6    Q    Is that your doctor?

7    A    Well, it's not my doctor but it's my hospital, yes.

8    Q    What is that information?

9    A    It's my -- my -- not my Medicare -- my insurance, my

10   medical.

11   Q    This is your insurance company?

12   A    Not my insurance company.  I'm trying to think how to

13   say it.

14   Q    Your HMO?

15   A    Yes.  Thank you.

16   Q    Okay.  So Kaiser, that's not the name of your doctor,

17   correct?

18   A    No.

19   Q    That's not the name of the company?

20   A    Yes.

21   Q    To your knowledge was Kaiser ever contacted

22   concerning the online orders?

23   A    No, they weren't.

24   Q    Did you ever pay with the online orders using you're

25   HMO?

```
 1   A     Never.

 2   Q     How did you pay for the online orders?

 3   A     Credit card or money order.

 4   Q     So sometimes you use a money order.  Describe how

 5   that process would work.

 6   A     You would -- when FedEx came, you just give them the

 7   money order.  I'd get it through the bank.

 8   Q     Okay.  So if that were the case would you put in a

 9   billing address in the system?

10   A     Yes.

11   Q     You would still?

12   A     Oh, wait.  No, no.  I would just go to the bank and

13   fill it out, no.

14   Q     So you would just put a shipping address, that would

15   be it, and then FedEx came?

16   A     Then I'd give the driver the check.

17   Q     Okay.  Thank you.

18         If you would take look at 106A, a whole new set

19   which, is that 391958.  Please take a look at the order

20   date.

21   A     Yes.

22   Q     Is that a date when you would have ordered?

23   A     Yes.

24   Q     And does your name appear on this summary?

25   A     Yes.
```

Direct Examination – Kirstin Wulfekuhler

1   Q    The drug, what drug is that?

2   A    Phendimetrazine.

3   Q    What quantity?

4   A    90.

5   Q    Is that a drug that you would order?

6   A    Yes.

7   Q    And quantity that you would order?

8   A    Yes.

9   Q    If you would take a look at the address again.  Is

10  that your address?

11  A    Yes.

12  Q    The same address on the last order, right?

13  A    Yes.

14  Q    And look at the doctor name, what doctor name is

15  that?

16  A    Dr. Andrew Desonia.

17  Q    Did you ever have contact with that doctor?

18  A    No.

19  Q    Were you ever examined by him?

20  A    No.

21  Q    You ever speak with him?

22  A    No.

23  Q    And the pharmacy is what?

24  A    Midland Pharmacy.

25  Q    That's the same pharmacy as the last order?

1   A    Yes.

2   Q    You have so speak up.

3   A    Yes.

4   Q    If we could look at the phone and e-mail in that

5   section.

6   A    It's the same.

7   Q    Same phone and e-mail as last order, correct?

8   A    Yes.

9   Q    And your same date of birth, correct?

10  A    Correct.

11  Q    If we could toggle this order with 106D as in delta

12  which is at 393179.  Again, do you see a cart ID at the

13  top of 106A?

14  A    Yes.

15  Q    Does that match the number at the top the 106D?

16  A    Yes.

17  Q    And if you look at the last question now on 106D,

18  what's that question?

19  A    Who's my primary care physician and contact

20  information.

21  Q    What information did you put?

22  A    My HMO, Kaiser.

23  Q    Did you ever provide false information to obtain a

24  drug online?

25  A    I believe my weight.

Direct Examination - Kirstin Wulfekuhler

1   Q    What would you do?

2   A    I would say I weighed more than I did.

3   Q    Why did you do that?

4   A    So they would continue to send them to me.

5   Q    By about 2003 how many sites would you say you were

6   ordering online from?

7   A    I couldn't even tell you.

8   Q    Can you give us ballpark number, was it a lot?

9   A    It was a lot, a lot of sites.  A lot of sites.

10  Q    How often would you order?

11  A    I believe every two weeks.

12  Q    How much would you take per day?

13  A    Probably eight.

14  Q    Eight per day?  And during any of this online

15  ordering, were you ever supervised by any of the doctors

16  that you were receiving these medications from?

17  A    No.

18  Q    Were you receiving any follow-up care at all?

19  A    No.

20  Q    How much would you say you were spending?

21  A    Probably between 500 to 575.

22  Q    Per what?

23  A    Per month.

24  Q    Per month.  Did you have any side effects from taking

25  these drugs?

1  A     I was addicted.

2  Q     When you say you were addicted, what do you mean?

3  A     Well, I definitely needed to have them and I started

4  drinking more.

5  Q     And what would happen if you wouldn't take the drug?

6  A     I would become extremely tired.

7  Q     Was this a physical addiction?

8  A     Yes.

9  Q     Was it a psychological addiction as well?

10  A     Yes.

11  Q     And how did you stop taking Phentermine?  First, did

12  you stop taking Phentermine?

13  A     Yes.

14  Q     When was that?

15  A     Um, I think it's about four years now.

16  Q     How did you stop?

17  A     Honestly, I moved out of the country, so --

18         MR. IRVIN:  I didn't --

19         THE WITNESS:  I moved out of the country, so I

20  stopped ordering online.

21  BY MR. IRICK:

22  Q     At any point did you enter any kind of drug

23  treatment?

24  A     I did.

25  Q     Tell us about that.

Direct Examination – Kirstin Wulfekuhler                37

```
 1   A    I went to city RP which is through my HMO and I
 2   stopped for a while but then I started again.
 3   Q    Was there an inpatient component to that?
 4   A    No.  It was outpatient.
 5   Q    Was outpatient?
 6   A    Yes.
 7   Q    And how long were you in drug rehab?
 8   A    It was a two week course, but I messed up, so it was
 9   about a month I would say.
10   Q    When you say -- I guess relapsed, is that the term?
11   A    Yes.
12   Q    When you relapsed, did you order online?
13   A    Yes.
14        MR. IRICK:  Nothing further, Your Honor.  Thank
15   you.
16        THE COURT:  You may cross-examine.
17        MR. LEVENTHAL:  No questions, Your Honor.
18        MR. NICHOLA:
19                    CROSS-EXAMINATION
20   BY MR. NICHOLA:
21   Q    The exhibits that the government showed you this
22   morning pertain to a Dr. Mcintosh and a Dr. Desonia, is
23   that correct?
24   A    Yes.
25   Q    Do you remember any of the other doctors that
```

1    prescribed medicine for you?

2    A    No.

3    Q    You indicated that you went to a clinic in the very

4    beginning for weight loss and weight loss medicine, is

5    that correct?

6    A    Correct.

7    Q    And it was your decision not to go back to that

8    clinic?

9    A    No.

10   Q    Why didn't you go back to the clinic?

11   A    Because as I said prior, my mom called them and told

12   them to stop.

13           MR. IRVIN:  Objection, hearsay.

14           THE COURT:  Well, she answered the question.

15   Overruled.

16   BY MR. NICHOLA:

17   Q    So was it your HMO that terminated your treatment at

18   the clinic?

19   A    No.

20   Q    Why didn't you go to another clinic through your HMO?

21   A    Because it was easier to order online.

22   Q    Would your HMO have covered the cost involved?

23   A    No, because I wasn't overweight.

24   Q    I see.

25           So the HMO would not have approved for you to receive

1   this medicine, or you don't know?

2   A    Well, I mean it depends on what someone would say

3   what my weight was, but --

4   Q    Did you ever acquire this medicine by sending

5   somebody else to a doctor's office to get it for you?

6   A    No.

7   Q    You don't know Dr. Tobin, do you?

8   A    No.

9          MR. NICHOLA:  No further questions.

10                    CROSS-EXAMINATION

11  BY MR. IRVIN:

12  Q    Miss Wulfekuhler, did I pronounce that correctly?

13  A    Yes.

14  Q    Miss Wulfekuhler, I wasn't clear on this inpatient

15  and stopping and going back.  I'm not clear what you were

16  saying.  Were you saying that you no longer -- when

17  Mr. Nichola asked, you say you no longer went back because

18  you were no longer overweight?  I wasn't clear on that.

19  A    Well, I mean, it's more than a yes and no question.

20  Can I answer it?

21  Q    You certainly may.

22  A    Okay.  When I started I probably had to lose about 10

23  pounds, and then I stayed with it and I didn't have to

24  lose any more weight.  My mom noticed a difference in my

25  personality and called them and told them to stop.

1   Q    Were you in an inpatient.

2   A    No, not inpatient nothing.  It's a weight loss

3   clinic.

4   Q    So you were never in an inpatient facility?

5   A    For losing weight, no.

6   Q    Oh, okay.  I noticed your e-mail address NLRsundance.

7   A    Yes.

8   Q    What, you a dancer or something?

9   A    No.  I think it's N -- I think it was NRCLsundance.

10  Q    Sundance, what is that?

11  A    (No audible response.)

12  Q    Let me ask you this you said you were -- you were --

13  you stopped using the medication when you went out of the

14  country to Italy, I take it?

15  A    Yes.

16  Q    Okay.  You just stopped using it, is that correct?

17  A    I did.  It was hard, but I did.

18  Q    You were asked about taking Phendimetrazine and

19  Phentermine, I think the Phendimetrazine you said you were

20  taking it because you did start to lose weight, is that

21  correct?  You were losing weight?

22  A    Slightly, not...

23  Q    And you were asked why you were ordering it online,

24  do you remember that?

25  A    Yes.

1    Q    And isn't it true that part of the reason you also

2    were ordering it online was because it was cheaper than

3    going to a doctor, you were able to go online and get the

4    prescription for less than you would have to pay any other

5    way, isn't that it?

6    A    No, that's not true.

7    Q    You paid the same if you went to a doctor?

8    A    Yes.

9    Q    Okay.  When you went to the wellness clinic, did you

10   also have to pay a fee for going to see the doctor is what

11   I'm saying to you?

12   A    Yes, I did.

13   Q    They weren't seeing you for free, right?

14   A    No.

15   Q    So you had to pay the doctor's cost, then you had to

16   pay the prescription cost is what I'm saying?

17   A    It was still less expensive to order on -- to go to

18   the doctor.

19   Q    Are you saying that pill was more expensive online

20   than it was going to a pharmacist?

21   A    It was.

22   Q    Am I correct that you are no longer on the

23   prescription drugs at all?

24   A    I'm on antidepressants.

25   Q    Okay.  You stopped taking Phentermine quite sometime

1   ago, what, four years ago, three years ago?

2   A     Almost four years.

3   Q     Almost four years ago.  And you are taking any other

4   medications at the time you were taking the

5   Phendimetrazine?

6   A     My antidepressants.

7   Q     So you have been on antidepressants in conjunction

8   with being on Phentermine, is that correct?

9   A     Yes.

10  Q     I know it's painful.  I don't mean to do that, but --

11  let me take a moment.

12  A     No, I don't need a moment.  It's fine.

13  Q     Miss Wulfekuhler, so at this time that you started

14  ordering the Phendimetrazine was because you had a weight

15  problem, correct?

16  A     Not when I started online.

17  Q     You started online you had a weight problem?

18  A     No.  I was already addicted.

19  Q     Before you started ordering online, is that correct?

20  A     Yes.

21  Q     And prior to that you were suffering from depression

22  as well, correct?

23  A     Yeah.

24  Q     Before you ever took the drug?

25  A     Yes.

```
 1            MR. IRVIN:  Nothing further, Your Honor.
 2                      CROSS-EXAMINATION
 3   BY MR. PHILLIPS:
 4   Q    Miss Wulfekuhler, good morning.  I'm Brian Phillips.
 5   A    Good morning.
 6   Q    Easy questions.
 7        Have you ever heard of Guennet Chebssi before?
 8   A    No.
 9   Q    Have you ever heard of Family Health Pharmacy before?
10   A    I don't think so.
11            MR. PHILLIPS:  Nothing further, Your Honor.
12            THE COURT:  Mr. LaCour?
13            MR. JUDE LACOUR:  No questions, Your Honor.
14            MR. IRICK:  Nothing, Your Honor.
15            THE COURT:  You said no questions?
16            MR. JUDE LACOUR:  Yes, Your Honor.
17            THE COURT:  Okay.  Thank you.
18        You may step down, thank you.
19        Please call your next witness.
20            MS. GABLE:  Yes, Your Honor.  We call Jack
21   Freedman.
22                     (WITNESS SWORN)
23                     DIRECT EXAMINATION
24   BY MS. GABLE:
25   Q    Good morning, sir.  Please state your full name.
```

1   A     Jack Harris Freedman.

2   Q     Mr. Freedman, how do you spell your last name?

3   A     F-R-E-E-D-M-A-N.

4   Q     Mr. Freedman, are you currently retired?

5   A     Yes, I am.

6   Q     Where did you retire from?

7   A     I retired from the Division of Drug Control in the

8   state of Maryland.

9   Q     And what did you do for the Division of Drug Control?

10  A     Well, basically, I did administrative work and we

11  also did work for the Board of Pharmacy, all the boards,

12  the medical board.  We did audits.  We did just about

13  everything when it came to drugs.

14  Q     And were you -- what was the Division of Drug Control

15  part of what agency?

16  A     It was part of the lab administration, Department of

17  Health and Mental Hygiene.

18  Q     Were you an investigator?

19  A     Initially I was, then I became a deputy and then I

20  became chief of the division.

21  Q     You said that you also as -- in the division of drug

22  control did work for the Board of Pharmacy.  What kind of

23  work did you do for the Board of Pharmacy?

24  A     We did inspections.  We did investigations.  We did

25  some in conjunction with them.  We basically were kind of

1    like the eyes and ears.  We did, like I said, the

2    inspections, the normal inspections as well as special

3    inspections.

4    Q    I want to turn your attention to approximately

5    February 23rd of 2005.  Did you have an occasion to enter

6    Family Health Pharmacy?

7    A    Yes, I did.

8    Q    What were the circumstances in which you went into

9    Family Health Pharmacy on that date?

10   A    The pharmacist manager requested that we go there to

11   review the legality of her dispensing medication.

12   Q    And who was that?

13   A    I believe it was Ms. Chebssi.

14   Q    And did you go to the pharmacy?

15   A    Yes, I did.

16   Q    Do you recall where it was located?

17   A    It was located on University Parkway.

18   Q    And was this the first time that you had gone to the

19   pharmacy?

20   A    I'm not sure.  It might have been the first or second

21   time.  This time I took with me Mel Ruben who's a

22   president of the Board of Pharmacy and another inspector,

23   Peter Smith.

24   Q    When you went into a pharmacy, what did you find?

25   A    Well, we found -- she showed us a computer and she

1    showed us a printer and she showed us some prescriptions.

2    Q    And can you describe the prescriptions that you saw?

3    A    Well, the prescriptions we saw were from out-of-state

4    physicians and for out-of-state patients.

5    Q    And did you see how it is she was obtaining those

6    prescriptions?

7    A    She said she obtained them -- I didn't see because

8    she said she obtained them from the printer.

9    Q    And did you happen to look at the prescriptions to

10   see what kind of drugs they were for?

11   A    Yes.

12   Q    What were they for?

13   A    Well, one -- the one I remember was for Phentermine.

14   Q    And do you know Phentermine to be a controlled

15   substance?

16   A    Yes, I believe it is a schedule IV.

17   Q    And under both the Controlled Substances Act

18   federally?

19   A    Yes, and state.

20   Q    About how long were you at the pharmacy?

21   A    I'll say probably maybe an hour and a half, maybe two

22   hours at the most.

23   Q    And in looking at those prescriptions, what could you

24   determine by looking at those?

25   A    Well, we could determine, one, that, you know, they

1    seemed to be from various states.  If I remember, one or

2    two of the physicians were from Puerto Rico, and the

3    physicians and the patients were not in proximity to each

4    other.  They were from different states, many of them.

5    Q    By looking at those prescriptions, could you tell

6    that physicians were not examining the patients?

7    A    Well, we couldn't tell that they were not examining

8    the patients, but we could tell that there should be a

9    presumption that they were not.

10          THE COURT:  May I interrupt?  What was the date

11   of your visit?

12          THE WITNESS:  February 23, 2005.

13          THE COURT:  Thank you.

14   BY MS. GABLE:

15   Q    At the time that you were in the pharmacy looking at

16   these prescriptions, had Ms. Chebssi mentioned anything to

17   you about a California state Board disciplinary action or

18   warning letter?

19   A    No.

20   Q    At the time that you were in the pharmacy looking

21   at -- at the time that you were in the pharmacy, did you

22   have any understanding as to how long Ms. Chebssi had been

23   engaging in this practice?

24   A    No, not really, but it seemed that she had been doing

25   it, I guess, for a period of time.

1  Q    When you saw those prescriptions, did you provide any

2  direction to Ms. Chebssi?

3  A    Well, we informed her of the state law which is

4  basically the same as the federal law, and that is she has

5  corresponding liability to make, to verify the

6  prescriptions and that the prescriptions are legitimate

7  for medical use.

8  Q    And as part of that corresponding responsibility,

9  under state law did you advise her that she had not -- she

10 had a responsibility to ensure that the prescriptions were

11 issued in the usual course of professional practice?

12 A    Yes, that that was her responsibility.

13 Q    Now, at the time that you went to examine this

14 pharmacy or this practice, was it -- well, let me ask it a

15 different way.  When, after you looked at her pharmacy and

16 what she was doing, what did you do?

17 A    Well, what we did was we told her that -- because Mel

18 Ruben was president of the Board of Pharmacy that the

19 Board of Pharmacy would respond to her in a formal manner.

20 Q    Okay.  And could you do anything else?

21 A    No.

22 Q    Did you refer her or refer the action or what was

23 going on at that pharmacy to any other agency?

24 A    Yes.  We sent DEA a letter outlining of what she told

25 us, about how she had received the prescriptions, her

Direct Examination - Jack Freedman                49

1    belief that the physician had not examined the patients

2    and her method of verification.

3    Q    I'm sorry.  I didn't hear the --

4    A    And her method, how she was verifying the

5    prescriptions.

6    Q    Now, you said that prior to this date of

7    February 23rd.  Had you been in that pharmacy before?

8    A    I don't remember.  I don't recall.

9    Q    Well, if you -- let me ask you something.  If you had

10   been in and seen this practice going on, is that something

11   you would have recalled?

12         MR. PHILLIPS:  Objection, Your Honor.  Calls for

13   speculation.

14         THE COURT:  Sustained.

15         MS. GABLE:  Thank you, sir.  I have no further

16   questions.

17         MR. LEVENTHAL:  I have no questions.

18         MR. NICHOLA:  No questions.

19         MR. IRVIN:  No questions, your Honor.

20                CROSS-EXAMINATION

21         MR. PHILLIPS:  Questions.

22   BY MR. PHILLIPS:

23   Q    Good morning, Mr. Freedman.

24   A    Good morning.

25   Q    I'm Brian Phillips.  I represent Guennet Chebssi.

1    A    Okay.

2    Q    When you were serving with the Maryland Department of

3    Health and Mental Hygiene Division of Drug Control, did

4    you have arrest power as law enforcement officer?

5    A    No.

6    Q    On the February 23rd visit, did anyone else?

7    A    No.

8    Q    Did you have the power as the chief of the Division

9    of Drug Control to shut down Family Health Pharmacy on

10   February 23rd, 2005?

11   A    No, but the Board of Pharmacy, Mel Ruben -- you want

12   me to continue?

13   Q    Yes.  Mel Ruben had found that he wanted -- that

14   there was an imminent danger, he could have pulled the

15   members of the board and done some sort of emergency

16   action and shut it down?

17   A    Yes.

18   Q    On February 23rd, you were there at Family Health

19   Pharmacy, right?

20   A    Right.

21   Q    Who is Peter Smith?

22   A    Peter Smith is an inspector works for -- worked for

23   me in my office.

24   Q    And you were also there with Mel Ruben?

25   A    Right.

1   Q    Are you a acquainted with Mr. Ruben?

2   A    Yes.

3   Q    He was at the time -- at the time he held what

4   position?

5   A    I believe he was president of the board.

6   Q    The Board of Pharmacy?

7   A    Right.

8   Q    You indicated in your direct testimony that the

9   pharmacy manager had contacted you to come out and inspect

10  the pharmacy?

11  A    Yes.

12  Q    By what means did Guennet Chebssi contact?

13  A    I don't remember.  I remember that we went out there

14  upon request and I believe it was -- I'm almost certain it

15  was her request that we went out there.

16  Q    You indicated in your direct examination that you saw

17  that some of the physicians were not local Maryland

18  physicians.

19  A    Yes.

20  Q    Did you see any licenses of those physicians during

21  your February 23 visit?

22  A    No.

23  Q    Did you ask for them?

24  A    No.

25  Q    You indicated in your direct examination that you

 1   referred the matter to DEA?

 2   A    Right.

 3   Q    And you did that via letter?

 4   A    Yes.

 5   Q    You got -- you also said that it got referred to the

 6   Medical Board of Pharmacy.

 7   A    Right.

 8   Q    And the Maryland Board of Pharmacy acted, did it not?

 9   A    It sent her a letter and it sent it over to, also to

10   the Medical Board, I believe.

11   Q    Chris, could we pull up Bates 072334.  This is

12   exhibit 60A, Mr. Freedman.  Should come up on the monitor

13   in front of you.  And specifically, Chris, page 8 of that

14   exhibit.  I think that's that same -- yes, it is.  Okay.

15   Good.  Page 8 of that Bates number.

16        Mr. Freedman, do you have that in front of you?

17   A    Yes.

18   Q    On the second page of that document, Chris, which I

19   think would be the next 335, I think.  At the bottom are

20   you on the CC list there?

21   A    Yes.

22   Q    Did you receive this letter?

23   A    I don't remember.

24   Q    You did see a letter, however, from the Board of

25   Pharmacy to Ms. Chebssi at some time?

1    A    At some time.

2    Q    That was the closure to your referral to --

3    A    Right.

4    Q    Go to the first page of that document.  What is the

5    date of this letter, sir?

6    A    It was March 17.

7    Q    So, from February 23 to March 17?

8    A    Yes.

9    Q    Now between those two dates, you went back to Family

10   Health Pharmacy, did you not?

11   A    Yes.

12   Q    On March 9 of 2005?

13   A    Right.

14   Q    With two DEA diversion investigators and some other

15   folks?

16   A    Right.

17   Q    Now, on that second visit, what did you do?

18   A    Basically we did the same thing.  We reviewed, and

19   DEA did their thing.

20   Q    You brought the DEA up to speed on the things you had

21   learned in the February 23 meeting?

22   A    Right.

23   Q    All right.  Was Mr. Ruben with you the second time?

24   A    I don't remember.

25   Q    Did you make anyone aware of the second inspection?

1    A      I don't remember.

2    Q      Did you shut Family Health Pharmacy down or anybody

3    shut it down after the second inspection?

4    A      Not that I know of.

5    Q      Again, the Board was still cogitating through a

6    letter, right?  We just saw you got letter.

7    A      Right.

8    Q      Was Mr. Chebssi cooperative?

9    A      Yes.

10   Q      On both the 23rd and on the March 9 dates?

11   A      On the February 23rd she was very cooperative.

12   March 9th we didn't have that much dealing with her, but

13   she was cooperative.

14   Q      Who was Laverne Nasaya?  I'm probably not pronouncing

15   that right.

16   A      She's the executive director of the Board of

17   Pharmacy.

18   Q      Is there a difference between a president of the

19   Board of Pharmacy and executive director?

20   A      Yeah.  President of the Board of Pharmacy is a of

21   member the board.  Executive director handles basically

22   administrative work, finances, you know, personnel, things

23   like that.

24   Q      So Ms. Nasaya would work for Mel Ruben if they were

25   there at the same time?

```
 1   A     Yes.

 2   Q     Okay.

 3         MR. PHILLIPS:  Your Honor, I have no further

 4   questions.

 5         MR. JUDE LACOUR:  No questions, Your Honor.

 6         THE COURT:  Thank you.  Any redirect?

 7         MS. GABLE:  No, Your Honor.

 8         THE COURT:  You may step down.

 9       Please call your next witness.

10         MR. IRICK:  Your Honor, the United States calls

11   Noreen Valentine.

12                    (WITNESS SWORN)

13                  DIRECT EXAMINATION

14   BY MR. IRICK:

15   Q     Good morning.

16   A     Good morning.

17   Q     Would you please state your full name and spell your

18   name for the record?

19   A     Noreen Shernall Valentine.  N-O-R-E-E-N;

20   S-H-E-R-N-A-L-L; V-A-L-E-N-T-I-N-E.

21   Q     How do you work for?

22   A     The Drug Enforcement Administration.

23   Q     And what is your title with DEA.

24   A     Diversion investigator.

25   Q     How long have you been a diversion investigator?
```

1    A     For approximately six years.

2    Q     As a division investigator, what are your duties?

3    A     My duties are to monitor the businesses and

4    individuals who have access to controlled substances and

5    schedules II through IV, whether they manufacture the

6    drug, distribute the drug or prescribe administer or

7    dispense the drug.

8    Q     So you investigate all DEA registrants?

9    A     Yes.

10   Q     And what kind of training do you have to become a

11   diversion investigator?

12   A     Three months in-house at Quantico in Virginia.

13   Q     You have ongoing training?

14   A     Yes.

15   Q     Throughout your career?

16   A     Yes, sir.

17   Q     What is your educational background?

18   A     I have a bachelor's in sociology with a minor in

19   criminology.

20   Q     And where do you work for DEA?

21   A     At the Washington, D.C. field office.

22   Q     As DEA diversion investigator, is it a regular part

23   of your duties to conduct inspections of DEA registrants?

24   A     Yes, sir.

25   Q     And how many inspections of DEA registrants do you

1    think you have done throughout your career?

2    A    Approximately 100 inspections.

3    Q    What is involved in those inspections?

4    A    We have documents called the DEA 82 form which is the

5    notice of inspection and we have to present that form and

6    the registrant endorses the form which allows us to

7    inspect the facility.  We look at the records.  Sometimes

8    we do audit of the particular drugs that are there for

9    accountability purposes, and we usually interview

10   employees.

11   Q    Does that include interviews of the registrants?

12   A    Yes.

13   Q    Now, as part of your duties did you conduct

14   inspections of Family Health Pharmacy?

15   A    Yes, sir.

16   Q    And where is Family Health located?

17   A    In Hyattsville, Maryland on University Boulevard.

18   Q    And who is the pharmacist at that pharmacy?

19   A    Guennet Chebssi.

20   Q    Is this Ms. Chebssi the registrant of DEA?

21   A    The pharmacy is.

22   Q    How many times did you visit that pharmacy?

23   A    Three.

24   Q    And what were the dates of those visits?

25   A    First went to visit on March 9, 2005, returned on

1    March 10, 2005, and the last visit was approximately

2    March 22, 2005.

3    Q    Let me direct your attention to the first time you

4    visited:  March 9, 2005.  Did you provide MS. Chebssi with

5    any prior notice that you were going to inspect her

6    pharmacy?

7    A    No, sir.

8    Q    Is that standard practice?

9    A    Yes, sir.

10   Q    For a DEA diversion investigate?

11   A    Yes.

12   Q    And what was the purpose of your visit to her

13   pharmacy?

14   A    To inspect the DEA activities that were going on at

15   the pharmacy.

16   Q    Did you conduct the interview of Ms. Chebssi?

17   A    I did.

18   Q    Now, according to Ms. Chebssi, when did she open

19   Family Health Pharmacy?

20   A    During the interview she stated that she became

21   operational in February of 2004.

22   Q    And when did Ms. Chebssi say she began dispensing

23   drugs based on online orders?

24   A    She stated that the computer and printer was

25   installed in August of 2004.

1    Q    Is that when she began dispensing?

2    A    Yes.

3    Q    What company did she say she dispensed orders online?

4    A    Jive Network.

5    Q    How was that she began to dispense for Jive Network?

6    A    She was introduced to the business through a

7    colleague, and at some point in June of 2004 she was faxed

8    over a list of controlled substances that she would

9    prepare, fill for the network, and in August she installed

10   a printer and the computer.

11   Q    Did she tell you who her contact at Jive Network was?

12   A    She mentioned a Hudsen Smith.

13   Q    And was it Hudsen Smith that installed the computer

14   and printer?

15   A    That's what she stated.

16   Q    Did Ms. Chebssi tell you what drug she primarily

17   dispensed?

18   A    She stated that Phentermine was the primary drug.

19   Q    And is that a controlled substance?

20   A    Yes, it is.

21   Q    What, if anything, did she tell you about the drug

22   wholesaler that she obtained the Phentermine from?

23   A    She stated she obtained the Phentermine from Anda.

24   Q    And how did that compare with the drug wholesaler she

25   obtained the rest of her drugs from?

1    A    She said that the other drugs came from Amerisource

2    (phonetic.

3    Q    Is that -- was that a separate drug wholesaler for

4    Phentermine?

5    A    Yes.

6    Q    Did Ms. Chebssi tell you how the Internet order she

7    filled were shipped?

8    A    She stated that they were shipped via FedEx.

9    Q    And how were they picked up?

10   A    Once a day between the hours of 4 and 6:00 p.m.

11   Q    FedEx would come to her business?

12   A    Yes.

13   Q    The first time you interviewed her, what did Ms.

14   Chebssi say about shipping costs?

15   A    She stated that she wasn't aware of -- she wasn't

16   aware who incurred the shipping cost.

17   Q    Did she say whether there was any charge to her?

18   A    No, there was no charge to her.

19   Q    Now, in relation to the shipping, did you notice

20   anything during your visit at the pharmacy?

21   A    Yes.  There was a room in the back of the facility

22   with FedEx boxes from the ceiling to the floor,

23   approximately 100 boxes.

24   Q    What, if anything, had Ms. Chebssi told you about the

25   revenue of her pharmacy?

1  A     She stated in reference to the Internet activity that

2  she -- it was 98 percent of her business, and that she was

3  paid $4 per script and she filled approximately 1,000

4  scripts per week.

5  Q     So how many was that per day?

6  A     200 per day.

7  Q     And how was she paid by Jive Network according to

8  her?

9  A     According to her she received payment via wire

10 transfer from SunTrust bank.

11 Q     How many times per week was she paid?

12 A     Three times a week.

13 Q     Did she tell you that there were any other employees

14 at Family Health Pharmacy?

15 A     She said there was a part-time pharmacy tech, yes.

16 Q     What was his name?

17 A     Russell Miles.

18 Q     During the course of this first inspection, what did

19 you notice about the business activity of Family Health

20 Pharmacy?

21 A     I noticed there were only two walk-in customers when

22 we were there for about approximately three and a half

23 hours, and the phone I think three times while we were

24 there.

25 Q     And how does that compare with other pharmacies you

1    have been in during the course of your duties?

2              MR. PHILLIPS:  Objection; relevance.

3              THE COURT:  Overruled.

4              THE WITNESS:  Other pharmacies have many more

5    customers that come in and out and the phones are usually

6    ringing constantly.

7    BY MR. IRICK:

8    Q    Now, when you concluded the interview on March 9,

9    what, if anything, did you tell Ms. Chebssi about your

10   intent to return to the pharmacy?

11             MR. PHILLIPS:  Objection, hearsay.

12             THE COURT:  Overruled.  What did you tell her?

13             THE WITNESS:  I didn't tell her anything about

14   returning.

15   BY MR. IRICK:

16   Q    When did you actually return to Family Health

17   Pharmacy?

18   A    I returned the next day.

19   Q    And is it against standard practice for you not to

20   give notice of your intent to return?

21   A    It's not against practice, no.

22   Q    What was the purpose of this second inspection?

23   A    We revisited the pharmacy in hope of getting a

24   consent search granted.

25   Q    And did you also conduct a second interview of Ms.

1    Chebssi?

2    A    I did.

3    Q    And did you perform a search of the pharmacy?

4    A    Yes.

5    Q    Did you also perform a physical inventory of

6    controlled substances?

7    A    Yes, we did.

8    Q    Let's talk about that second interview on March 10,

9    2005.  Did Ms. Chebssi tell you whether or not she had a

10   contract with Jive Network?

11   A    She said she did not have a contract.

12   Q    And did you again discuss with her the payment by

13   Jive Network?

14   A    I believe so.

15   Q    And, again, what did she tell you about how many

16   orders per week she filled and how much she was paid per

17   script for dispensing?

18   A    Four dollars per script, approximately 1,000 scripts

19   per week.

20   Q    And did she again tell you what her primary drug that

21   she shipped was?

22   A    Phentermine.

23   Q    Did she tell you how the cost of the drugs themselves

24   were paid?

25   A    She was reimbursed by Jive Network for the cost of

1    drugs.

2    Q    And this time did she tell you who paid for the

3    shipping?

4    A    Yes.  She said that Jive Network was responsible for

5    the shipping cost.

6    Q    What did Ms. Chebssi say about her contact with the

7    doctors that were approving these drug orders?

8    A    She stated they were approximately four to five

9    doctors' names who appeared on the prescriptions and that

10   on occasion she spoke with all of them.

11   Q    And what was the nature of the conversation that she

12   had with the doctors?

13   A    She stated it was for verification purposes.

14   Q    And what did the doctors tell her?

15   A    The doctors -- Ms. Chebssi stated the doctors said

16   that if the script was from, through Jive Network, that

17   they were okay to fill.

18   Q    And did she ever contact the doctors again?

19   A    There was no need.

20   Q    According to her?

21   A    Yes.

22   Q    What, if anything, did Ms. Chebssi say about her

23   contact with online customers?

24   A    She stated that customers would call for refills but

25   she would direct them to Jive Network.

1    Q    Did she tell you whether or not they called for any

2    reason other than refills?

3    A    No.

4              MR. IRICK:  Your Honor, may I approach the

5    witness?

6              THE COURT:  Yes.

7    BY MR. IRICK:

8    Q    If you will take a look at what's been marked for

9    identification as Government's Exhibit 62.  You see that?

10   A    Yes.

11   Q    Do you recognize that?

12   A    Yes.

13   Q    Is that a document that you obtained during the

14   search of the pharmacy?

15   A    Yes.

16             MR. IRICK:  Your Honor, is it -- excuse me.

17   Your Honor, the United States would move to admit

18   Government's Exhibit 62.

19             MR. PHILLIPS:  No objection.

20             THE COURT:  It will be admitted.  And you have

21   got a number of exhibits you want to review with this

22   witness?

23             MR. IRICK:  Yes, Your Honor.

24             THE COURT:  It's time to take the morning

25   recess.  So we will stop now and we will file out.  We

 1  will take 15 minutes.

 2                          (Recess)

 3                  (jury present -- 10:48 a.m.)

 4          THE COURT:  You may resume your direct

 5  examination of the witness.

 6          MR. IRICK:  Thank you, Your Honor.  Your Honor,

 7  I believe that Government's Exhibit 62 is now admitted,

 8  correct?  And may we publish?

 9          THE COURT:  Yes.

10  BY MR. IRICK:

11  Q    If you will publish -- take a look at the first, this

12  is the first page of the document, 62-1.  What does this

13  page appear to be?

14  A    I have 62 as the first page.

15  Q    Excuse me.  62-1.  It's on your screen.  What does

16  that page appear to be?

17  A    California State Board of Pharmacy Declaration of

18  Service by certified mail addressed to Family Health

19  Pharmacy.

20  Q    All right.  Go back to the first page.  What does

21  this appear to be?

22  A    Family Health Pharmacy fax cover sheet addressed to

23  Hudsen Smith.

24  Q    If you will speak up a little bit or just pull the

25  mic closer.

1  A    A Family Health pharmacy fax cover sheet addressed to

2  Mr. Hudsen Smith.

3  Q    And who does it say it's from?

4  A    From Guennet Chebssi.

5  Q    What is the date according to the document?

6  A    January 24, 2005.

7  Q    And how many pages does it say this fax is?

8  A    12.

9  Q    Take a look at the second page now.  What does this

10 appear to be?  You read the first two lines of the title.

11 A    California State Board of Pharmacy Declaration of

12 Service by certified mail.

13 Q    And what is the date of service according to this

14 document?

15 A    January 21, 2005.

16 Q    And what is this document come from?  Who is the

17 sender of this document?

18 A    The California State Board of Pharmacy.

19 Q    If you take a look at I believe it's the 9th page of

20 this document.  It appears at 391737.  It's the Bates

21 number.

22 A    I have it.

23 Q    What is the title of this document?

24 A    Board Pharmacy Department of Customer Affairs State

25 of California.

1    Q      Below that?

2    A      Citation and fine, order of abatement.

3    Q      And what is the pharmacy that is being -- is the

4    subject of this order?

5    A      Family Health Pharmacy.

6    Q      Do you see a section in the middle that has a

7    subheading "conduct?"

8    A      Yes.

9    Q      If you could read that alleged conduct according to

10   this document.

11   A      On or about October 8, 2004, Family Health Pharmacy

12   2426 University Boulevard, E, Hyattsville, Maryland, 2783,

13   dispensed description number 714790-707308C for --

14           THE COURT:  Slow down just a little bit, please.

15           THE WITNESS:  For a controlled substance to a

16   California resident without first being licensed in

17   California.  This is a violation of business and

18   professions code section 4112 subdivision A.

19       On or about October 8, 2004, Family Health Pharmacy,

20   2426 University Boulevard, E, Hyattsville, Maryland 20783

21   dispensed prescription number 7147790-707308C via the

22   Internet for controlled substance without a prescription

23   issued pursuant to a prior good faith examination.  This

24   is a violation of business and professions code section --

25   professions code section 4067.

1   BY MR. IRICK:

2   Q     And what's the title of the next section?

3   A     Order of abatement.

4   Q     In that section, do you see where it says cease and

5   desist?

6   A     Yes.

7   Q     And if you look at the bottom of the document.  It

8   says, citation issued on and then provides a date.  You

9   may need to look at the original.

10  A     January 21, 2005.

11  Q     We could move a little farther up this document.  You

12  see the chart where offense is listed?

13  A     The violation code, yeah.  Offense, yes.

14  Q     Can you just read the description of the two offenses

15  that are there.  Don't need to read the code or the fine,

16  just the offense.

17  A     Nonresident Pharmacy registration provision of

18  information to board, maintaining records, patient

19  consultation, internet dispensing dangerous drugs or

20  devices without prescription.

21  Q     Thank you.  During your search did you also recover

22  prescriptions themselves?

23  A     Yes.

24  Q     Documents that purported to be prescriptions?

25  A     Yes, sir.

1   Q    If you would take a look at what's in evidence as

2   Government's Exhibit 63.  Are these documents that you

3   recovered during the search?

4   A    Yes, sir.

5   Q    Now those documents are they on normal letter paper?

6   A    No, sir.

7   Q    Would you describe the kind of paper that they're on?

8   A    It has like adhesive backing to it.

9   Q    And --

10  A    So you can peel it off.

11  Q    Are those peel-off sheets?

12  A    Yes.

13  Q    If we could publish the first page of this exhibit

14  which is at 276213.

15       As DEA diversion investigator, what do you notice

16  about this prescription or this document when you looked

17  at it?

18  A    There's no signature.

19  Q    Signature of whom?

20  A    The doctor or the physician.

21  Q    Is the signature of a doctor required for a valid

22  prescription?

23  A    Yes, sir.

24  Q    What is this drug for?

25  A    Phentermine tablets.

1   Q    And what is the date of this document?

2   A    February 8, 2005.

3   Q    If you would, how many documents do you have there in

4   your hand?  And they are numbered on the blue exhibit tag

5   that will help you.

6   A    You want me to count them individually?

7   Q    Well, just if you could look at the last page number.

8   What page number is that on the blue exhibit tag?

9   A    The last page number is exhibit 63-73.

10  Q    73?

11  A    Yes.

12  Q    And if you would, let's look at the second one,

13  276215.

14  A    I have it.

15  Q    Do you see that?

16  A    Yes.

17  Q    What's the date on that?

18  A    February 8, 2005.

19  Q    And does the signature appear on this order?

20  A    No, sir.

21  Q    And if you would look through quickly every page of

22  this exhibit.  I would ask you to look for two things.

23  One, whether there's a doctor's signature on any of these

24  records, and, two, what is the month in which these orders

25  were dated.

1   A    Month of February, 2005, no signatures.

2   Q    Are there any signatures on any of those orders?

3   A    No, sir.

4   Q    If you would, please, take a look at what's been

5   marked for identification as Government's Exhibit 64.  Do

6   you recognize that?

7   A    Yes.  This is a prescription.

8   Q    Is that another document that you recovered during

9   the search?

10  A    Yes, sir.

11        MR. IRICK:  Your Honor, we will move to admit

12  Government's Exhibit 64.

13        MR. PHILLIPS:  Again, no objection.

14        THE COURT:  It will be admitted.

15        MR. IRICK:  May we publish?

16        THE COURT:  Yes.

17  BY MR. IRICK:

18  Q    As diversion investigator, what do you notice about

19  this order?

20  A    There's no physician information listed on this

21  document as well as there's no signature.

22  Q    Is there no physician information at all?

23  A    No name, no license number, no Drug Enforcement

24  Agency.

25  Q    No DEA registration number?

1    A    No, sir.

2    Q    Is that a requirement for a controlled substance

3    prescription?

4    A    Yes.  In schedules 2 through 5, yes.

5    Q    And what is the date on this order?

6    A    February 28, 2005.

7    Q    I would ask that you take a look at Government's

8    Exhibit -- toggle 64B with this document.  64B appears at

9    393064.

10   A    I don't have 64B.

11   Q    It's on your screen.  Take a look at your screen.

12   A    Okay.

13   Q    Do you see a process date on 64B?

14   A    Yes.  Process date is February 28, 2005.

15   Q    And how does that correspond to the date on the order

16   on 64?

17   A    It is the same.

18   Q    Do you see a RX number on Government's Exhibit 64?

19   A    994383-986881C.

20   Q    How does that compare to the cart ID and item ID

21   number on Government's Exhibit 64B?

22   A    They match except for the alphabet at the end, the C

23   at the end.

24   Q    And the customer name?  Do they match on both

25   documents?

1    A    Yes, sir.

2    Q    And customer address?

3    A    Yes, they match.

4    Q    What about the customer date of birth?

5    A    They match also.

6    Q    I'll also have you take a look at the drug.

7    A    Phentermine.

8    Q    Do they match on both documents?

9    A    Yes.

10   Q    And the product pill counts and product amount?

11   A    Yes, they match.

12   Q    And what is the quantity and dosage?

13   A    90 is the quantity and dosage is 37.5.

14   Q    That is the same on both documents?

15   A    Yes.

16   Q    Now, if you will look to 64B there's a pharmacy name

17   listed, correct?  What is that?

18   A    Family Health Pharmacy.

19   Q    Is that the pharmacy at which you recovered

20   Government's Exhibit 64?

21   A    Yes, sir.

22   Q    Now, if you will take a look at where it says item

23   status on 64B.  Do you see that?

24   A    Yes.

25   Q    What is the item status?

1    A    SH.

2    Q    And above that, do you see a tracking number?

3    A    Yes, sir.

4    Q    If we could remove Government's Exhibit 64 and

5    replace it with Government's Exhibit 64A.  First section

6    is 64A.  Scroll down a little farther on 64A to the top of

7    the document.  All the way to the top.  Do you see that

8    purports to be a document from FedEx?

9    A    Yes, sir.

10   Q    Do you see a tracking ID number?

11   A    Yes.

12   Q    On the FedEx document 64A?

13   A    Yes.

14   Q    Is that the same tracking number as on Government's

15   Exhibit 64B?

16   A    Yes.

17   Q    Is there a delivered date on Government's Exhibit

18   64A?

19   A    March 1, 2005.

20   Q    And do you see the sender?

21   A    Yes.  Family Health pharmacy.

22   Q    Address there?

23   A    2426 University Boulevard, east, Hyattsville,

24   Maryland 20783.

25   Q    And is that the address of the Pharmacy that you

1    searched?

2    A    Yes, sir.

3    Q    And is that what were you recovered Government's

4    Exhibit 64 you're looking at?

5    A    Yes.

6    Q    Do you see the section under recipient?

7    A    Yes.

8    Q    Is that the same address that appears on Government's

9    Exhibit 64B for the customer?

10   A    Yes.

11   Q    Is that the same address that appears on Government's

12   Exhibit 64 which I believe is in front of you?

13   A    Yes.

14   Q    Now while you have Government's Exhibit 64 actually

15   in your hand, does it appear as though items were peeled

16   off of that document?

17   A    Yes.

18   Q    And in your experience as a diversion investigator,

19   what would those items have been?

20   A    The portion that's affixed to the vile and the FedEx

21   tracking label.

22   Q    FedEx label?

23   A    Uh-huh.

24   Q    And the bottle label?

25   A    Yes.

1    Q    All right.  Thank you.  You can put that exhibit to

2    the side.

3         If you will take a look at what's been marked for

4    identification as Government's Exhibit 65.  Do you see

5    that?

6    A    Yes.

7    Q    Do you recognize that?

8    A    Yes.

9    Q    Is that a document you recovered during the search of

10   Family Health Pharmacy?

11   A    Yes, sir.

12            MR. IRICK:  We would move to admit Government's

13   Exhibit 65.

14            MR. PHILLIPS:  No objection.

15            THE COURT:  It will be received.

16            MR. IRICK:  May we publish?

17            THE COURT:  Yes.

18   BY MR. IRICK:

19   Q    Is this a document similar to Government's Exhibit

20   64?

21   A    Yes.

22   Q    It appears on the same kind of paper as 64?

23   A    Yes.

24   Q    And just like 64, does it appear as though items were

25   peeled off of it?

1    A    Yes.

2    Q    Now, if you will, what is the date on Government's

3    Exhibit 65?

4    A    March 1, 2005.

5    Q    And what is the drug?

6    A    Phentermine.

7    Q    And what strikes you about this order?

8    A    There's no physician information, nor is there a

9    signature.

10   Q    Is there any DEA registration number?

11   A    No DEA registration number.

12   Q    There any license number?

13   A    No license number.

14   Q    Now, if we could toggle this document with

15   Government's Exhibit 65E which appears at 393065.

16   Starting at the top, look at the cart ID and item ID

17   number.  How did those compare to the RX number on

18   Government's Exhibit 65?

19   A    They match.

20   Q    And would you now compare the process date on

21   Government's Exhibit 65B to the date in the upper

22   right-hand corner of Government's Exhibit 65.

23   A    The dates match.

24   Q    Again, that date was?

25   A    March 1, 2005.

1    Q    What about the customer name?

2    A    They match.

3    Q    On both documents?

4    A    Yes, sir.

5    Q    Would you look also to the address.

6    A    They match.

7    Q    Below the address is there a phone number?  I believe

8    it appears with no --

9    A    Yes.

10   Q    Is that the same as the customer phone on 65B?

11   A    Yes.

12   Q    What about the quantity of the drug and the dosage?

13   Compare both documents and tell me if they match.

14   A    Yes, they do match.

15   Q    And what is that quantity and dosage?

16   A    90 tabs at 37.5 milligrams.

17   Q    If you will take a look at the pharmacy name on 65B.

18   A    Family Health Pharmacy.

19   Q    Is that that pharmacy which you recovered 65?

20   A    Yes.

21   Q    And above the pharmacy it says doctor name, correct?

22   A    Yes.

23   Q    Is there any doctor listed on 65B?

24   A    No, sir.

25   Q    And does that correspond with 65?

1    A    Yes.

2    Q    So no doctor on either document, correct?

3    A    Correct.

4    Q    Now if you would look at the item status on 65B, what

5    does that say?

6    A    SH.

7    Q    And above that does there appear a tracking number?

8    A    Yes.

9    Q    Now, if we could remove 65 and place 65A which is

10   393057.  And where does this document appear to be from?

11   A    The FedEx invoice document.

12   Q    If you could scroll down to the second entry on this

13   document.  Does that FedEx tracking number on 65B match

14   the FedEx tracking number on 65A?

15   A    Yes.

16   Q    Do you see the section titled delivered on 65A?

17   A    Yes.

18   Q    Is there a delivery date?

19   A    March 2nd, 2005.

20   Q    And who was the sender?

21   A    Family Health Pharmacy.

22   Q    Is the address listed?

23   A    2426 University Boulevard east, Hyattsville, Maryland

24   20783.

25   Q    Is that the location you searched?

1   A     Yes.

2   Q     And recovered Government's Exhibit 65 from?

3   A     Yes.

4   Q     There's also a recipient name.  Do you see that?

5   A     Yes.

6   Q     Is that the same as the customer name on Government's

7   Exhibit 65B?

8   A     It is the same.

9   Q     Is that the same as the customer information on

10  Government's Exhibit 65?

11  A     Yes.

12  Q     You also take a look at 65A.  There is a section that

13  says "picked up."  Do you see that?

14  A     Yes.

15  Q     What date is that?

16  A     March 1, 2005.

17  Q     Is that the same date that appears on Government's

18  Exhibit 65?  Take a look at it.  It's in front of you.

19  It's the actual recovered document.

20  A     Yes.

21  Q     And is that the same as the process date on 65B?

22  A     Process date is, yes, March 1, 2005.

23  Q     All right.  Thank you.  You can put that to the side.

24        Please take a look at what's in front of you as

25  Government's Exhibit 66, marked for identification.  Do

1    you recognize that?

2    A    Yes.

3    Q    Is that a document you recovered during the search of

4    Family Health Pharmacy?

5    A    Yes.

6              MR. IRICK:  Your Honor, we will move to admit

7    Government's Exhibit 66.

8              MR. PHILLIPS:  We stipulate, Your Honor.

9              THE COURT:  It's admitted.

10             MR. IRICK:  May we publish?

11             THE COURT:  Yes.

12   BY MR. IRICK:

13   Q    Again, as DEA diversion investigator, what strikes

14   you about this document?

15   A    There's no physician information, no license

16   information, no DEA registration information, no

17   signature.

18   Q    If we can toggle this with Government's Exhibit 66B.

19   Excuse me.  66B is 393066.  Again, starting at the top.

20   If you could -- excuse me -- if you could compare the RX

21   number to the cart ID and item ID number.

22   A    They're the same.

23   Q    Does the RX number appear on Government's Exhibit 66?

24   A    Yes.

25   Q    And the cart ID and item ID on Government's Exhibit

1   66B?

2   A    Yes.

3   Q    Would you please take a look at the date on

4   Government's Exhibit 66?

5   A    March 8, 2005.

6   Q    How did that compare to the process date on 66B?

7   A    They match.

8   Q    What about the customer name?

9   A    It is the same.

10  Q    And what about the customer address?

11  A    They match.

12  Q    Move down to the next section doctor name.  There any

13  information on Government's Exhibit 66B as to doctor name?

14  A    No, sir.

15  Q    And how does that compare to the order you recovered

16  at Family Health Pharmacy?

17  A    There's no doctor information listed.

18  Q    And the Pharmacy name on 66B?

19  A    Family Health Pharmacy.

20  Q    That's where you recovered Government's Exhibit 66,

21  correct?

22  A    Yes.

23  Q    You look at 66B.  Would you take a look at the drug

24  quantity and dosage.

25  A    Quantity 90, dosage 37.5.

1    Q    What is the drug?

2    A    Phentermine.

3    Q    How does that compare to Government's Exhibit 66?

4    A    It's the same.

5    Q    Would you take a look at the item status on

6    Government's Exhibit 66B.

7    A    SH.

8    Q    And is there a tracking number above that?

9    A    Yes.

10   Q    And if we could remove 66 and place up 66A which is

11   at 393053.  How does that compare to the tracking number

12   on 66A?

13   A    They match.

14   Q    Is 66A the FedEx invoice?

15   A    Yes.

16   Q    And do you see a section titled delivered on 6A?

17   A    Yes.  March 10, 2005.

18   Q    What is the pickup date according to the FedEx

19   invoice?

20   A    March 8, 2005.

21   Q    How does that compare to the process date of

22   Government's Exhibit 66B?

23   A    March 8, 2005.  They match.

24   Q    The same?

25   A    They match.

1   Q    And the sender?

2   A    Family Health Pharmacy, 2426 University Boulevard

3   east, Hyattsville, Maryland 20783.

4   Q    And that is the location you recovered Government's

5   Exhibit 66 from?

6   A    Yes.

7   Q    And that is the location you searched, correct?

8   A    Yes.

9   Q    And the recipient name, do you see that?

10  A    Yes, I do.

11  Q    And is that name and address the same as the customer

12  information on Government's Exhibits 66B and 66?

13  A    Yes.  They match.

14  Q    If you would take a look at what's been marked for

15  identification as Government's Exhibit 196.  Do you

16  recognize that?

17  A    Yes.

18  Q    What is it?

19  A    A prescription that we retrieved from Family Health

20  Pharmacy.

21  Q    Is this another order just like the past few that you

22  recovered from Family Health Pharmacy?

23  A    Yes, sir.

24  Q    You recovered that during the search?

25  A    Yes.

1          MR. IRICK:  Your Honor, we would move to admit

2    Government's Exhibit 196.

3          MR. PHILLIPS:  Same stipulation.  No objection.

4          THE COURT:  It's admitted.

5          MR. IRICK:  May we publish?

6          THE COURT:  Yes.

7    BY MR. IRICK:

8    Q    Again, what do you notice about this order?

9    A    There's no physician information, no license

10   information, DEA registration information, no signature.

11   Q    If you to toggle this with Government's Exhibit 196B

12   which appears at 393223.  Again, would you compare the RX

13   number at the top of 196 to the cart ID and item number of

14   the top of 196B?

15   A    They match.

16   Q    Would you compare the date on 196 to the process date

17   on 196B?

18   A    February 17, 2005; February 17, 2005.

19   Q    What about the customer name and address on both of

20   these documents?

21   A    They're the same.

22   Q    What about the customer telephone number on both of

23   these documents?

24   A    They match.

25   Q    The customer date of birth?

1   A     5-13-1958; they match.

2   Q     And the drug quantity and dosage?

3   A     90 quantity Phentermine, 37.5, and they match.

4   Q     Both Phentermine, correct?

5   A     Yes, for Phentermine.

6   Q     On Government's Exhibit 196B, is doctor name listed?

7   A     No.

8   Q     Does that correspond with 196?

9   A     Yes.  It corresponds with that.

10  Q     No doctor on your document?

11  A     No doctor information.

12  Q     And the Pharmacy name on 196B?

13  A     Family Health pharmacy.

14  Q     Is that where you recovered 196?

15  A     Yes.

16  Q     If you will take a look at the item status.  What is

17  it?

18  A     SH.

19  Q     All right.  If we could remove 196.  Place up 196A

20  which appears at 393120.

21        I believe we're looking at the second entry on that

22  document.  What is 196A?

23  A     FedEx invoice.

24  Q     Do you see the tracking number on 196B?

25  A     I see them both, and they match.

1   Q    They match on both documents?

2   A    Yes.

3   Q    Do you see the delivery date on 196A?

4   A    February 18, 2005.

5   Q    Do you see pick up dates on the FedEx invoice?

6   A    February 17, 2005.

7   Q    How does that correspond with the process date on

8   196B?

9   A    They're the same, February 17, 2005.

10  Q    And the sender on 196A?

11  A    Family Health Pharmacy, 2426 University Boulevard,

12  east, Hyattsville, Maryland 20783.

13  Q    And now the recipient on 196A name and address?  Is

14  that the same information that appears as the customer on

15  196 and 196B?

16  A    Yes.

17  Q    If you will place that to the side.

18       Other than these documents such as 62, 63, 64, 196,

19  the orders, did you receive any or did you recover any

20  patient records arranged by name?

21  A    No, sir.

22  Q    During the second inspection I believe you stated you

23  conducted a physical inventory count, correct?

24  A    Yes.

25  Q    And was that of Family Health Pharmacy controlled

1    substances?

2    A    Yes.

3    Q    Did you inventory all of their controlled substances?

4    A    Yes.

5    Q    What is physical inventory counts?

6    A    We count what's on hand that day.

7    Q    You will actually count the pills on hand?

8    A    Yes.

9    Q    In your experience was there anything unusual about

10   the inventory of Family Health Pharmacy?

11   A    There was a large volume of the particular drug to

12   include the Phentermine.

13   Q    And what was the primary drug held in the inventory

14   at Family Health Pharmacy?

15   A    Phentermine.

16        MR. IRICK:  One moment, Your Honor.

17   BY MR. IRICK:

18   Q    Would you take 196 out again.  During the search did

19   you take all the documents that were of the kind of 196,

20   all these orders?

21   A    Yes, sir.

22   Q    You recovered all those?

23   A    Yes, sir.

24        MR. IRICK:  Thank you.  Nothing further, Your

25   Honor.

1          MR. LEVENTHAL:  No questions, Your Honor.

2          MR. NICHOLA:  If I may Your Honor.

3                    CROSS-EXAMINATION

4  BY MR. NICHOLA:

5  Q    Miss Valentine, did you testify something to the

6  effect that there were -- that you followed a list of

7  doctors at the Pharmacy?

8  A    We had a photocopy of a sheet that listed I believe

9  approximately three doctors.

10  Q    Dr. Tobin was not among those listed, correct?

11  A    I don't recall the names.

12  Q    Did you ever contact Jive Network in follow up to

13  your investigation in this matter?

14  A    No, sir.

15  Q    As part of your investigation, you learned nothing

16  about Dr. Tobin, isn't that true?

17  A    I don't know who that person is.

18          MR. NICHOLA:  No further questions.

19          MR. IRVIN:  No questions, Your Honor.

20          THE COURT:  Thank you.

21                    CROSS-EXAMINATION

22  BY MR. PHILLIPS:

23  Q    Good morning.  I'm Brian Phillips.  I present Guennet

24  Chebssi.

25  A    Good morning.

1   Q     You testified on direct examination that you went to

2   Family Health Pharmacy three times?

3   A     Yes, sir.

4   Q     March 9, March 10, and March 22.  Right?

5   A     Yes.

6   Q     Okay.  What was the purpose of your visit on the

7   22nd?

8   A     I went to the pharmacy with another investigator on a

9   separate matter.

10   Q     Unrelated to prior times you had been there on the

11   9th and 10th?

12   A     Yes.

13   Q     And nothing you recovered or did or learned on the

14   22nd has anything to do with any of this?

15   A     No, sir.

16   Q     Okay.  Let's talk about the 9th and the 10.

17         When you arrived at Family Health Pharmacy on

18   March 9th, you testified that you were unannounced, there

19   was no call saying they were coming to see you?

20   A     No.  Right.

21   Q     When you arrived, who were you with?

22   A     I was accompanied by other investigators from DEA.

23   Q     Two other diversion investigators?

24   A     Yes.  And also Mr. Freedman from Department of Health

25   and Mental Hygiene from Maryland.

1   Q    Maryland Drug and Department of Control?

2   A    Yes.

3   Q    So that we're clear on your title, you're a drug

4   investigator, right?

5   A    Diversion investigator.

6   Q    My apologies.  Diversion and drug investigator.  You

7   are not a special agent?

8   A    I am not a special agent.

9   Q    Therefore you do not have arrest power?

10  A    I do not.

11  Q    Neither did any of the other people with you on the

12  9th of March 2005?

13  A    That is correct.

14  Q    The three diversion investigators and the guy from

15  Maryland, Mr. Freedman?

16  A    Yes.

17  Q    Okay.  When you arrived was Ms. Chebssi cooperative?

18  A    Yes.

19  Q    Did she endeavor to hide anything or keep you from

20  getting to anything you asked her for?

21  A    No.

22  Q    Did she stop her pharmacy business and sit down with

23  you and answer your questions?

24  A    Yes.

25  Q    You testified on direct that she had opened Family

1    Health Pharmacy in February of '04, right?

2    A     That's what she stated.

3    Q     Okay.  Did your investigation reveal anything to the

4    contrary?

5    A     We have DEA registration history that dates further

6    back.

7    Q     That she was registered with DEA before that?

8    A     Yes, sir.

9    Q     In fact, did it reveal what type of pharmacy she was

10   involved in before Family Health Pharmacy?

11   A     I don't recall, sir.

12   Q     Did you have registration information for Family

13   Health Pharmacy as a DEA registrant?

14   A     Yes.

15   Q     On February '04?

16   A     Yes.

17   Q     You testified that she had informed you that in June

18   of '04 was the first time she had seen the list of drugs

19   that were she to do business with, in this case Jive

20   Network, she would be dispensing?

21   A     Yes.

22   Q     She further indicated she began filling prescriptions

23   for Jive in August of 2004?

24   A     Yes.

25   Q     And your investigation supports both of those

1    conclusions as well, doesn't it?

2    A    That's what she stated that she again fill

3    August 2004.

4    Q    Correct.  Did your investigation reveal anything to

5    the contrary?

6    A    No.

7    Q    She also told you she received four dollars per

8    prescription that she filled?

9    A    Yes, sir.

10   Q    Did your investigation reveal anything to the

11   contrary on that point?

12   A    No, sir.

13   Q    How long were you all there on the 9th?

14   A    About three and a half hours.

15   Q    Three and a half hours.  You testified on direct

16   examination that you did not -- you saw a couple of

17   walk-ins and the phone rang a little bit?

18   A    Yes.

19   Q    What day of the week was the 9th?

20   A    I don't recall the day of the weak, sir.

21   Q    You don't remember which day of the week it was?

22   A    I do not recall the day of the week.

23   Q    Did Ms. Chebssi take any of those point calls or deal

24   with walk-ins while you were all there?

25   A    Yes.

1   Q     So she interrupted your meeting to go take care of

2   that and come back to you?

3   A     Yes, sir.

4   Q     Miss Valentine, at the Drug Enforcement

5   Administration, do you work with special agents?

6   A     Yes.

7   Q     On a fairly regularly occasion?

8   A     Yes.

9   Q     Did you call any of the special agents to come over

10  and shut down Family Health Pharmacy on the 9th of March?

11  A     No, sir.

12  Q     Mr. Irick asked you on direct what did you tell her

13  at the end of her meeting on the 9th.  You said nothing.

14  You remember saying that?

15  A     I was questioned in reference to whether I told her I

16  would return the next -- or return to the pharmacy.

17  Q     Okay.  And you didn't give her any feedback on that?

18  A     No.

19  Q     You go back the next day?

20  A     Yes.

21  Q     The 10th?

22  A     Yes.

23  Q     Your testimony on direct was you were hoping to do a

24  second interview and get -- do some sort of search?

25  A     We were hoping to get approval or we were hoping to a

1    subsequent search.

2    Q    Subsequent, exactly.  So you arrived on the 10th at

3    roughly what time?

4    A    I believe it was around 11:30, 11:45, approximately.

5    Q    Actually, let me go back to the 9th for just one

6    second.  I'll get back to the become 10th in a second.

7    One thing on my mind.  What's a DEA form 82?

8    A    It's a notice of inspection.  It's a document that we

9    give to each registrant when we visit their facility.

10   Q    It's also an acknowledgment -- statement of rights

11   and --

12   A    And consent and whatnot, yes.

13   Q    Is it a form that you used to hand to a registrant

14   that you're interviewing to let them know, here's why

15   we're here, here's what we're doing?

16   A    Yes.

17   Q    Did you give one of those to Ms. Chebssi?

18   A    Yes.

19   Q    You signed it?

20   A    Yes.

21   Q    And she signed it?

22   A    Yes.

23   Q    And then you guys had your conversation?

24   A    Yes.

25   Q    I just want to make sure I got the sequence right.

1   Let's turn to the 10th for a second.  You hoped to do a

2   consent search.  What's a DEA form 88?  If I showed you

3   one would that refresh your recollection?

4   A    Yes.

5             MR. PHILLIPS:  May I approach?

6             THE COURT:  Yes.

7   BY MR. PHILLIPS:

8   Q    Thank you, Your Honor.

9   A    It's a consent to search.

10  Q    Okay.  That refresh your recollection?

11  A    Yes.

12  Q    So a DEA form 88 is a consent to search?

13  A    Yes.

14  Q    Did you prepare and present one of these to Ms.

15  Chebssi on the 10th?

16  A    Yes.

17  Q    Did she consent?

18  A    Yes, she did.

19  Q    Did she consent to just your searching the physical

20  premises?  Or did she subsequent to more than that?

21  A    She consented to the search.

22  Q    Did she consent to your searching electronically

23  stored data?

24  A    Yes.  She allowed us to mirror the computer.

25  Q    She gave you access to Jive's computer.

1    A    Yes.

2    Q    Said you could mirror image it, do whatever you want

3    with it?

4    A    Yes.

5    Q    When you left on the 10th, you took a fair amount of

6    material with you, right?

7    A    Yes, sir.

8    Q    You'd done an inventory, and the controlled

9    substances left with you that day?

10   A    Yes, sir.

11   Q    And you left with a bunch of records she had supplied

12   you?

13   A    Yes.

14   Q    If fact, she gave you a copy of her lease and her

15   handwritten notes and all that kind of fun stuff too,

16   right?

17   A    Yes.

18   Q    Was there anything you asked for she didn't give you?

19   A    No.

20   Q    She volunteered some stuff you probably didn't want?

21   A    What we asked for we got.

22   Q    Okay.  Are you aware from your inspection, the search

23   or any other means, the total number of prescriptions that

24   Family Health Pharmacy filled with respect to Jive

25   Network?  From -- sorry -- let me finish.  From roughly

1    let's call it August of '04 through the, I guess we call

2    it the 8th or 9th of March '05?

3    A    I don't know the total number.  I just know that we

4    took all that was there at the time.

5    Q    Okay.  You took whatever records she had at the time?

6    A    Exactly.

7    Q    So when we talk about exhibits 64, 5, 6, and 196, the

8    four prescriptions that have no information on them --

9    A    Yes, sir.

10   Q    Do you have a sense of what percentage of the total

11   number of prescriptions she filled those four would be?

12   A    No, sir.

13   Q    Exhibit 63 is the 74 -- 73 page exhibit you looked at

14   on direct examination.

15   A    You said what number?

16   Q    63.  That's the one without Dr. --

17   A    Yes, sir.

18   Q    Hanny's signature on that.

19   A    Uh-huh.

20   Q    Did you discuss 63 or 64, 5, 6 or 196 with Ms.

21   Chebssi on the 10th when you were there?

22   A    No.

23   Q    Miss Valentine, on the -- I'm sorry -- Miss Valentine

24   on the 10th -- my apologies -- on the 9th, did you prepare

25   a handwritten document outlining Ms. Chebssi's

1   circumstances?

2   A     Yes, sir.

3   Q     You signed it?

4   A     Yes.

5   Q     She signed it?

6   A     Yes.

7   Q     In that document you call her a cooperating witness,

8   do you not?

9          MR. IRICK:  Objection, Your Honor.  It's

10  hearsay.

11         THE COURT:  Overruled.

12  BY MR. PHILLIPS:

13  Q     Do you call her in that document a cooperating

14  witness?

15  A     That's the verbiage I used, yes.

16  Q     Those words you used?

17  A     Yes.

18  Q     You further instructed her orally and memorialized in

19  this document not to contact anybody else without DEA

20  approval, right?

21  A     Yes.

22  Q     To your knowledge did she comply with that?

23  A     To my knowledge she did.

24  Q     Fair enough.

25  A     To my knowledge she did.

Case 6:08-cr-00118-ACC-TBS   Document 873   Filed 09/10/09   Page 101 of 279 PageID 7389

1    Q    To your knowledge she did comply?

2    A    Uh-huh.

3    Q    In your presence did she not call Hudsen Smith and

4    tell him that she was not feeling well and that sort of

5    thing?

6    A    Yes, sir.

7    Q    Did she tell in your presence Mr. Smith to come get

8    the equipment from Jive?

9              MR. IRICK:  Objection.  It's hearsay.

10             THE COURT:  Sustained.

11   BY MR. PHILLIPS:

12   Q    Were you present when she made a phone call to Hudsen

13   Smith?

14   A    Yes.

15   Q    Did you hear what Mr. Smith said on phone?

16   A    No, sir.

17   Q    Did you hear what Ms. Chebssi said on the phone?

18   A    I don't recall the specifics, sir.

19   Q    Fair enough.

20        To your knowledge after March 9 of 2005 did Family

21   Health Pharmacy or Ms. Chebssi fill any more prescriptions

22   for Jive?

23   A    I don't have that knowledge.  To my knowledge, no.

24   Q    To your knowledge that's fair.

25        On the 10th, the second day, who was there with you?

1   A    We had a couple of Special Agents to accompany us on

2   the 10th.

3   Q    FBI Special Agent?

4   A    Yes.

5   Q    And you had a FDA, I think, special agent as well?

6   A    Yes.

7   Q    Those folks have a arrest power, don't they?

8   A    Yes, they do.

9   Q    Did you arrest Ms. Chebssi that day?

10   A    No, sir.

11   Q    Did you shut down Family Health Pharmacy that day?

12   A    No, sir.  We just conducted a search.

13           MR. PHILLIPS:  If I may have a moment.

14       Pull up exhibit 62, please.  I didn't catch the

15   Bates.  I'm sorry.

16   BY MR. PHILLIPS:

17   Q    This is the California Board of Pharmacy document

18   that you recovered on the 9th or the 10th.  I'm looking

19   for that date of that document, that's in the highlighted

20   section.  Let's do page 1 first.

21       Do you have that front of you on the screen there?

22   A    Yes.

23   Q    What's the date of that fax?

24   A    January 24, 2005.

25   Q    January 24, '05.  Okay.  Can you tell what the

1  document itself is dated?  I think it's at the bottom of
2  that shaded area.  Do see the shaded area?  We can't read
3  it too well on the screen.
4  A    Yes.  January 21, 2005.
5  Q    January 21, 2005.
6  A    Yes.
7           MR. PHILLIPS:  Your Honor, no further questions.
8           THE COURT:  Mr. LaCour?
9           MR. JUDE LACOUR:  Yes, Your Honor.  If I could
10 have one second.
11                    CROSS-EXAMINATION
12           MR. JUDE LACOUR:  May I, Your Honor?
13           THE COURT:  Please.
14 BY MR. JUDE LACOUR:
15 Q    Good morning, Miss Valentine.
16 A    Good morning.
17 Q    My name is Jude LaCour.  I'm representing myself.
18       In your time with the DEA as diversion investigator,
19 I believe you said you have done hundreds of inspections.
20 Is that correct?
21 A    Yes.
22 Q    How many inspections have you done where online
23 pharmacy was involved?
24 A    Three.
25 Q    Were they all about the same time frame as this one?

1   A    One in -- another one in 2005, and additional one in

2   2006.

3   Q    So you haven't done any since then, is that correct?

4   A    Correct.

5   Q    In your position as a diversion investigator, are you

6   required to stay on top of the law?

7   A    We get updates.

8   Q    You get updates from a legal department at the DEA?

9   A    We get updates from our headquarters, whether it be a

10  particular section or chief counsel's office, we just get

11  updates.

12  Q    I'm sorry.  Repeat the last part.

13  A    We can get it from a section of headquarters or chief

14  counsel's office at headquarters just filters down into

15  the field offices.

16  Q    And when you get these briefings, are they usually in

17  writing or are there also some that are verbal?

18  A    In writing.

19  Q    Have you ever gotten any that were verbal?

20  A    Not that I recall.

21  Q    And are these -- are your briefings typically on

22  state or federal laws?

23  A    All that apply to the Drug Enforcement

24  Administration.

25  Q    Which is federal.

```
 1   A    Federal.
 2   Q    And is it your experience that the law is changed
 3   frequently?
 4             MR. IRICK:  Objection, relevance.
 5             THE COURT:  Sustained.
 6   BY MR. JUDE LACOUR:
 7   Q    Are you familiar with the Controlled Substances Act?
 8   A    Yes, sir.
 9   Q    Are you familiar with any modifications recently to
10   the Controlled Substances Act?
11             MR. IRICK:  Objection.
12             THE COURT:  Sustained.
13   BY MR. JUDE LACOUR:
14   Q    When you did your inspection, did you inspect how the
15   software worked that Ms. Chebssi was using to fill the
16   orders for Jive Network?
17   A    We had computer specialists who mirrored the
18   computer.  I didn't inspect the computer.
19   Q    The documents that you recovered and have been
20   inserted as exhibits here today, is that all of the
21   documents that were recovered?
22   A    This is a sample of the documents recovered.
23   Q    Were there a large number of other similar documents
24   recovered?
25   A    Yes, sir.
```

1   Q    And did you find any of the other documents that any

2   of the information was missing as is missing on these

3   documents?

4   A    Yes.

5   Q    And did you produce those documents also?

6   A    Produce them?

7          THE COURT:  The word produce is -- possibly

8   needs explanation.

9   BY MR. JUDE LACOUR:

10  Q    What do you mean by produce?  Were they turned over

11  in your investigation to the investigators?

12  A    We seized documents and took them back to our office.

13  Q    So there were many of the documents that had the

14  correct information on them, is that correct?

15  A    There were documents that had a signature and

16  physician information.

17  Q    Did you check every single document if they had --

18  see if they had those prescribing information signatures,

19  et cetera?

20  A    I did not check every single document.

21  Q    At any time during your investigation, did you ever

22  determine the total number of prescriptions filled?

23  A    We have a receipt that was generated that would give

24  the total counts of prescriptions taken that day.

25  Q    Okay.  So from the software, you actually did not ask

1   anybody to analyze the software how many total orders were

2   shipped, is that correct?

3   A    There was analysis done.  It's mirrored computer and

4   no information was found.

5   Q    Did the investigators who analyzed the software

6   inform you how it worked in any capacity?

7   A    I don't recall.

8             MR. JUDE LACOUR:  No further questions.  Thank

9   you.

10            THE COURT:  Any redirect?

11            MR. IRICK:  Briefly, Your Honor.

12            THE COURT:  Go ahead.  Please.

13                       REDIRECT EXAMINATION

14  BY MR. IRICK:

15  Q    I believe on cross-examination you were asked whether

16  or not you shut down Family Health Pharmacy, correct?

17  A    Yes.

18  Q    Is it true that you did not shut them down because

19  she agreed to stop dispensing?

20  A    We did not shut down the pharmacy.

21  Q    Did she also that day agree -- Ms. Chebssi agree to

22  stop dispensing that date?

23  A    Yes.

24  Q    Also, you were asked about whether or not you

25  arrested Ms. Chebssi on that day.  Correct?

1    A      Correct.

2    Q      Is it your experience as an investigator that

3    investigations are conducted before an arrest is made?

4    A      It is my experience that investigations are

5    conducted.

6              MR. IRICK:  Thank you.

7              THE COURT:  Anything further?

8              MR. PHILLIPS:  No, Your Honor.

9              THE COURT:  Thank you.  You may step down.

10   We will take the noon recess.

11   I ask you to be back at 1:00.  You may file out.

12   Counsel remain, please.

13                    (jury luncheon recess)

14             THE COURT:  It's my understanding that the

15   government wishes to propose using the 404(b) evidence

16   with your next witness.

17             MS. GABLE:  That is correct, Your Honor.

18             THE COURT:  Well, let's all get together about

19   10 minutes to one.  We will review it then.

20             MS. GABLE:  Okay.  Thank you very much.

21             THE COURT:  Court will be in recess.  Thank you.

22                    (Recess - staff)

23             THE COURT:  Let the record show that the jury

24   has not been returned to the courtroom.  It's five minutes

25   to one.

1       I wanted to start at 10 minutes to one, and counsel

2   and the government wanted to discuss putting 404(b)

3   evidence, and so now is your opportunity to tell me what

4   you want to do and why you should do it now.

5           MS. GABLE:  Your Honor, we have evidence that is

6   404(b).  It is Government's Exhibit No. 74 which is a

7   board action, North Carolina Medical Board action against

8   the defendant Christopher Tobin.  The charge is -- the

9   charging document was dated in --

10          THE COURT:  You say it's 74.

11          MS. GABLE:  Yeah.  It's 74, Your Honor.

12      It was delivered -- the charging document was

13  delivered to Mr. Tobin in, I believe it was August of

14  2003.  The certified copy of the exhibit itself shows that

15  the allegations were that the defendant during the period

16  2003 through 2002 had issued prescriptions online to

17  individuals that he never met and that that was -- that

18  violated North Carolina general statute section 914A6 in

19  that he engaged in unprofessional conduct and that by

20  engaging in that conduct his conduct departed from the

21  standards of acceptable and prevailing medical practice

22  and other ethics of the medical profession.  Thereafter,

23  he entered into a consent order with the North Carolina

24  Board in December of 2003 in which he admitted that

25  prescribing online to people that he never met did

1    constitute unprofessional conduct.

2         Similarly, on Exhibit No. 75 is an agreed order

3    between the defendant Christopher Tobin and the Texas

4    State Medical Board.  And that agreed order is dated

5    December 13, 2002, which is just two and a half to three

6    months before the defendant began working for Jive

7    Network.  And in this agreed order the defendant agreed

8    that he had issued prescriptions to individuals based

9    solely on online questionnaires and that such conduct

10   constituted unprofessional conduct pursuant to the Texas

11   Board rules.

12        So these orders I believe are admissible under 404(b)

13   not to show that the defendant engaged in the conduct in

14   which he engaged in in this case, but to show that he had

15   knowledge that such conduct, that is, Internet prescribing

16   was outside the usual course of professional practice, and

17   also to show that he did not engage in his conduct with

18   Jive Network by accident or mistake.  They also are

19   admissible to show whatever level of intent is ultimately

20   determined to be required in this case.

21        Finally, Your Honor, the issue here is whether or not

22   the conduct was outside the usual course of professional

23   practice.  And these orders themselves are some

24   circumstantial evidence that such conduct was outside the

25   usual course of professional practice, because as the

1    Court, the 11th Circuit said in United States v Williams,

2    and it's cited in our motion, state and federal

3    regulations are evidence of conduct which occurs outside

4    the usual course of professional practice.

5        So the orders, Your Honor, under 404(b) are being

6    admitted for a proper purpose.  They're highly probative

7    of the defendant's knowledge, and there is no unfair

8    prejudice to the defendant in admitting these orders for

9    two reasons.  One, Your Honor, is that the conduct in

10   these orders is no more inflammatory or even any different

11   than the conduct which the defendant is accused of

12   engaging in this case and of which the jury has held.

13       Second, any type of prejudice will be mitigated by a

14   limiting instruction that this Court will give.

15       And we would ask the Court to give the limiting

16   instruction after these orders are entered both, you know,

17   at the time that we admit these orders and also at the

18   conclusion of the case, and its instructions to the jury.

19       Finally, Your Honor, under the 11th Circuit, rule

20   404(b) evidence is a rule of inclusion, and the evidence

21   if it is useful and meets the test under 404B is to be

22   admitted similarly under a 403 balancing test.  The 11th

23   Circuit has asked for a rule of inclusion.

24       So for those reasons, Your Honor, we ask the Court to

25   allow the government to admit 74 and 75 and ask the Court

1    to give an appropriate limiting instruction to the jury.

2            THE COURT:  How do you propose to put it before

3    the jury?

4            MS. GABLE:  Your Honor, they are certified

5    public records, so they're self-authenticating.  We would

6    put them in front of the jury by the next witness who's a

7    employee of the DEA who actually did retrieve these

8    documents, and I'll publish them through that witness.

9            THE COURT:  I'll hear from counsel for the

10   defendant.

11           MR. NICHOLA:  Okay.  Judge, may it please the

12   Court.  Mike Nichola representing Christopher Tobin.

13      Judge, this particular motion made by the government

14   brings into focus before the Court the preliminary motion

15   in limine that the government made in order to keep all

16   defendants from raising the issue of mistake.  The

17   government -- there was a door open.  There was a juror

18   out there.

19           THE COURT:  Thank you.

20           MR. NICHOLA:  The government made a motion in

21   limine to prevent the defendants, all defendants from

22   raising certain issues concerning good faith and perhaps

23   estoppel for government representations to individuals,

24   and this Court has already ruled that the motion should be

25   granted.  The preliminary motion, that is, the motion in

1    limine with respect to keeping the defendants at bay from

2    presenting evidence in the defense to show that the

3    doctors or the pharmacists acted in good faith with the

4    government, that they acted in reliance on what other

5    people told them.  And the government made the point of

6    saying, no, that's not the standard in the counts of the

7    indictment against these individuals.

8        So now government is coming back to the Court and

9    saying that 404(b) evidence against Dr. Tobin is important

10   because we want to show intent, that there's no mistake by

11   Dr. Tobin in the conduct that he did in knowing that he

12   knew he was doing something wrong and therefore violating

13   the law.

14       So my first argument is, is that the government has

15   first made a motion in limine to prevent all the

16   defendants from presenting a good faith defense.  Now the

17   government wants to take that back with respect to

18   Dr. Tobin and say, Dr. Tobin, we got 404(b) evidence

19   against you to prove knowledge and intent, which is it's

20   like a double whammy for Dr. Tobin.

21       The other matter I'd like to address in this is that

22   in North Carolina documents Exhibit 74, Judge, those --

23   that involves a consent order that was entered

24   December 18, 2003.  It's a contention of Dr. Tobin that

25   his involvement with Jive Network had already terminated

1    before December 18 of 2003.

2         With respect to the Texas board, that is an agreed

3    order.  There's a reason for it.  And the same thing goes

4    with the North Carolina board consent order.  What happens

5    is if these documents are published to the jury, that

6    means the defendant must take the stand to defend himself

7    because the government's going to do what it's done all

8    through the trial:  Take documents instead of saying the

9    document speaks for itself.  We're going to emphasis let's

10   look at this paragraph and the agent's going to read it.

11             THE COURT:  When do you say that Dr. Tobin

12   stopped his association with Jive Network and Jude LaCour?

13             MR. NICHOLA:  In November of, end of

14   November 2003.

15             THE COURT:  That was after the Texas order?

16             MR. NICHOLA:  Yes.

17             THE COURT:  But before the North Carolina order?

18             MR. NICHOLA:  Yes.  And what will happen --

19             THE COURT:  Well, does the government agree that

20   his work with Jive Network stopped in November of 2003?

21             MS. GABLE:  No, Your Honor.  And, in fact, we

22   have put evidence in the record that says to the contrary.

23   We will put further evidence in.

24             THE COURT:  What evidence is that?  Just help

25   me.

```
 1              MS. GABLE:  We'll put in a summary of all of the
 2   others that he reviewed.
 3              THE COURT:  Where is the summary?
 4              MS. GABLE:  It's what government -- what number
 5   is it?
 6              THE COURT:  Yes.
 7              DEFENDANT DR. TOBIN:  Exhibit 122.
 8              THE COURT:  Excuse me?
 9              DEFENDANT DR. TOBIN:  122. if you look at the
10   last page you will see quite a bit of discrepancies in the
11   data.
12              THE COURT:  126 deals with Baranwal.
13              DEFENDANT DR. TOBIN:  Exhibit 122.
14              THE COURT:  I'm sorry?
15              DEFENDANT DR. TOBIN:  The very last page.
16              THE COURT:  I misunderstood you.
17              MR. NICHOLA:  Exhibit Government 122.
18              THE COURT:  Wait a minute.  Let me find it.
19   Which of the 122 exhibits that shows the last work?
20              MR. NICHOLA:  If you have a Bates number, 391.
21              THE COURT:  I don't have Bates numbers.  I need
22   exhibit numbers.
23              MS. GABLE:  Exhibit No. 122, Your Honor.
24              THE COURT:  1 --
25              DEFENDANT DR. TOBIN:  122-15, Your Honor.
```

1          THE COURT:  122 straight or 122 with a letter?

2          MS. GABLE:  It's just 122.

3          THE COURT:  I don't have a 122 up here.  I got

4    122A.  I don't have a 122.  Well, maybe I do.  Excuse me.

5    I beg your pardon.  I have it.

6      Well, it shows approvals in 2004, not many, it shows

7    2004 -- March 29, 2004; April 5, 2004; April 6, 2004;

8    April 25, 2004; April 26, and 2005, March 23.  And so

9    that's post North Carolina decree, right?

10          MS. GABLE:  It is, Your Honor.

11          THE COURT:  When's the North Carolina decree

12   again?

13          MS. GABLE:  Well, the consent order was signed

14   August 7 of 2003, but the actual notice of charges was

15   delivered to Mr. Tobin on August 3rd or August 26th of

16   2003.

17          MR. NICHOLA:  Judge, on page 5 of 6 of the

18   order, it's dated December 18 of 2003.  And Dr. Tobin had

19   signed it on December 15 of 2003 on page 6 of 6.  And our

20   contention going back to Government's Exhibit 122 is that

21   the numbers that appear after November 30th of 2003 as

22   being controlled reviews point out a deficiency in the

23   computer system of Jive Network.

24          THE COURT:  Well, there's no question that the

25   Texas order comes down before he stops with Jive Network.

1    And that's not a dispute, is it?

2            MS. GABLE:  That's correct, Your Honor.

3            MR. NICHOLA:  That's correct.  And that

4    particular matter involved another company.  It was called

5    E-scripts.

6            THE COURT:  Well, it's not the company; it's the

7    conduct.

8            MR. NICHOLA:  But it's an agreed order and

9    what's going to happen is now I'm going to have to -- if

10   this is allowed in, I'll have to bring in Mr. Bigelow to

11   explain that this is an item that Dr. Tobin could have won

12   in Texas, but Dr. Tobin chose to agree to this order in

13   order to settle the matter.

14       So what we'll be doing, we might be confusing the

15   jury on what the issues are if we allow in the Texas

16   order.  If anything, Judge, if Dr. Tobin were to take the

17   witness stand, then perhaps the Court will consider

18   whether to allow the government to cross-examine Dr. Tobin

19   with respect to the Texas order.

20           THE COURT:  Well, your contention is that

21   Dr. Tobin is at least of the belief that he stopped

22   prescribing for Jive Network before the North Carolina

23   order came down?

24           MR. NICHOLA:  That's correct.  Before Dr. Tobin

25   entered into that consent order.

1          THE COURT:  The North Carolina you're talking

2     about?

3          MR. NICHOLA:  North Carolina.

4          THE COURT:  Yeah.  And of course the

5     government's database shows to the contrary.

6          MR. NICHOLA:  Well --

7          THE COURT:  But, in any event, the Texas comes

8     down long before he stopped working with Jive Network, and

9     there's no dispute over that, is there?

10          MR. NICHOLA:  No.  But it was an agreed order.

11          THE COURT:  Well, agreed or not, he said he

12     would stop doing what he's alleged to have done in this

13     case.

14          MR. NICHOLA:  But then it brings in the issue of

15     are we dealing with federal law or state regulatory.

16          THE COURT:  We're dealing with prescribing

17     controlled substances without ever seeing a patient.

18     That's what we're dealing with in this case.  We have been

19     dealing with it since the opening statements.  And that's

20     why you got so upset yesterday when Jude LaCour asked the

21     Cleveland Plain Dealer reporter on cross-examination what

22     the investigation was all about and he summarized it in

23     two sentences.  That's the case.  The case is

24     prescriptions without ever seeing the patient.

25          MR. NICHOLA:  But that behavior is not

1   prohibited in the Controlled Substances Act until the Ryan

2   Haight Amendment that went into effect this week.

3           THE COURT:  That has to do with arguments that

4   we'll make when we get the instructions.

5       I'm going to admit the Texas order.  I'm going to

6   withhold judgment on the North Carolina.  So I'm not going

7   to admit North Carolina at this point.

8           MS. GABLE:  Very well, Your Honor.

9       And if you will give a limiting instruction --

10          THE COURT:  I will.

11          MS. GABLE:  -- at the conclusion.

12      Thank you very much.

13          THE COURT:  And then if Dr. Tobin agrees he

14  decides to testify, then you can confront him with the

15  North Carolina.

16          MS. GABLE:  Very well, Your Honor.

17          MR. NICHOLA:  Judge, with regards to the Texas

18  order, I would ask that it not be read out of context but

19  that the entire --

20          THE COURT:  I don't know what you mean out of

21  context.  It is what it is.

22          MR. NICHOLA:  That's right.  It is what it is.

23  But --

24          THE COURT:  I don't know what you mean by out of

25  context.

1          MR. NICHOLA:  The government's going to present

2     an agent who's probably going to read one paragraph, two

3     paragraphs to focus the jury's attention.

4          THE COURT:  You could have the rest of it read

5     then if you feel wounded by that.

6          MR. NICHOLA:  Judge is so wise.

7          THE COURT:  Excuse me?

8          MR. NICHOLA:  You're wise.  You're wise.  That's

9     a wise decision.

10          THE COURT:  Thank you.

11          MR. NICHOLA:  Even though we do reserve our

12     right under the objection of that, Judge.

13          THE COURT:  You got the right.  You objected.

14     If your client is convicted, that's the one assignment of

15     error of which you probably -- you probably got quite a

16     few by now.

17       All right.  Did we finish the testimony of the last

18     witness?

19          MR. PHILLIPS:  In response to your question, I

20     believe we did.

21          THE COURT:  We're ready for another witness.

22          MS. GABLE:  Yes, Your Honor.

23          THE COURT:  All right.  Are you ready for the

24     jury.

25          MS. GABLE:  Yes, we are, Your Honor.

```
 1                (Jury present -- 1:16 p.m.)

 2          MS. GABLE:  May I approach the witness stand,

 3   Your Honor.

 4          THE COURT:  Please.

 5          MS. GABLE:  Thank you.

 6          THE COURT:  Please call your next witness.

 7          MS. GABLE:  Thank you very much.

 8      The United States next calls James Graumlich to the

 9   stand.

10                       (WITNESS SWORN)

11                     DIRECT EXAMINATION

12   BY MS. GABLE:

13   Q    Good afternoon sir, please state your full name.

14   A    James Walden Graumlich.

15   Q    How do you spell your last name?

16   A    G-R-A-U-M-L-I-C-H.

17   Q    Mr. Graumlich, where do you work?

18   A    I work for the diversion group here in Orlando for

19   the Drug Enforcement Agency.

20   Q    What is the diversion group?

21   A    We're the arm of DEA, the regulatory arm, if you

22   will.  We ensure compliance with the Controlled Substances

23   Act by monitoring and investigating individuals who have

24   applied for and received licenses under the law to handle,

25   administer, prescribe, dispense control drugs.
```

1   Q    How long have you worked for the DEA in this

2   capacity?

3   A    Between 19 and a half and 20 years.

4   Q    And as part of your responsibilities, do you conduct

5   audits and investigations of DEA registrants?

6   A    Yes, ma'am, I do.

7   Q    What is a DEA registrant?

8   A    A registrant is one of those individuals or firms who

9   has applied for the ability under the law to obtain and

10  distribute controlled drugs.

11  Q    Can anyone handle controlled substances under the

12  Controlled Substances Act?

13  A    No.  No.  Issuance of a DEA registration is based

14  upon appropriate state licensure or other licensure

15  required in municipality or locality.

16  Q    And why is it under the Controlled Substances Act

17  that only those individuals issued with a license can

18  handle control substances?

19  A    Well, it's to ensure what's called DEA close system

20  of distribution, because DEA, under the Controlled

21  Substances Act, created a system where everybody had to

22  have a license and was responsible for maintaining records

23  of all their drugs that they either obtained or

24  distributed.

25  Q    What are the recordkeeping requirements for

1    controlled substances under the controlled substances

2    acts?

3    A    Every registrant must maintain records of all

4    controlled substances they purchase that they obtain.

5    They must maintain inventories of everything in stock on

6    an annual or actually bi-annual basis, which is every two

7    years, and otherwise distributed by them such as

8    pharmacies have to have prescriptions, wholesale drugs

9    houses have to have distribution invoices.

10   Q    What are -- with respect to -- I guess this would

11   apply to all DEA registrants, but pharmacists in

12   particular, what are their recordkeeping requirements

13   regarding prescriptions?

14   A    Prescriptions -- well, all records must be maintained

15   for two years separate from other business records, what

16   we call a readily retrievable manner.  So that we show up

17   to do an audit or an inspection of the pharmacy, those

18   records are available for us to look through and to use to

19   balance, do a balance sheet so we can account for the

20   drugs that they've purchased and distributed.  They must

21   maintain their prescription separately from other business

22   records because the prescription acts a as their record of

23   distribution.  It's their record that they filled the

24   prescription that was brought to them.

25   Q    In addition to the prescription acts as the record of

1    distribution, is there another record that a pharmacist

2    maintains to show obtaining the controlled substance?

3    A    Yes.  Like all other registrants they must maintain

4    receipt invoices for Schedule III through V.  For Schedule

5    II drugs, they have to have a real -- it's a specific form

6    that DEA issues to them.  But for Schedule III, IV and V

7    drugs, they have to have receipt invoices from the

8    distributor.

9    Q    Did you obtain -- do you know Noreen Valentine?

10   A    Yes, I do.

11   Q    And are you -- have you worked on the Jive Network

12   investigation as the DEA division investigator?

13   A    Yes, ma'am, I have.

14   Q    Did you obtain from Miss Valentine the prescriptions

15   that she had retrieved from Ms. Chebssi's pharmacy at

16   Family Health Pharmacy?

17   A    Yes, ma'am, I did.

18   Q    Did you go through those prescriptions?

19   A    Yes, ma'am, I did.

20   Q    And for what months were those prescriptions?

21   A    February and March of 2005.

22   Q    Did you find any prescriptions for August of 2004?

23   A    No, ma'am.

24   Q    How about any prescriptions for September of 2004?

25   A    No, ma'am.

1    Q    Any prescriptions for October of 2004?

2    A    No, ma'am.

3    Q    How about for November or December of 2004?

4    A    No, ma'am.

5    Q    Did you find any for January of 2005?

6    A    No, ma'am.

7    Q    Now, in addition to the recordkeeping requirements,

8    are pharmacists required to conduct and maintain an

9    inventory of their control substances?

10   A    Yes, ma'am.  Not a perpetual inventory but all

11   registrants, including pharmacies, have to take what's

12   called an initial inventory on the date that they first

13   start handling controlled substances, and then every two

14   years there after they have to take a hard count of all

15   controlled drugs on the premises so that we can do an

16   accountability if we show up to look through their

17   records.

18   Q    Now, with respect to prescriptions, are you familiar

19   with the requirements of the Federal Code of Regulations?

20   A    Yes, ma'am.  The CFR.

21   Q    And what -- under the CFR, what is a valid

22   prescription?

23   A    For a prescription to be effective or valid it must

24   be issued by a -- for a legitimate medical reason, for a

25   practitioner acting in the usual course of their

1    professional practice, and they must make sure that -- it

2    says responsibility for ensuring that rests upon the

3    physician issuing the prescription, but a corresponding

4    responsibility for the validity of the prescription also

5    rests upon the filler of the prescription, which is

6    normally a pharmacist.

7        It says that a prescription order, that is, does not

8    me the requirements of being valid under this section is

9    not a valid prescription.  And as such, both the person

10   writing it and the person filling it are subject to

11   penalties under the Act.

12   Q    With respect to prescriptions, does the CFR also

13   provide regulations regarding what kind of information

14   must be -- is required on a prescription?

15   A    Yes, ma'am.  A prescription has to have the name and

16   address of the person who received it from the physician.

17   It has to have the instructions for filling.  It has to

18   have the dosage of the drug, the name of the drug, the

19   quantity of the drug.  It also has to have the name of the

20   doctor, his or her DEA number, and also it has to be

21   signed by the physician.

22   Q    Are there certain requirements for the physician's

23   signature?

24   A    According to the CFR it says that a prescription

25   should be signed as one would sign a check.

1   Q    I want you to take a look at what's been admitted as

2   Government's Exhibit No. 103A.  That's at 391754.  Do you

3   see that in front of you, sir?

4   A    Yes, ma'am, on the screen.

5   Q    If you will take a look at that signature.  Does that

6   meet the signature requirements under the CFR?

7   A    No, ma'am, it doesn't.

8   Q    And why is that?

9   A    Because this signature is on a prescription that was

10  not originally signed by Dr. Baranwal.  It was affixed

11  within a computer system.

12  Q    With respect to the Controlled Substances Act, who

13  does the Controlled Substances Act regulate who may obtain

14  controlled substances from a distributor or a wholesaler

15  or drug distributor wholesaler?

16  A    Yes, ma'am, it does.

17  Q    And in what way does it do that?

18  A    You have to be appropriately registered in the right

19  category to obtain drugs from another registrant.  And you

20  also must have -- your registration must have the

21  schedules that you are -- that you are purchasing.  The

22  drugs are scheduled.

23  Q    So is a pharmacy that is licensed pursuant to state

24  law that has a DEA license, are they able to obtain

25  controlled substances from a wholesaler or a distributor?

1   A    Yes.  DEA registers by location so that a pharmacy

2   can only obtain the drugs -- a distributor can only ship

3   the drugs to the registered location because it's based

4   again upon state licensure where they're doing business.

5   Q    I want to have you take a look at what has been

6   marked for identification as -- I believe you will have to

7   look and help me -- there is it Government's Exhibit No.

8   217 and 218?

9   A    Yes, ma'am.

10  Q    Do you recognize these documents?

11  A    Yes, ma'am.

12  Q    How do you recognize the documents?

13  A    These are copies of certified public records that we

14  obtained from the Maryland Board of Pharmacy pursuant to a

15  subpoena.

16          MS. GABLE:  At this time we move into admission

17  Government's Exhibit No. 217 and 218.

18          MR. PHILLIPS:  No objection.

19          THE COURT:  They'll be received.

20          MS. GABLE:  Thank you.

21  BY MS. GABLE:

22  Q    And if we could publish first Government's Exhibit

23  No. 218.  That is at 393208.  What is the first page of

24  Government's Exhibit No. 317?

25  A    217.

1   Q     217 thank you.

2   A     I believe your first page is different than the one I

3   have in front of me.  My Bates number is 393192.

4   Q     Is it 393208?  Do you have another exhibit in front

5   of you?

6   A     Sorry.  That is 217.

7   Q     Okay.  Now the record is messed up.  So what number

8   are we on?

9   A     218.

10  Q     Okay.  So Exhibit No. 218?

11  A     Yes, ma'am.

12  Q     You will take a look at the first page.

13  A     That is a pharmacist reinstatement application.

14  Q     For who is it?

15  A     For Ms. Guennet Chebssi.

16  Q     And for what state is the reinstatement application

17  for?

18  A     For the state of Maryland.

19  Q     And on this application, what year does it show that

20  Ms. Chebssi obtained or graduated from Howard University

21  with her degree in pharmacy?

22  A     5 of '87.

23  Q     And on this application does it show that she has

24  some work experience i retail pharmacy?

25  A     Yes, ma'am.  Both Rite-Aid and CVS pharmacy.

1   Q    I understand this is a 1998 application, but what

2   year does she work at Rite-Aid pharmacy?

3   A    From June '87 to present.

4   Q    And what year did she work at the CVS pharmacy?

5   A    From October of '94 to April of '95.

6   Q    Turning to the fourth page of Government's Exhibit

7   No. 218, which, for the record, is at 393210.  What is

8   this document?

9   A    Record of her continuing education.

10  Q    What is continuing education?

11  A    Continuing medical professionals must undergo

12  annually continuing their education process to remain

13  current from the state of the business world -- state of

14  the medical world.

15  Q    If you will take a look at the next page of

16  Government's Exhibit No. 218 which is at 393211.

17  A    Yes, ma'am.

18  Q    What is this?

19  A    This is an acknowledgment for the receipt of her

20  application for examination as a pharmacist.

21  Q    And do you see a time and date set up for an

22  examination?

23  A    Yes, ma'am.  It's under reinstatement.  It states law

24  examination at 8:45.

25  Q    If you will take a look at two pages back which is at

1   393213, does it again show that a reinstatement for the

2   law examination was set up for Ms. Chebssi?

3   A    Yes, ma'am.  At 9:00 in the morning -- well, 9:00.

4   Q    If you will take a look at 393214.

5   A    Yes, ma'am.

6   Q    What is this document?

7   A    This states that she's successfully completed her

8   examination for licensure as a pharmacist conducted by the

9   Maryland Board of Pharmacy.

10  Q    What is the date of this document?

11  A    December 9 of 1998.

12  Q    As part of that examination does she have an

13  examination on Maryland law?

14  A    Yes, ma'am.

15  Q    If you will turn to Government's Exhibit No. 217,

16  and, again, are these records from the Maryland Board of

17  Pharmacy?

18  A    Yes, ma'am, they are.

19  Q    And what is this document?

20  A    It's an application for a pharmacy permit.

21  Q    Did you see a date on this document?

22  A    Yes, ma'am.  I see a date of October 22nd.  02 --

23  well, under the board stamp.

24  Q    Thank you.  And do you see where under item number 7

25  where it states the applicant is to check all applicable

1   descriptions of the pharmacy?

2   A    Yes, ma'am.

3   Q    What did Ms. Chebssi check?

4   A    Community.

5   Q    If you will turn to page number 393199.

6   A    Yes, ma'am.

7   Q    What is this document?

8   A    This is a citation from the Maryland Board of

9   Pharmacy.

10  Q    And what is this date?

11  A    The date of the citation is May 4, 2005.

12  Q    And to clarify, Mr. Graumlich, is it a citation being

13  referred to the Maryland Board of Pharmacy from another

14  state board of pharmacy?

15  A    Yes, ma'am.  It's from the California State Board of

16  Pharmacy.

17  Q    And if you will take a look at 393200.

18  A    Yes, ma'am.

19  Q    What is the date of this document?

20  A    October 18, 2005.

21  Q    And, again, what is this?

22  A    This, again, is a citation.  It's a letter in

23  reference to the citation.

24  Q    Citation from where?

25  A    From the California Board of Pharmacy.

1   Q    Finally, if you will take a look at 393201.  What is

2   this document?

3   A    This is a citation and fine, an order of abatement

4   from the state of California Board of Pharmacy.

5   Q    And it's addressed to whom?

6   A    Family Health Pharmacy.

7   Q    And what is the conduct which is the subject of this

8   citation?

9   A    It states, "On or about October 8, 2004, Family

10  Health Pharmacy, 2426 University Boulevard, number E,

11  Hyattsville, Maryland, 20783 dispensed prescription number

12  714790-707308C.

13           MR. IRVIN:  Objection.  This is cumulative.  We

14  heard this morning.

15           THE COURT:  Overruled.

16           THE WITNESS:  For controlled substances to a

17  California resident without first being licensed in

18  California.  This is a violation of business and

19  professions code section 4112 subdivision A.

20  BY MS. GABLE:

21  Q    Then the second paragraph, if you will summarize,

22  please.

23  A    Yes, ma'am.  It says on or about October 8, the

24  pharmacy dispensed a prescription number 714790707308C via

25  the Internet for a controlled substance without a prior

1    good faith examination and that is a violation of their

2    business and professions code.

3    Q     Thank you.

4          Mr. Graumlich, as part of your responsibilities and

5    in this case did you also issue a subpoena to the Texas

6    State Board of Medical Examiners concerning Christopher

7    Tobin?

8    A     Yes, ma'am, I did.

9    Q     And did you receive any documents in return to this

10   subpoena?

11   A     Yes, ma'am, I did.

12   Q     Can you take a look at what's been marked for

13   identification as Government's Exhibit No. 75.

14   A     Yes, ma'am.

15   Q     Do you recognize Government's Exhibit No. 75?

16   A     Yes, ma'am.

17   Q     What is this?

18   A     It's a copy of an agreed order that I got from the

19   board.

20   Q     And if you will take a look on the back page of the

21   document.  Do you see a copy of the published seal?

22   A     Yes, ma'am.

23          MS. GABLE:  At this time, Your Honor, we move

24   for the admission of Government's Exhibit No. 75.

25          MR. NICHOLA:  As previously noted and before.

1           THE COURT:  The exhibit will be admitted.  You

2    may continue.

3           MS. GABLE:  Thank you very much, Your Honor.  At

4    this time, Your Honor, we would like to publish this

5    order, and it is at 39282.

6           THE COURT:  Well, let me give a preliminary

7    instruction to the jury --

8           MS. GABLE:  Yes, sir.

9           THE COURT:  -- before we display it.

10      You will shortly hear evidence of acts of the

11   defendant Christopher Tobin which may be similar to the

12   act charged in the indictment but we're committed on other

13   occasions.  You must not consider any of this evidence in

14   deciding if the defendant committed the acts charged in

15   this case and in a second superseding indictment.

16   However, you may consider this evidence for other very

17   limited purposes.  If you find beyond a reasonable doubt

18   from other evidence in the case that the defendant

19   Christopher Tobin did commit the acts charged in the

20   indictment, as you see in the second superseding

21   indictment, then you may consider evidence of the similar

22   act allegedly committed on another occasion to determine,

23   first, whether the defendant had the state of mind or

24   intent necessary to commit the crime charged in the second

25   superseding indictment specifically whether defendant knew

1    he was acting outside the usual course of professional

2    practice or whether defendant committed the act for which

3    the defendant is on trial by accident or mistake.

4         Now you may proceed.

5              MS. GABLE:  Thank you very much, Your Honor.

6         If we could publish the first page 392828.

7         Would you please switch.

8              THE DEPUTY CLERK:  I'm sorry.

9    BY MS. GABLE:

10   Q    Mr. Graumlich, could you please read for the jury

11   what is at the top of this document?

12   A    The header?

13   Q    Yes.

14   A    It says, "In the matter of the license of Christopher

15   G. Tobin, M.D. before the Texas State Board of Medical

16   Examiners.

17   Q    And is does it say "Agreed Order"?

18   A    Yes, ma'am.

19   Q    And what is the date of the order?

20   A    The 13th of December, 2002.

21   Q    And if you will turn to page 4 of 5 of the document,

22   which is at 392831?

23   A    Yes, ma'am.

24   Q    Could you please read the bottom of the document?

25   A    It says, "This order is a public record.  I,

1    Christopher G. Tobin, have read and understand the

2    foregoing agreed order.  I understand that by signing it

3    I waive certain rights.  I sign it voluntarily.  I

4    understand this agreed order contains the entire agreement

5    and there is no other agreement of any kind, verbal

6    written or otherwise.

7    Q    In you will turn to the next page at 3392832.  Do you

8    see a signature for Christopher G. Tobin, M.D.?

9    A    Yes, ma'am.  The upper right hand.

10   Q    And is there a notary signature?

11   A    Yes, ma'am.

12   Q    And when was this signed and entered by the Texas

13   Board of Medical Examiners?

14   A    The 21 -- well, giving my hand the official seal of

15   this office the 21st day of November, 2002.

16   Q    If you will look at the bottom of the document when

17   was it signed and entered by the Texas Board of Medical

18   examiners?

19   A    The 13th of December, 2002.

20   Q    Turn back to the first page now of the agreed order

21   at 392828.

22   A    Yes, ma'am.

23   Q    Can you read under the finding of facts, beginning at

24   paragraph 1?

25   A    Yes, ma'am.

```
 1              THE COURT:  And please read just a little
 2   slower, please.
 3              THE WITNESS:  Yes, sir.
 4        Respondent, Christopher G. Tobin M.D., holds Texas
 5   medical license K5414.  The board has jurisdiction over
 6   the subject matter and respondent.  Respondent received
 7   all notice which may be required by law and the rules of
 8   the board.  All jurisdiction requirements have been
 9   satisfied under the Texas occupational code annotated
10   subtitle B and it says 2002.  Hereinafter the act.
11   BY MS. GABLE:
12   Q    If you will now read paragraph 3.
13   A    Respondent is not certified by the American Board of
14   Medical Specialties but is primarily engaged in the
15   practice of general medicine.
16   Q    And paragraph 4?
17   A    Respondent has been licensed to practice by the Board
18   for approximately four years.
19   Q    Go to the next page at 392829.
20   A    Yes.
21   Q    Could you please read paragraph five?
22   A    "Respondent has entered into this agreed order
23   pursuant to the provisions of section 164.002, the Act."
24   Q    And paragraph 6?
25   A    "In response to an Internet questionnaire, respondent
```

1   prescribed the drug Viagra to a federation of state

2   medical boards investigator without ever personally seeing

3   the patient, examining the patient or even speaking to the

4   patient."

5   Q      And paragraph 7?

6   A      "Respondent failed to adhere to the Board's policy on

7   Internet prescribing which provides in pertinent part:  It

8   is unprofessional conduct for a physician to initially

9   prescribe any dangerous drugs or controlled substances

10  without first establishing a proper physician-patient

11  relationship.  A proper relationship, at a minimum,

12  requires:  One, verifying that the person requesting the

13  medication is in fact who they claim to be; two,

14  establishing a diagnosis through the use of accepted

15  medical practices such as a patient history, mental status

16  exam, physical examination and appropriate diagnostic and

17  laboratory testing; 3, discussing with the patient the

18  diagnosis and the evidence for it, the risks and benefits

19  of various treatment options; and, 4, insuring

20  availability of the physician or coverage for the patient

21  for appropriate follow-up care.  An on line or telephone

22  evaluation by questionnaire is inadequate."

23  Q      Under the conclusions of the law, could you please

24  read paragraph 1.

25  A      "Respondent is subject to disciplinary action by the

1    Board pursuant to section 164.051A6 of the Act by failing

2    to practice medicine in an acceptable professional manner

3    consistent with the public health and welfare."

4    Q    And paragraph 2?

5    A    "Respondent has committed a prohibited act or

6    practice within the meaning of sections 164.052A5 and

7    164.053A5 of the Act by prescribing or administering a

8    drug or treatment that is non therapeutic in nature or non

9    therapeutic in the manner the drug or treatment is

10   administered or prescribed."

11   Q    Number 3?

12   A    "Respondent has committed a prohibited act or

13   practice within the meaning of a section 164.052A5 of the

14   act based upon unprofessional or dishonorable conduct that

15   is likely to deceive or defraud the public or injure the

16   public."

17   Q    And if you will turn to the next page at 392830.

18   A    Yes, ma'am.

19   Q    Under order.

20   A    Yes, ma'am.

21   Q    Will you please read that?

22   A    Yes, ma'am.  "Based on the above findings of fact and

23   conclusions of law, the board orders that:  1, this agreed

24   order shall constitute a public reprimand of respondent,

25   and that respondent is hereby reprimanded.

1    2, respondent's Texas license is hereby restricted

2    under the following terms and conditions for three years

3    from the date of the signing of this agreed order by the

4    presiding officer of the board.

5    3, respondent shall not prescribe or otherwise

6    dispense any schedule medications to patients via the

7    Internet, through the Internet, or in any other manner

8    facilitated by the Internet.

9    4, respondent shall pay an administrative penalty in

10   the amount of $1,000 within 30 days of the signing of this

11   order by the presiding officer of the board.

12   5, the administrative penalty shall be paid in a

13   single payment by cashier check or money order payable to

14   the Texas State Board of Medical Examiners and shall be

15   submitted to the director of compliance for the board for

16   routing so as to be remitted to the controller of Texas

17   for deposit in the general revenue fund.

18   6, respondent's failure to pay the administrative

19   penalty as ordered shall constitute grounds for further

20   disciplinary action by the Board as provided for in the

21   Act, and may result in a referral by the executive

22   director of the board for collection by the office of the

23   attorney general.

24   7, respondent shall obtain five hours of an ethics

25   course or ethics programs per year for three years.

```
 1    Documentation of attendance and successful completion of
 2    each yearly requirement for ethics shall be delivered to
 3    the director of compliance for the Board on or before the
 4    end of each year this order is in effect.
 5        This ethics instruction is limited to medical
 6    ethics."
 7    Q    And, sir, if you will turn to 392831.
 8    A    Yes, ma'am.
 9    Q    Could you please read paragraph 11?
10    A    Yes, ma'am.  "11, Any violation of the terms,
11    conditions or requirements of this order by respondent
12    shall constitute unprofessional conduct likely to deceive
13    or defraud the public, and to injure the public, and shall
14    constitute a basis for disciplinary action by the board
15    against respondent pursuant to the Act."
16    Q    And on what date did the defendant sign this agreed
17    order?
18    A    The 21st of November, 2002.
19            MS. GABLE:  Thank you.  I have no further
20    questions.
21                    CROSS-EXAMINATION
22            MR. LEVENTHAL:  Can I have one moment, Your
23    Honor?
24            THE COURT:  Please.
25            MR. LEVENTHAL:  I'm sorry, Your Honor.  I wanted
```

 1   to get the numbers straight.

 2   BY MR. LEVENTHAL:

 3   Q    Good afternoon, sir.

 4   A    Good afternoon.

 5   Q    A few questions.  You testified in some of

 6   government's questions about the Code of the Federal

 7   Regulations?

 8   A    Yes, sir.

 9   Q    You're familiar with those because of your job?

10   A    Yes, sir.

11   Q    What is the Code of Federal Regulations so the jury

12   knows?

13   A    The Code of Federal Regulations are the actual --

14   they are the rules, if you will, under the law.  They

15   are -- they tell the people who are covered under the law

16   what they have to do to comply with the law.

17   Q    Okay.  But they're rules, correct?

18   A    Yes, sir.

19   Q    But they're called regulations?

20   A    Yes.

21   Q    Okay.  I think you said that those regulations define

22   what a prescription is?

23   A    Yes.

24   Q    Is that correct?

25   A    Yes, sir.

1   Q    And that's where you got the basis of your testimony

2   you have given this afternoon from those regulations?

3   A    Yes, sir.

4   Q    Okay.  A prescription is a prescription if it's

5   authorized for medical reasons, correct?

6   A    That's one of the reasons, yes, sir.

7   Q    Okay.  Did the Code of Federal Regulations -- they

8   define what a medical reason is?

9   A    No, sir.

10   Q    Have you had any training separate and apart from

11   your knowledge of the regulations as to what a medical

12   reason is for a prescription?

13   A    No, sir.

14   Q    You also in answering the government's question in

15   defining what a prescription is that it has to be for a

16   medical reason and in the usual course of medical

17   practice.  Correct?

18   A    Yes, sir.  Professional practice.

19   Q    Professional practice?

20   A    Yes, sir.

21   Q    Okay.  Is that right out of the regulations?

22   A    Yes, sir.

23   Q    Okay.  So you basically quoted it?

24   A    Not verbatim but, yes, sir.

25   Q    Close enough.

1      Did the regulations define what is in the usual

2  course of professional practice?

3  A    No, sir.

4          MR. LEVENTHAL:  Chris, can you pull up please,

5  393175.

6      Can I step over here, Your Honor?

7          THE COURT:  Excuse me?

8          MR. LEVENTHAL:  Can I step over?

9  BY MR. LEVENTHAL:

10 Q   Can you scroll down to the bottom.  You see what's on

11 the screen, sir?

12 A    Yes, sir.

13 Q   Okay.  For purposes of just moving this along, this

14 is a medical questionnaire that goes along with the

15 exhibit that you looked at earlier which was I think

16 Exhibit 103A.  This was the questionnaire that goes along

17 with what you looked at on the screen for the government.

18 A    Okay.

19 Q   Okay.  And it's a medical questionnaire for an

20 individual that was requesting to be prescribed with

21 Adipex P.  Correct?

22 A    Yes, sir.  Sorry, I didn't realize that was a

23 question.

24 Q   I'm sorry?

25 A    I didn't know you were asking a question.  I thought

1    you were stating it, so --

2    Q    Okay.

3    A    Yes, sir.  I see Adipex P there.

4    Q    In your work in diversion control, have you heard the

5    term body mass index?

6    A    Yes, sir, I have.

7    Q    And what do you know that to mean?

8              MS. GABLE:  Objection, Your Honor.  Outside the

9    scope of direct examination.

10              THE COURT:  Overruled.

11   BY MR. LEVENTHAL:

12   Q    Go ahead.

13   A    Generically I know that it's a measurement of --

14   Q    Keep your voice up.

15   A    Sorry.  It's a measurement of a person's muscle mass

16   to I guess fat ratio.

17   Q    Okay.  Is it usually associated with -- that term

18   associated with overweight or obesity?

19              MS. GABLE:  Objection.  Beyond the scope of

20   direct.

21              THE COURT:  Well, you asked him about federal

22   regulations, and you went from that area.  He can answer

23   the question to the extent he knows about it.

24              THE WITNESS:  What was the question?

25   BY MR. LEVENTHAL:

1   Q    Do you know if that term that you just told us about,

2   body mass index, is associated with overweight or obesity?

3   A    I have heard of that, yes.

4   Q    Okay.  Thank you.  When you looked at the exhibit --

5   this was on 391754 -- Chris, this was Exhibit 103A -- that

6   you looked at in your direct examination, sir.  It will be

7   on the screen.  Do you see that?

8   A    Yes, sir.

9   Q    Okay.  I think you were asked some questions about

10  the name at the bottom Ahkil Baranwal?

11  A    Yes, sir.

12  Q    And you testified that prescription -- I may have

13  this wrong -- you correct me if I do -- that a

14  prescription has to have an original signature of a

15  doctor?

16  A    Yes, sir.  A prescription that is carried by a

17  patient to a pharmacy or faxed to a pharmacy has to have

18  an original prescription -- original signature.  The only

19  other provision is for a prescription to be phoned in by a

20  doctor's office and then reduced to writing by the

21  pharmacy.

22  Q    Okay.  Is that in the code of federal regulations?

23  A    Yes, sir.

24  Q    Okay.  Even this particular document that you're

25  looking at, there's a prescription for a young woman who's

1    already testified.  We're not going to worry about that.

2    It lists the name of the prescribing doctor.

3    A    Yes, sir.

4    Q    And do you know what the numbers in parens are after

5    that?

6    A    I do not know what those numbers are.

7    Q    Looks like a phone number, doesn't it with an area

8    code?

9    A    It could be.  I don't know what that number is.

10    Q    Okay.  It's got an address, correct?

11    A    Yes, sir.

12    Q    Sundell Circle, Blackshear, Georgia?

13    A    Yes.

14    Q    It has a license number?  Do you know is that a

15    medical license number?

16    A    It appears to be a Georgia medical license number of

17    some sort.

18    Q    Okay.  And it's got a DEA number BB6829800.

19    A    Yes, sir.

20    Q    You see that?

21    A    Yes.

22    Q    What is that?

23    A    Without checking, I have to assume that's his DEA

24    registration.

25    Q    But a DEA number?

```
 1   A     Yes, sir.

 2   Q     A registration number?

 3   A     That's a format of DEA registration number.

 4   Q     And doctors that prescribe controlled substances have

 5   to have such a DEA registration?

 6   A     Yes, sir.

 7   Q     And you talked about, a little earlier about

 8   pharmacies are required to keep records for a certain

 9   period of time?

10   A     Yes, sir.

11   Q     If they're registered?

12   A     Yes, sir.

13   Q     What about doctors?

14   A     Doctors do not have to keep records of every

15   prescription they write.

16   Q     Okay.

17            MR. LEVENTHAL:  I have no further questions.

18   Thank you.

19                    CROSS-EXAMINATION

20   BY MR. NICHOLA:

21   Q     Good afternoon, Mr. Graumlich.

22   A     Good afternoon.

23   Q     I want to follow-up on something about the signature

24   being an original.  What effect, if any, does the -- I

25   think it might have been the first Bush, maybe it was the
```

1    second Bush president who enacted some law concerning

2    electronic signatures be sufficient to be original

3    signatures?

4              MS. GABLE:  Objection.

5    BY MR. NICHOLA:

6    Q    Do you know what effect that might have on your

7    opinion concerning what you testified to previously?

8              MS. GABLE:  Objection.

9              THE COURT:  Well, the question was do you know

10   anything about the so-called legislation?

11             THE WITNESS:  No, sir.

12             THE COURT:  Next question.

13   BY MR. NICHOLA:

14   Q    Let's turn to Government's Exhibit number 75.  If we

15   could have Bates number 392829 shown on the screen,

16   please.

17        Now, you will notice in paragraph 7, Mr. Graumlich,

18   that the respondent -- according to this, the respondent

19   failed to adhere to the Board's policy.  Isn't that

20   correct?

21   A    Yes, sir.  That's what it says.

22   Q    And if we go down to the conclusion of law in the

23   same page, in paragraph 2, it indicates that respondent

24   has committed a prohibited act or practice within the

25   meaning of those statutes by prescribing or administering

1    a drug or treatment that is non therapeutic in nature.

2    Now, let's look back up to paragraph 6.  Respondent

3    prescribed the drug Viagra to an investigator without

4    personally seeing the patient, examining the patient or

5    even speaking with the patient.  Now, this is an agreed

6    order, right?

7              THE COURT:  What was the question?

8    BY MR. NICHOLA:

9    Q    Does the DEA require a doctor to do something --

10   let's see -- does the DEA require a doctor to measure a

11   male's penis before prescribing by Viagra?

12             MS. GABLE:  Objection, Your Honor.

13             THE COURT:  Well, I don't think a male penis has

14   anything to do with this case.

15             MR. NICHOLA:  Judge, Judge, wait a minute.  What

16   is the doctor --

17             THE COURT:  The objection is sustained.

18             MR. NICHOLA:  Okay.

19   BY MR. NICHOLA:

20   Q    What is the doctor supposed to do during a physical

21   examination prior to prescribing Viagra?

22             MS. GABLE:  Objection.  Beyond the scope.

23             THE COURT:  Sustained.

24             MR. NICHOLA:  Okay.

25   BY MR. NICHOLA:

1    Q    These are things that people probably prefer to do

2    over the Internet, isn't that true, Mr. Graumlich?

3              MS. GABLE:  Objection.

4              THE COURT:  I'm sorry. I didn't get the

5    question. Speak --

6    BY MR. NICHOLA:

7    Q    These are the type --

8              THE COURT:  Wait a minute.  I'm still talking.

9    There's one rule in the courtroom that's been in place

10   ever since I was a lawyer and that's when a judge is

11   talking, everybody else is quiet.  It hasn't changed.

12       Now, I didn't hear your question.  If you want to

13   repeat your question because there was an objection to it,

14   I don't know how to rule on the objection until I know

15   what the question is.

16             MR. NICHOLA:  I'll repeat it for you, Judge.  I

17   almost forgot it.

18   BY MR. NICHOLA:

19   Q    How is a doctor supposed to exam a patient prior to

20   prescribing Viagra?

21             MS. GABLE:  Objection.

22             THE COURT:  Sustained.

23   BY MR. NICHOLA:

24   Q    So, Mr. Graumlich, would you agree that these are the

25   type of issues that perhaps many patients would prefer to

1    handle over the Internet?

2            MS. GABLE:  Objection.

3            THE COURT:  Sustained.

4    BY MR. NICHOLA:

5    Q    Is there no criminal charges that resulted from

6    Dr. Tobin prescribing Viagra in this Texas matter, is

7    there?

8    A    I don't know.

9    Q    Well, do you know whether Dr. Tobin still has his DEA

10   registration license?

11   A    I don't know.

12   Q    You didn't check that?

13   A    No.

14   Q    Prior to testifying?

15   A    No, sir.

16   Q    If he didn't wouldn't you have been prepared to offer

17   that information today?

18           MS. GABLE:  Objection, Your Honor.

19           THE COURT:  Sustained.

20           MR. NICHOLA:  Well, no further questions, Judge.

21                         CROSS-EXAMINATION

22   BY MR. IRVIN:

23   Q    Mr. Graumlich -- we can leave that exhibit up, that

24   was just up, Bates number, I think it's 392829.  Same

25   exhibit that they have been talking about.  That's all

1    regarding state law, Texas law, correct?

2    A    This is an order from the Texas board, yes, sir.

3    Q    It has nothing to do with the federal law, correct?

4    A    From the Texas board.  It's state of Texas.

5    Q    Okay.  Can you take it off.  Thank you very much.

6         Ms. Gable asked you a question, Mr. Leventhal asked

7    you a question regarding signature.  I understood your

8    testimony during Mrs. Gable's examination of you that it

9    was signed as on signing a check.  When you talked about

10   signing a prescription, signed as on signing a check.

11   Then Mr. Leventhal questioned you, you used the word

12   original.  And I want you to think about both of those

13   answers because the CFD did not use the word original, did

14   it?

15             THE COURT:  CFR original about what?

16             MR. IRVIN:  About signature.

17   BY MR. IRVIN:

18   Q    You said one signed it as signing a check, another --

19   A    It says it must be signed meaning the interpretation

20   is that it must be physically be signed because DEA has

21   gone on to further discuss facsimile signatures.

22   Q    Talking about a CFR, not what the DEA does.  The CFR,

23   that's what you testified about?

24   A    Okay.

25   Q    The Code of Federal Regulation does not use the term

1   original signature, does it?

2   A    It uses the term signature.

3   Q    Uses signature, that is correct.

4        Now, signature is not defined, is it?

5   A    Beyond saying as one would sign a check, no, sir.

6   Q    When you get your pay check it does not have blue ink

7   or red ink.  It has a stamped electronic signature, does

8   it not?

9              MS. GABLE:  Objection.  Relevance.

10             THE COURT:  Sustained.

11  BY MR. IRVIN:

12  Q    So once again, I want to make sure I --

13             THE COURT:  Well, no, what you want to do is

14  irrelevant.  Ask the question.

15  BY MR. IRVIN:

16  Q    Signature is -- signature is not defined.

17  A    Not -- the word is used but it's not defined beyond

18  that.

19             MR. IRVIN:  Thank you very much.

20                          CROSS-EXAMINATION

21  BY MR. PHILLIPS:

22  Q    Good afternoon, Investigator Graumlich.

23  A    Good afternoon.

24  Q    You testified that the Code of Federal Regulations

25  doesn't define signature.  It doesn't define -- what was

1   it legitimate medical purpose or usual course of practice,

2   that kind of stuff, right?

3   A    Correct.

4   Q    It also doesn't define the phrase corresponding

5   responsibility, does it?

6   A    It uses it, but beyond that, no, sir.

7   Q    Correct.  It says there is corresponding

8   responsibility without further definition?

9   A    Yes, sir.

10  Q    Okay.  Now, you testified that if a pharmacist

11  violates this corresponding responsibility, both the

12  physician and the pharmacist are responsibly exposed?

13  A    Yes, sir.

14  Q    So it would also therefore be true that the physician

15  violates something the pharmacist would be exposed?

16          MS. GABLE:  Objection, Your Honor.

17          THE COURT:  I'm not sure I understand.  Rephrase

18  the question.

19  BY MR. PHILLIPS:

20  Q    Gladly.

21     Investigator Graumlich, you testified that there was

22  this --

23          THE COURT:  Don't ask what he testified.  Ask

24  him a question.

25          MR. PHILLIPS:  That's my intention, Your Honor.

```
 1   BY MR. PHILLIPS:

 2   Q    You testified did you not, on direct examination --

 3             THE COURT:  Now, you got a "not" in the

 4   question.  When you say is it true you did not, you

 5   mean -- you got to get the "not" out of the question.  Now

 6   I have lawyers who do that all the time.  N-O-T does not

 7   belong in the question.  Ask the question again.

 8             MR. PHILLIPS:  Thank you, Your Honor.

 9   BY MR. PHILLIPS:

10   Q    If a pharmacist breaches the pharmacist's

11   corresponding responsibility, you indicated that the

12   physician could be subject to sanction.  Is that true?

13             MS. GABLE:  Objection, Your Honor.

14             THE COURT:  Sustained.

15   BY MR. PHILLIPS:

16   Q    You testified on direct examination that the -- that

17   both would be subject to penalties in the event of a

18   violation of the Code of Federal Regulations.  You

19   remember that?

20   A    Yes, sir.

21   Q    Who are both in that sentence?

22   A    The prescriber and the filler.

23   Q    The physician and the pharmacist?

24   A    Yes, sir.

25   Q    In this fact pattern, let's say.
```

```
 1   A     Yes, sir.

 2   Q     These haven't been digitized so I have put them on

 3   the DOAR system for you.

 4         Do you have Exhibit 218 in front of you?

 5   A     Yes, sir, I do.

 6   Q     Would you turn to the second page of it.

 7   A     Yes, sir.

 8   Q     See if I can get this -- would you read item 8A on

 9   that, please, for me?

10   A     8A.  Has any state licensing or disciplinary board or

11   a comparable body in the armed service denied your

12   application for licensure, reinstatement or renewal, or

13   taken any action against your license including but not

14   limited to reprimand, suspension, or revocation?

15   Q     What response is indicated there?

16   A     No.

17   Q     Read 8B for us, please.

18   A     Have you surrendered or failed to renew a license in

19   any state?

20   Q     And the response indicated?

21   A     No.

22   Q     Nine, please.

23   A     Are there any outstanding complaints, investigations

24   or charges pending against you in any state by any

25   licensing or disciplinary board or a comparable body in
```

1    the armed services?

2    Q    And again the indicated response?

3    A    No.

4    Q    Apart from that matter, has your investigation

5    revealed any of those answers to be untrue?

6    A    No, sir.

7    Q    Turn to the next page of that same exhibit.  This is

8    Bates 393210 from Exhibit 218.  On direct examination you

9    described this as Ms. Chebssi's continuing education log.

10   A    Yes, sir.

11   Q    Do you have that in front of you?

12   A    Yes, sir.

13   Q    Do you know -- do you note anywhere on there that

14   she's taken any classes on Internet pharmacy, or read any

15   articles on Internet pharmacy?

16   A    I'll review it.

17   Q    Please.

18   A    No, sir.

19   Q    It does indicate she's read the drug store news and

20   the pharmacist's letter, among other things?

21   A    I'm sorry.  I don't see where that is.

22   Q    In the column "provider."

23   A    Yes, sir.  Sorry.

24   Q    You see that now?

25        Turning to Bates 393214 which I think -- or 218 is

 1    the next to last page of that.

 2    A    Yes, sir.

 3    Q    She get a 76 in Maryland law.

 4    A    That's what it says, yes, sir.

 5    Q    Do you know what passing is?

 6    A    No, sir.

 7    Q    But she passed?

 8    A    Yes, sir.

 9    Q    You indicated in your direct examination that this

10    was a petition for reinstatement?

11    A    Yes, sir.

12    Q    Are you aware that Ms. Chebssi was also licensed in

13    Virginia?

14    A    Yes, sir.

15    Q    Turning to Exhibit 217, if you have that one in front

16    of you.

17         Turning back to Bates number 393199 which is the

18    third page from the end.

19    A    Yes, sir.

20    Q    This is the letter -- one of the letters you

21    testified to on your direct examination.

22    A    Yes, sir.

23    Q    What is the date of that letter?

24    A    May 4, 2005.

25    Q    Now, who is it from?

1   A    The California State Board of Pharmacy.

2   Q    Who is it –– to whom is it addressed?

3   A    The Maryland Board of Pharmacy.

4   Q    And it inquire –– transmits the citation from the

5   California Board?

6   A    Yes, sir.

7   Q    Okay.  Turn the page.  What's the date of this

8   letter?

9   A    October 18, 2005.

10  Q    Who's it from?

11  A    California State Board of Pharmacy.

12  Q    Who, to whom?

13  A    The Maryland Board of Pharmacy.

14  Q    And what's –– you see the highlight there in the

15  third highlight where it says "please."  Would you read

16  that sentence for me, please?

17  A    "Please advise as to the status of actions being

18  taken by your board."

19  Q    And attached to this was this last page which is the

20  same thing we saw this morning –– I'm sorry you weren't

21  here –– which is the California citation and order of

22  abatement?

23  A    Yes, sir.

24  Q    Let's go back to that one page.  That's 18 October

25  '05?

1    A    Yes, sir.

2    Q    When did Family Health Pharmacy cease operation with

3    respect to Jive Network?

4    A    I'm not sure.

5             MR. PHILLIPS:  Thank you.

6         Your Honor, I have no further questions.

7             THE COURT:  Thank you.  Mr. LaCour?

8                      CROSS-EXAMINATION

9    BY MR. JUDE LACOUR:

10   Q    Good afternoon, Mr. Graumlich.

11   A    Good afternoon.

12   Q    Is that correct -- did I pronounce it correctly?

13   A    Yes, sir.

14   Q    As a DEA diversion investigator I believe you

15   testified that you investigate people who hold DEA

16   licenses, is that correct?

17   A    Yes, sir.

18   Q    And how long have you been on this particular

19   investigation?

20   A    Since late 2004.

21   Q    And how many people did you interview in relation to

22   this investigation?

23             MS. GABLE:  Objection, Your Honor.

24             THE COURT:  Sustained.

25   BY MR. JUDE LACOUR:

1   Q    Was everyone that you interviewed a licensed DEA

2   registrant?

3             MS. GABLE:  Objection.

4             THE COURT:  Sustained.

5   BY MR. JUDE LACOUR:

6   Q    I believe it says, you testified that only pharmacies

7   can order controlled substances based on having a DEA

8   registration.  Is that correct?

9   A    No, sir.  I don't believe that's what I said.

10  Q    Is it true that only pharmacies can order controlled

11  substances?

12  A    No.

13  Q    Who else can order controlled discussions?

14  A    When you say order, do you mean purchase from another

15  registrant?

16  Q    Yes.  Who else can order controlled substances from a

17  drug wholesaler, for example?

18  A    Well, either another distributor or drug wholesaler

19  may or a doctor appropriately licensed and registered or a

20  pharmacist or a pharmacy, excuse me.

21  Q    Okay.  So, to order controlled substances, either a

22  doctor or pharmacy or wholesaler have to be listened with

23  the DEA, is that correct?

24  A    Yes, sir.  Anyone who purchases controlled substances

25  has to have a registration.

```
 1   Q     So is it safe to stay that controlled substances

 2   cannot shipped through non licensed facilities?

 3   A     To non registered, correct.

 4   Q     And did you find proof controlled substances were

 5   being sent to non licensed facilities in that

 6   investigation?

 7               MS. GABLE:  Objection.

 8               THE COURT:  Sustained.

 9   BY MR. JUDE LACOUR:

10   Q     You mentioned the CFR.  Is that the Code of Federal

11   Regulations?

12   A     Yes, sir, it is.

13   Q     And does the CFR mention Internet pharmacy in any

14   capacity?

15               MS. GABLE:  Objection, relevance.

16               THE COURT:  Overruled.  He may answer if he

17   knows the answer.

18               THE WITNESS:  No, sir.  The term Internet

19   pharmacy does not currently appear in the CFR.

20   BY MR. JUDE LACOUR:

21   Q     You also mentioned that you're familiar with the

22   Controlled Substances Act.  Is that correct?

23   A     Yes, sir.

24   Q     And is the Controlled Substances Act a higher

25   authority than the CFR or are they one in the same?
```

1              MS. GABLE:  Objection.

2              THE COURT:  Sustained.

3    BY MR. JUDE LACOUR:

4    Q    I believe you also testified that the CFR doesn't

5    define certain items such as what's a correct signature,

6    usual course of professional practice, et cetera.  Do you

7    remember saying that?

8    A    Yes, sir.  I said that.

9    Q    And based on that, is it hard to interpret exactly

10   how the CFR would apply to Internet pharmacy?

11             MS. GABLE:  Objection, Your Honor.

12             THE COURT:  Well, I don't think it's a proper

13   question for this witness.  Objection sustained.  You can

14   put on any testimony to that effect if you wish.

15   BY MR. JUDE LACOUR:

16   Q    In your position as a DEA investigator, are you

17   required to stay on top of the law?

18   A    Yes, sir.

19   Q    And in relation to that, do you get legal briefings

20   of any sort from people above you?

21   A    We get instructions on changes or modifications to

22   the law.  I wouldn't call them briefings.

23   Q    So it's often -- how often does the laws change?

24   A    Well, we get a new Code of Federal Regulations every

25   year that includes any amendments from the previous year.

```
 1   New CFRs are issued every year, but the law itself, the
 2   Controlled Substances Act, is not amended very frequently.
 3   Q    Do you when the last time it was amended?
 4            MS. GABLE:  Objection, Your Honor.
 5            THE COURT:  Sustained.
 6   BY MR. JUDE LACOUR:
 7   Q    So in addition to getting briefing on CFR, you also
 8   get briefing on other laws including the Controlled
 9   Substances Act and any other laws required to operate your
10   job, is that correct?
11   A    Yes, sir.
12   Q    And how often do you get these briefings or updates?
13   A    It depends on how frequently new laws are passed or
14   modifications are enacted.
15   Q    So it's typically an instance just when something is
16   changed or enacted?
17   A    No, sir.
18   Q    Is there a typical lag time?
19            MS. GABLE:  Objection, Your Honor.  Relevance.
20            THE COURT:  Sustained.
21   BY MR. JUDE LACOUR:
22   Q    And when you get these legal briefings and/or updates
23   are they -- any of them verbal at any time?
24   A    Normally we get something in writing.
25   Q    And would you be required to be updated on a
```

1   significant modification to the Controlled Substances Act?

2           MS. GABLE:  Objection, Your Honor.

3           THE COURT:  Sustained.

4           MR. JUDE LACOUR:  No further questions, Your

5   Honor.

6       Thank you, Mr. Graumlich.

7           THE COURT:  Anything further?

8           MS. GABLE:  No, Your Honor.  Nothing.

9           THE COURT:  You may step down.

10          THE WITNESS:  Thank you.

11          MS. GABLE:  Should I call my next witness.

12          THE COURT:  Please.

13          MS. GABLE:  The next witness is Carmine

14  Catizone.

15                      **(WITNESS SWORN)**

16                    DIRECT EXAMINATION

17          MS. GABLE:  May I inquire.

18          THE COURT:  Do you intend to offer this witness

19  with expert testimony?

20          MS. GABLE:  I do, Your Honor.

21          THE COURT:  Well, let me just explain expert

22  testimony to the jury before we begin.

23      Normally a witness is not permitted to offer

24  opinions.  Rather witnesses testify as to facts they see,

25  hear, taste et cetera, but there is an exception in the

1   law which provides that if a person has a particular

2   experience in a given field based on education, normally,

3   or experience and education, he or she may be allowed to

4   express an opinion, and we sometimes refer to that as

5   expert testimony.  I prefer to refer it to as opinion

6   testimony.  So the witness is presented as an opinion

7   witness.  He or she is allowed to express an opinion based

8   on facts as he or she sees them.  And I gather this is --

9   the government intends to present this witness as an

10  opinion witness.

11      You have the same responsibility with respect to

12  credibility as the expert or opinion witness as you do to

13  other witnesses.  You must decide for yourself whether you

14  believe all, part, or none of the witness has to say.  So

15  scrutinize the testimony of the witness the same as you

16  would any other witness understanding that the Court --

17  assuming this witness is properly qualified -- will be

18  permitted to express an opinion.

19      You may continue.

20          MS. GABLE:  Thank you so much, Your Honor.

21  BY MS. GABLE:

22  Q    Mr. Catizone, where do you work?

23  A    Work in state of Illinois at the National Association

24  of Boards of Pharmacy.

25  Q    What is the National Association of the Boards of

1   Pharmacy?

2   A    NABP as it is commonly known is the association of

3   all the state agencies that regulate pharmacists and

4   pharmacies.  Individual pharmacists cannot be members,

5   drug companies can not be members.  It's only the state

6   agencies that regulate pharmacy and pharmacists that can

7   be members.

8   Q    And does every state within the United States have a

9   board of pharmacy?

10  A    Yes.

11  Q    Can you pull the mic phone a little closer to you.

12  A    Sure.

13  Q    Thank you.  What is your position with the National

14  Association of the Boards of Pharmacy?

15  A    I'm the executive director or the executive officer.

16  Q    How long have you been the executive director?

17  A    Since 1988.  I have been with NABP since 1985.

18  Q    How is it that you became the executive director of

19  the National Association of the Boards of Pharmacy?

20  A    The association conducted a national search trying to

21  find somebody to serve as the CEO.  Among all the

22  candidates I was fortunate to be selected.

23  Q    Before becoming the executive director of the

24  National Association of the Boards of Pharmacy, did you

25  hold any other positions with that organization?

1    A    Yes.  I was the test and measurement director.  I

2    oversaw all the competency assessment or the licensures

3    examination programs.

4    Q    Now, what are the licensure examination programs of

5    the National Association of the Boards of Pharmacy?

6    A    Every state requires our national licensure exam for

7    pharmacists seeking to become licensed in their states.

8    The national licensure exam tests the pharmacist's

9    competence or ability to practice pharmacy safely.  We

10   develop that exam and administer that for the states.

11       We also provide a state law exam for 46 states that

12   participate in the program and the state law exam examines

13   a person's knowledge of state and federal law and whether

14   or not that person is competent in pharmacy law in order

15   to practice in that individual state.

16   Q    Can you give the jury a brief resume of your academic

17   background?

18   A    I graduated with a bachelor of science degree from

19   the University of Illinois; obtained my master degree in

20   pharmacy administration and pharmacy healthcare policy

21   from the University of Illinois; served as an adjunct

22   faculty at the University of Illinois Midwestern College

23   of Pharmacy; and guest lecturer and speaker at numerous

24   universities and colleges across the country.

25   Q    During your professional career, have you worked as a

1   pharmacist?

2   A    Yes.  I worked in both the retail and at a chain

3   pharmacy as well as a hospital pharmacy during my career.

4   Q    How many years have you worked as a pharmacist?

5   A    I worked 14 years in both the chain and hospital

6   settings.

7   Q    Have you developed an expertise in the area of

8   pharmacies operating on the Internet through your training

9   and experience?

10  A    Yes.

11  Q    Can you tell the jury a little bit about that

12  expertise?

13  A    Based upon the knowledge that I have of state laws,

14  regulations and federal laws, in 1997 we became involved

15  with Internet pharmacy practice.  And since that time, we

16  have researched Internet pharmacy.  We have worked with

17  the states in developing laws on Internet pharmacies, and

18  we have assisted state boards of pharmacy and agencies in

19  regulating or accrediting Internet pharmacies.

20  Q    Have you taught any courses at the Drug Enforcement

21  Administration regarding Internet pharmacy?

22  A    Yes.  I recently provided a class at Quantico at the

23  training center for the DEA on Internet pharmacy.

24  Q    Are you familiar with the laws pertaining to

25  pharmacies operating on the Internet?

1    A    Yes.

2    Q    And are you also knowledgeable regarding the state

3    requirements for the boards of pharmacies for each of the

4    states in the United States?

5    A    Yes.  Based upon, again, my experience in working

6    with all the states on their statutes and regulations, and

7    the -- one of the programs that we also administer, is we

8    have all the state regulations and statutes on a computer

9    database that we utilize daily in working with the states

10   and helping the states developing rules and regulations

11   within their own jurisdictions.

12   Q    Have you made any presentations on the topic of the

13   Internet pharmacies?

14   A    Yes, I have.

15   Q    And what type of presentations have you made?

16   A    The presentations have varied from presentations at

17   Quantico or colleges of pharmacy to appearances on CNN,

18   the Today Show and other programs where I talked to

19   consumers about Internet pharmacy practice, what to look

20   for in a safe Internet practice, and some of the warning

21   signs they should be aware of when dealing with pharmacies

22   that may not be accredited or safe.

23   Q    Have you testified as an expert in the area of

24   Internet pharmacy and pharmacy practice before?

25   A    Yes.

1   Q     And where have you testified as an expert?

2   A     I have testified in almost all the states at board

3   hearings or board meetings, except for Alaska; testified

4   in two for three DEA registrations, hearings where they

5   were moving to revoke the registration of a DEA

6   registrant; and I have testified in four federal cases

7   involving Internet pharmacy practice.

8          MS. GABLE:  Your Honor, at this time we move to

9   qualify Dr. Catizone as an expert in the area of Internet

10  pharmacies and pharmacy practice.

11         THE COURT:  You may proceed, and of course the

12  jury will recall my earlier instructions, that even though

13  I permit this witness to offer opinions, it is your

14  responsibility to weigh and determine his credibility.

15         MR. IRVIN:  Voir dire?

16         THE COURT:  No.  You'll get a chance to

17  cross-examine.  Let's move on, please.

18         MS. GABLE:  Thank you.

19  BY MS. GABLE:

20  Q     Dr. Catizone, has The national Association of the

21  Boards of Pharmacy been involved in any initiatives to

22  address legitimate or illegitimate Internet pharmacies?

23  A     Yes.  We have two programs that we've watched for

24  consumers.  The first program is our verified Internet

25  pharmacy practice site program which we launched in 1999.

1    What that program does is offer a voluntary accreditation

2    for any Internet pharmacy seeking to practice in the

3    United States.  We review all the policies and procedures.

4    We ensure that the Internet pharmacy is in compliance with

5    all state and federal laws, and then we do a physical

6    inspection of all of the components of that Internet

7    pharmacy from the call center to the distribution center

8    to the Internet site itself to make sure that the policies

9    and procedures really are being enforced.

10        The second service that we just launched about a year

11   ago is an identification of those sites that we do not

12   recommend to consumers.  To date, we've reviewed over 1400

13   Internet sites.  We look to see whether they are in

14   compliance with state and federal laws, and whether or not

15   they adhere to criteria that was developed by a panel of

16   experts.

17        If a site does not meet those qualifications, we

18   place it on the list of not recommended and advise

19   consumers not to utilize those Internet pharmacies.

20   Q    What are the requirements for a pharmacy to be

21   certified through your VIPPS accreditation program?

22   A    Well, Internet pharmacy to be certified, they have to

23   comply with all of the same laws and regulations that a

24   traditional brick and mortar pharmacy must follow.  They

25   must also have in place some different security provisions

1    because of the transmission of patient data via the

2    Internet.  And they must also have procedures in place to

3    validate the identity of the doctor and the patient and to

4    determine that that prescription and that interaction

5    between the patient and the doctor is a legitimate

6    relationship.

7    Q    And through your experience, what is the basis for

8    the legitimate physician-patient relationship that you

9    have just talked about?

10   A    The basis is found under both federal and state laws.

11   Federal law says that there must be a valid prescription

12   or a valid patient-doctor relationship for a prescription

13   to be legitimate, and then it refers to state practice

14   acts and statutes to actually define what is valid, what

15   is a legitimate relationship.  All the state statutes and

16   medical acts that I'm familiar with require that, one,

17   there be a physical examination of that patient and a

18   medical history taken, that there be a discussion with

19   that patient of what their disease or symptoms are, what

20   the treatment will be, what the consequences of that

21   treatment could be, what the adverse reactions would be,

22   and that there's a logical connection then between the

23   patient's diagnosis and the prescription that the doctor

24   may write.

25       Again, that's founded in federal law.  It's founded

1    through the guidelines issued by the Drug Enforcement

2    Agency, and it's codified or listed in all of the state

3    medical and pharmacy practice acts.

4    Q    Prior to your testimony today, did you have an

5    opportunity to review materials and evidence with regard

6    to the operation of Jive Network?

7    A    Yes, I did.

8    Q    In your opinion, did the -- were the operations of

9    Jive Network, would they qualify as a legitimate Internet

10   pharmacy pursuant to your VIPPS program?

11   A    No.

12   Q    Can you explain the basis for your opinion?

13   A    When I reviewed the information, there were several

14   things that distinguish the Jive Network operation from

15   the pharmacies that we have accredited.  First, there was

16   no establishment of a legitimate patient-doctor

17   relationship as a basis for the prescriptions that were

18   issued.  The physician records that I looked at often

19   qualified or approved orders from patients in as little as

20   three seconds, with an average of sometimes just 40

21   seconds, which did not meet the standard of care that I'm

22   familiar with for any medical practice act or that are

23   issued by the federation of state medical boards or the

24   American Medical Association.

25        There was also problems with the website in which

1    patients were able to self-select their medications and

2    were directed to medications, unlike a traditional brick

3    and mortar pharmacy.  And then there were problems with

4    the pharmacy not taking on its responsibility.  That's the

5    legal responsibility to ensure that the prescriptions were

6    legitimate and that fraud wasn't occurring.

7    Q    Have you had a chance to look at screen shots of one

8    of Jive Network's web site?

9    A    Yes.

10   Q    I'm going to show you what's been marked and admitted

11   as Government's Exhibit No. 117A.  Do you see this screen

12   shot of the pillstore.com website --

13   A    Yes.

14   Q    -- on Google.

15        Dr. Catizone, taking a look at Government's Exhibit

16   No. 117A, it is page 2, I believe, what are your

17   observations as to this page as compared to an Internet

18   pharmacy that the National Association of the Boards of

19   Pharmacy would certify through its VIPPS program?

20   A    The pharmacy that we accredit that operates via the

21   Internet would provide for the patient the same experience

22   they would have if they walked into their traditional drug

23   store.  And the basis of that interaction is the

24   prescription which the patient presents to the pharmacist

25   and then directs care from that point.  If you look at

1    this website, what is highlighted is not that

2    prescription.  What's highlighted instead is a list of

3    medications for the patient to select and choose without

4    that prescription, without any query as to what perhaps

5    the disease may be or the symptoms may be.  It's simple a

6    shopping list for the patient to choose whatever they

7    want.

8    Q    And let me see if I can focus in here.

9         If you take a look at the pillstore.com statement on

10   its website where it says that it contracts with the

11   physicians and pharmacies that are U.S. licensed and

12   requires them to comply with all applicable state laws.

13   As the executive director of the National Association of

14   the Boards of Pharmacy, are you familiar with state

15   pharmacy laws?

16   A    Yes.

17   Q    And are pharmacies required to be licensed in every

18   jurisdiction or state which they ship drugs?

19   A    Yes.  Forty-nine states require that if you're

20   shipping medications into that state, you have to be

21   licensed with them.  All 50 states require that if you are

22   operating as a pharmacy, that is taking in prescription

23   orders, handling medications, storing medications,

24   shipping medications, or dispensing those medications in

25   any way, you must be registered and licensed as a

1    pharmacy.  You can not operate in any state legally

2    without those two provisions in place.

3    Q    If you will take a look now at Government's Exhibit

4    117A, page 3.  What are your observations about this page

5    of the pillstore.com website as it relates to your

6    accreditation program for Internet pharmacy?

7    A    Again, we have a page that demonstrates or tries to

8    self-direct the patients to select medications, something

9    we wouldn't find in one of other accredited pharmacies.

10   This is a controlled substance that can be addicting to

11   the patient, also has some serious side effects for the

12   pharmacy to advertise or present the medication in this

13   way.  It is not the way an accredited pharmacy or

14   traditional brick and mortar would ever present

15   medications to a patient.

16   Q    And in the pharmacies that you accredit, are patients

17   able to self-select the drugs that they want?

18   A    No.  Everything is based upon the legal prescription

19   that has been provided to that patient from the doctor.

20   Q    Take to you page 5 of Government's Exhibit No. 117A.

21   Do you have any observations about pages 5 vis-a-vis your

22   accreditation program?

23   A    As it appears here, all it simply is is a request for

24   the patient shipping information.  There's been no

25   verification of that prescription, no validation of that

1    patient's diagnosis.  It looks as if they just continue

2    the process from the patient self-selecting and not

3    requesting where they want the medications mailed to.

4    Q    And do you see any verification of identity?

5    A    No.

6    Q    And on the accredited -- on the Internet pharmacies

7    that you or the National Association of the Boards of

8    Pharmacy accredit, is there verification of the identity

9    of the patient ordering the medication?

10   A    Yes.  The pharmacy must have a process in place to

11   validate that.  The patient is to provide some forms of

12   government identification, and those identifications have

13   to be validated by our accredited sites.

14   Q    Taking a look at page five of Government's Exhibit

15   No. 1 -- I'm sorry -- page 8 of Government's Exhibit No.

16   117A, of the pillstore.com website, do you see this block

17   "shipping process?"

18   A    Yes.

19   Q    Is this a kind of block that you would find on a

20   VIPPS accredited site?

21   A    No.

22   Q    Why not?

23   A    Once again, there's some statements that are made

24   that you would not find in an accredited site as well as a

25   traditional brick and mortar pharmacy.  Number one says

1    physician approved.  A traditional brick and mortar

2    accredited Internet pharmacy has to have a prescription in

3    place and the physician's approval then is based upon the

4    relationship between the doctor and the patient, not a

5    physician approval of something that's been shipped to

6    this website or e-mailed to this website.  That's outside

7    of the standard of care.

8         Second, the statement number two says processed by a

9    licensed pharmacy.  Licensed pharmacies dispense

10   medications to patients.  They don't process

11   prescriptions.  Again, it talks about the entire operation

12   and the process, and the use of language to suggest that

13   may be following the same procedures as an accredited

14   pharmacy or a traditional brick and mortar pharmacy, but

15   it's actually doing something that's quite different and

16   quite different from the standard of care.

17   Q    With respect to an accredited site or a brick and

18   mortar pharmacy, in your experience and based on your

19   training as a pharmacist and both in your experience as

20   the executive director of the National Organization, what

21   observations, if any, do you have about the menu of drugs

22   that are offered on the pillstore.com website?

23   A    Again, the pharmacies that we have accredited or the

24   traditional brick and mortar have a very different mix or

25   volume of prescription medications that they dispense.

1   Information released by the DEA and cited in journals

2   indicates that only 11 percent of the prescriptions that

3   are dispensed by a traditional brick and mortar pharmacy

4   are for controlled substances.  If you look at this

5   screen, you will see the overwhelming majority of the

6   medications on this page are controlled substances and,

7   again, self-directing the patient to select those

8   prescriptions.  Those are things you will never see in a

9   traditional brick and mortar pharmacy.

10  Q    Have you had a chance to -- if I can direct your

11  attention one moment.  We will have -- can we turn the --

12       THE COURT:  I think this is a good place to take

13  the afternoon recess.

14       MS. GABLE:  Thank you, Your Honor.

15       THE COURT:  So we will be in recess for 15

16  minutes.  You may file out.

17                      (Recess)

18       THE COURT:  All right.  Let's go.  What's the

19  problem?

20       MR. LEVENTHAL:  Your Honor, the witness has

21  testified thus far that he has testified on a number of

22  occasions that he's an expert witness.  We have been

23  provided no such transcripts of any testimony.  I think it

24  falls within the Jencks Act and I make my motion now for.

25       THE COURT:  The motion -- that's not Jencks

1    material.

2              MR. LEVENTHAL:  I'm sorry?

3              THE COURT:  That's not Jencks material.  Prior

4    testimony is not Jencks material.  If you're moving for

5    transcripts of his prior testimony, it's denied.

6         Is there anything else to bring to my attention?

7              MR. LEVENTHAL:  The next issue, so we don't get

8    in front of the jury with matters that may not be

9    admissible, he's testified to a series of events over a

10   number of years on behalf of his association.  I think

11   that the government has opened the door to the changes in

12   legislation that have taken place over the years including

13   up to and --

14             THE COURT:  The case law is to the contrary.  I

15   am not going to go through that.

16             MR. LEVENTHAL:  Well, I think that we have a

17   right to go there.  I want to put that on the record.

18             THE COURT:  All right.  I'm not going to let you

19   go there.

20             MR. IRVIN:  May I be heard for a moment?

21             THE COURT:  Do you want me to reexamine my

22   ruling?

23             MR. IRVIN:  No.  Judge, I wanted to add to it,

24   if I could, please.

25             THE COURT:  Excuse me?

1          MR. IRVIN:  Something Mr. Leventhal may have

2     left out I want to add.  This witness has talked about

3     various state laws and federal laws and how they have

4     affected the operation of Jive Network, and he's made his

5     decision and based his opinions about the fact of his

6     review of state law and federal law.  And I think where

7     Mr. Leventhal was going and where I go on behalf of

8     Dr. Pickens, I believe the rest of the attorneys, is that,

9     that we believe that opens the door to cross-examination

10    with respect to state law as well as federal law because

11    that is what he has based some of his opinion testimony

12    on.  And I wanted to be clear on the Court's ruling.  Are

13    we prevented from --

14          THE COURT:  Do you have any state law that says

15    you can prescribe controlled substance without seeing the

16    patient?  Any state said that?

17          MR. IRVIN:  Judge, this witness has not said

18    that.

19          THE COURT:  Has anybody said that?

20          MR. IRVIN:  Judge, I --

21          THE COURT:  Do you have any testimony to bring

22    in that says, yes, in state A, state B doctors can

23    prescribe prescriptions for people they have never seen

24    before?

25          MR. IRVIN:  Judge, I think what he's

1  testified --

2          THE COURT:  Do you have an answer to that

3  question?

4          MR. IRVIN:  I'm trying to answer it, Your Honor.

5          THE COURT:  Okay.  I'm just asking you, yes or

6  no, is there some -- has some state said you could

7  prescribe prescriptions for patients that have never seen,

8  you don't know, you don't know whether they exist or not?

9          MR. IRVIN:  With all do respect, Your Honor,

10  this witness testified about there not being a

11  doctor/patient relationship and what comprises what he

12  believe is a doctor/patient relationship.  And I'm only

13  asking if we can inquire with respect to how he has

14  defined a doctor/patient relationship.  And I don't think

15  it comes down to whether or not you saw the patient.  I

16  don't think that's what the law is.

17          THE COURT:  I disagree with you and I'm not

18  going to instruct along those lines.

19          MR. IRVIN:  Am I -- Judge, is just going to give

20  a jury instruction says if these people have not seen the

21  patient then they are to be found guilty?  Because that's

22  what the Court seems to be saying.

23          THE COURT:  Well, they can testify their good

24  faith belief that somehow what they're doing is okay.  I

25  think good faith is a potential defense.  If the jury will

1   buy it, fine.  I don't -- that's another issue.  Even the

2   government's jury instruction has slid good faith into the

3   question.  That's a different question, though.  The

4   doctors are going to have to take the stand and testify

5   and say, I had in good faith -- I believe that I could

6   prescribe medicines for people I never saw before, don't

7   know whether it's really the person who's asked for it.  I

8   believed I can do that.  Fine.  I'm interested in hearing

9   that testimony.

10          MR. NICHOLA:  Judge, to answer your question you

11  asked of Mr. Irvin, Utah does not require a physical exam

12  prior to writing a prescription.

13          THE COURT:  A physical exam is different than

14  seeing the patient.

15          MR. NICHOLA:  Also doesn't require seeing the

16  patient.

17          THE COURT:  Well, let's go on.  Let's bring --

18  let's go.

19          MR. PHILLIPS:  May I be heard on this?

20          THE COURT:  No.  I heard enough.  I want to get

21  on with this case.

22      Bring the witness back.

23          MR. PHILLIPS:  I appreciate the time.  I would

24  like access to the record at the close of the day after

25  you have adjourned the jury.

1           THE COURT:  Record to what?

2           MR. PHILLIPS:  Access to the record so I may

3    speak, Your Honor, for the preservation of the issues I

4    wish to address to the Court.

5           THE COURT:  Bring the witness in, bring the jury

6    in, please.

7           MR. IRVIN:  Thank you, Your Honor.

8                (jury present – 3:05 p.m.)

9           THE COURT:  You may continue.

10   BY MS. GABLE:

11   Q    Thank you.

12        Dr. Catizone, when we broke, we were looking at -- I

13   believe I may have had the wrong page up inadvertently.  I

14   meant to have up page 117A3 which I now have in front of

15   you, of exhibit 117.  And you are talking about the

16   controlled substances on the -- offered for sale on

17   pillstore.com.  What are controlled substances?

18   A    Controlled substances are prescription drugs that are

19   deemed to be addictive or dangerous and therefore there

20   are special requirements for the doctor to prescribe those

21   medications and for the pharmacist to dispense those

22   medications.

23   Q    And as a pharmacist are you familiar with the drug

24   Phentermine?

25   A    Yes.

1    Q    What schedule of the Controlled Substances Act does

2    that fall?

3    A    Phentermine is schedule IV.

4    Q    And in terms of the schedules of the controlled

5    substances, can you just explain to the jury how it is

6    they're scheduled?

7    A    Sure.  Schedule I is a category for drugs that have

8    no medical purpose.  Heroin is, for instance, is a

9    schedule 1 drug.  Schedule II are very addictive drugs,

10   very dangerous drugs.  That's where you will find morphine

11   and some other products that are used to treat pain.  As

12   you go down the schedules, the products are still very

13   dangerous and very addicting, but it's a little bit less

14   for each of the schedules.  So schedule III is less

15   dangerous, less addicting than schedule II, and schedule

16   IV are similarly less than schedule III.

17   Q    And looking at Exhibit 117A, under the drugs that

18   were offered for sale by this -- in this case

19   pillstore.com, under the weight loss, what kind of drugs

20   are those?

21   A    The general class of drugs that referred to as

22   amphetamines and those usually are drugs that people take

23   as stimulants.  Sometimes people call them speed.  Under

24   those categories you have products like Phentermine, which

25   is a schedule III product, a schedule IV, and the product

1   Phendimetrazine, other stimulants, they're all under this

2   general category of amphetamines or stimulants and what

3   they do is they stimulate the nervous system and stimulate

4   the body's actions in regard to the central nervous

5   system.

6   Q     With respect to a normal brick and mortar pharmacy or

7   even an Internet pharmacy that you accredit through the

8   VIPPS program, is it typical to see the pharmacy send out

9   orders to the customers telling them it's time to reorder

10  their controlled substance?

11  A     No.

12  Q     And what observations do you have about that?

13  A     That, again, is a practice that we have not seen at

14  traditional brick and mortar pharmacies simply because

15  these products are dangerous, people become addicted to

16  them, and usually the course of therapy on these products

17  is a very short time.  If it's prescribed for weight loss,

18  they're only for a short time because the patient has to

19  do other things to control their weight:  Diet, exercise.

20  Studies have found that there is only a weight loss in the

21  first couple of weeks, and even that weight loss with some

22  of these products isn't much different than a sugar pill

23  or placebo and, therefore, pharmacies don't send out

24  reminders on controlled substances because they're trying

25  to help their patients not become addicted and trying to

1    protect their patients from some of the side effects that

2    could occur with these medications.

3              THE COURT:  May I interrupt a second.

4         You're using the phrase brick and mortar pharmacies.

5    Can you explain what you mean by brick and mortar?

6              THE WITNESS:  Sure.  A brick and mortar pharmacy

7    I'm using to refer to the pharmacy you would find in your

8    neighborhoods, whether it's a chain pharmacy or an

9    independent pharmacy.  A pharmacy that has those four

10   walls that a patient actually walks into and provides the

11   prescription to the pharmacist.

12             THE COURT:  Thank you.

13   BY MS. GABLE:

14   Q    Again, looking at the Exhibit 117A, page 3 that we

15   had on the screen, do you see here where the prices for

16   the Phentermine have been discontinued?

17   A    Yes.

18   Q    Do you see that in your normal brick and mortar

19   pharmacy or even the Internet pharmacies that you

20   accredit?

21   A    Not in this particular fashion.  Pharmacies may

22   advertise their prices, and in some states it may be

23   required, but I have not seen in those traditional brick

24   and mortar any discounting or special offers of controlled

25   substances.  It's just a practice that I have not seen or

1    doesn't occur in those Internet pharmacies or brick and

2    mortar pharmacies.

3    Q    Take look at what's been admitted as Government's

4    Exhibit No. 158A.  It's at 39138.  It's 185A.  It's

5    393138.  Taking a look at this exhibit, this is the

6    breakdown of controlled substances to non controlled

7    substances sold by Jive Network.  What observations did

8    you have about this?

9    A    As I mentioned earlier, the traditional brick and

10   mortar pharmacy based upon information that is in the

11   literature that's been corroborated by the DEA through

12   information they collect from pharmacies and wholesalers,

13   a traditional pharmacy only dispenses about 11 percent of

14   their prescriptions for controlled substances.  The bulk

15   of what an Internet pharmacy that we have accredited or

16   traditional brick and mortar pharmacy would dispense are

17   medications for diabetes or high blood pressure or

18   glaucoma or the flu.  You wouldn't see this abundance of

19   controlled substances in a traditional brick and mortar or

20   Internet pharmacies that we have accredited.

21   Q    You have talked a little bit about the state pharmacy

22   boards.  Are you also familiar with state medical boards?

23   A    Yes.

24   Q    And does every state have a medical board?

25   A    Yes.

1    Q    In your practice in the national -- in your position

2    with the National Association of the Boards of Pharmacy,

3    do you -- are you familiar with national guidance provided

4    to physicians regarding Internet prescribing?

5              MR. IRVIN:  Objection.  Beyond his scope of a

6    pharmacist.

7              THE WITNESS:  We --

8              THE COURT:  Can you read the question.

9                   (question read back)

10             THE COURT:  Overruled.  You may answer.

11             THE WITNESS:  Yes.

12   BY MS. GABLE:

13   Q    And have any of the national physician organizations

14   provided guidance to physicians regarding this?

15   A    Yes.

16   Q    What organizations are you familiar with?

17   A    I'm familiar with the Federation of State Medical

18   Boards with whom we work very closely and with whom I have

19   served under committees in regard to Internet prescribing

20   and practice standard for physicians, and the American

21   Medical Association which also sets practice standards for

22   doctors.

23   Q    What is the guidance that the Federation of State

24   Medical Boards has provided to physicians?

25             MR. IRVIN:  Objection; hearsay.

1          THE COURT:  Overruled.

2          THE WITNESS:  In statements which the Federation

3    has released and has also testified to at hearings in

4    which I was present and I reviewed copies of their

5    testimony and policies, they said that for a valid

6    doctor/patient relationship, a physical exam must occur,

7    the patient medical history must be taken, the physician

8    must be operating within their practice and that the use

9    of online questionnaires is the only basis of a

10   prescription is not the standard of care that a doctor

11   should engage in.

12   BY MS. GABLE:

13   Q    And what about the American Medical Association?

14   A    The American Medical Association, again, in documents

15   that they publish that we have used to inform the state

16   boards of pharmacy and pharmacists about what the conduct

17   of doctors should be and may be, make the same points

18   about what a relationship should be between a doctor and

19   patient and physical exams required and medical history

20   should be taken, and there should be a dialogue between

21   the doctor and the patient about their treatment and about

22   their options.

23   Q    I want to shift your focus now to pharmacy -- brick

24   and mortar pharmacies as we have discussed.  If someone

25   wants to open a pharmacy, what do they have to do?

1    A    They would have to complete an application with the

2    State Board of Pharmacy.  They would have to have a

3    pharmacist in charge or responsible for the medications,

4    and then they would have to meet all requirements within

5    the state for the security of those medications, for the

6    dispensing of those medications, and for the care that

7    would be given to patients at that pharmacy.

8    Q    I think we have covered this, but does every state

9    have a board of pharmacy?

10   A    Yes.

11   Q    And are there certain rules or regulations or laws

12   that are uniform with respect to all boards of pharmacies?

13   A    Although it may appear that the states would have

14   different laws and regulations, they actually are quite

15   similar.  And those same laws and regulations apply to

16   what is a valid prescription, what a pharmacy must do in

17   order to practice, and compliance with the law, and what

18   the responsibilities of a pharmacist are.

19   Q    Based on your experience as the executive director of

20   National Association of the Boards of Pharmacy, do the

21   state boards of pharmacies communicate with each other

22   regarding adverse actions taken against a pharmacist?

23   A    There are two ways in which the states will

24   communicate.  One, if a pharmacist is licensed in one

25   state but holds a license in another state, that state

1   board of pharmacy, when they take action, will notify the

2   other state they have taken action against that

3   pharmacist's license.  What they also do is, our

4   organization is a national clearinghouse for disciplinary

5   actions on pharmacists and pharmacies.  As soon as the

6   state takes an action, they report it to us or we find

7   that action in the public documents that the state

8   provides to us, and then we alert every other state in

9   which that pharmacist is licensed that the action has been

10  taken against them.

11  Q    With respect to a pharmacist, how does a pharmacist

12  fit into our over -- into the healthcare delivery sample?

13  What role does a pharmacist play?

14  A    A pharmacist is really the final check and balance

15  before the patient receives the medication.  And the

16  pharmacist really has two responsibilities at that point.

17  One, when they receive the prescription they have to make

18  sure that it's the appropriate medication for that

19  patient.  So if the patient has diabetes, it has to be

20  medication to treat that disease or that symptom or those

21  symptoms.

22       Second, they have to make within that scope of making

23  sure the patient's medication is appropriate, to make sure

24  that it doesn't interact with other medications the

25  patient may be taking, to make sure the dose is correct

1    and strength is correct.

2         And if a pharmacist receives a medication for a child

3    and the dose of that medication was for an adult, the

4    pharmacist has the responsibility to call that doctor and

5    to clarify and fix that prescription.

6         The other responsibility the pharmacist has is to

7    make sure it's a legitimate prescription.  They have to

8    make sure there was a relationship between that doctor and

9    patient.  They have to make sure the patient's not simply

10   trying to buy prescription medications using fraudulent

11   names or fraud identities.  And the law even goes beyond

12   that saying the pharmacist not only has the responsibility

13   not to fill that prescription, but if they suspect that

14   something's occurring here and it's a pattern, and there's

15   a fraud occurring, they have to report that to the DEA and

16   to their local board of pharmacy.

17   Q    Based on your review of records, have you reviewed

18   records in this case pertaining to the Family Health

19   Pharmacy?

20   A    Yes.

21   Q    And based on your review of records, did you find any

22   red flags indicating that these prescriptions were not

23   issued in the usual course of professional practice?

24   A    Yes.

25   Q    What were those red flags?

1    A    Some of the red flags that I was able to identify

2    was, one, the prescriptions were written by doctors or the

3    orders were approved by doctors, because I couldn't find

4    any written prescriptions for patients that didn't appear

5    to have a relationship with that doctor.  The patients

6    were located outside of the doctor's area or states.

7    There were multiple patients being seen prescribed the

8    same medicines regardless of what the information was that

9    was submitted on the forms that the patient completed.

10   And the pharmacies were dispensing these medications,

11   again, not validating the pharmacist -- the doctor/patient

12   relationship, or the fact that they were legitimate

13   prescriptions, and they were dispensing prescriptions to

14   patients outside of their state and multiple states with

15   no verification of the patient, the doctor, or the

16   medication order.

17   Q    So taking a look at what has been admitted as Exhibit

18   No. 145A, and it's 393123.  This is a summary of the

19   controlled substances distributed by Family Health

20   Pharmacy owned by the defendant Chebssi.  Do you see that

21   in front of you?

22   A    Yes.

23   Q    Based on this summary, do you see the number of

24   controlled substances orders that were approved?

25   A    Yes.

Direct Examination - Carmine Catizone

1  Q    And is the type of drug, the recurring prescription

2  for a type of drug, is that a red flag that prescriptions

3  are issued outside the usual course of professional

4  practice?

5  A    Yes.

6  Q    And in what way?

7  A    Again, the number and volume of controlled

8  substances, the quantities are significantly larger than

9  any of the Internet pharmacies we accredit or the

10 traditional brick and mortar pharmacy.  And also at the

11 very bottom of the document, there is a statement there

12 that none of the -- the pharmacy didn't decline any of the

13 prescriptions which is highly unusual because in a

14 traditional pharmacy or the Internet pharmacy we accredit,

15 there's something wrong with some prescription at some

16 point where the pharmacist has to intervene or the

17 pharmacist decides not to fill that prescription.

18 Q    And looking at Exhibit 145A, do you see the mix of

19 drugs there that have been dispensed?

20 A    Yes.

21 Q    What are these?

22 A    I'm sorry.  What -- what's on screen now or --

23 Q    The types of drugs on the screen, what kind of drugs

24 are they?

25 A    Again, these are stimulants, a type of amphetamine.

1    They stimulate the nervous system and sometimes they're

2    used for weight loss.

3    Q    And are they controlled substances?

4    A    Yes, they are.

5    Q    If you will take a look at what's been admitted as

6    Exhibit 120A which is at 391841.  Do you see that in front

7    of you?

8    A    Yes.

9    Q    As a pharmacist, if there were -- if this were the

10   sole basis that the doctor used to approve an order or

11   write a prescription, would you approve it?

12   A    No.

13   Q    Why not?

14   A    The question would not meet --

15        MR. IRVIN:  Objection, Your Honor.  He's not a

16   medical doctor to approve medicine.

17        THE COURT:  Overruled.

18        THE WITNESS:  If the questionnaire doesn't meet

19   the standard of care that we require for a pharmacy to be

20   accredited or that a traditional pharmacy would utilize,

21   some of the questions are vague, some of the questions

22   lead the patient into responding -- as an example, one of

23   the questions that says how was your blood pressure, the

24   response normal doesn't provide any valid information to

25   the pharmacist because the range of blood pressure can

1    vary.  Normal may be 90 to 120.  It may be different for

2    different -- for different patients.  Simply saying it's

3    normal and allowing the patient to make that determination

4    is actually allowing the patient to diagnose and pick

5    their own medication, which is what the doctor's

6    responsibility is.

7    BY MS. GABLE:

8    Q    Dr. Catizone, I'm asking from a pharmacist's

9    perspective, assume that this is the sole basis this was

10   done online and this was the sole basis by which the

11   doctor issued the prescription without any physical

12   examination or face-to-face contact -- conduct. if you

13   knew this, would you as a pharmacist fill the prescription

14   that was generated by that questionnaire and that online

15   setting?

16   A    As pharmacist, no.

17   Q    If you will take a look at Exhibit 64, and it's at

18   276212.  In your opinion is this the type of prescription

19   form that you believe falls within the normal acceptable

20   standard by which prescriptions are written?

21   A    No.

22   Q    Why not?

23   A    One of most glaring red flags is there is no

24   prescribing doctor listed on this prescription.  In order

25   for a pharmacist to legally dispense a prescription for a

1    controlled substance, the doctor's name has to appear on

2    that order and the doctor must physically or manually sign

3    that prescription order to dispense medication without the

4    doctor's name violates state and federal law.

5            MS. GABLE:  Thank you, Dr. Catizone.  I have no

6    further questions.

7            THE COURT:  Any cross-examination?

8                    CROSS-EXAMINATION

9    BY MR. FISHER:

10   Q    Good afternoon, Dr. Catizone.  I'm Joseph Fisher.  I

11   represent Dr. Baranwal along with Mr. Leventhal.

12        Let me start with, you have been the executive

13   director of the NABP for 21 years?

14   A    21 years, yes, sir.

15   Q    And the NABP was around since 1904, correct.

16   A    Yes, sir.

17   Q    And one of the main goals of the NABP, as I

18   understand it, is to provide uniform standards that would

19   protect the public health, correct?

20   A    Yes, sir.

21   Q    And you started as the -- you started with the NABP

22   in '85 and you became the CEO in '88, correct?

23   A    Yes, sir.

24   Q    And I think you stated on direct around 1997 is when

25   you started dealing with Internet issues?

```
 1   A    Yes, sir.

 2   Q    And at some point in the late 90s, you became acutely

 3   aware that the Internet and e-commerce would have a

 4   significant impact on the pharmaceutical industry,

 5   correct?

 6   A    Yes, sir.

 7   Q    And by e-commerce you had concerns about people being

 8   able to buy prescriptions the same way they started buying

 9   music and other goods and services, correct?

10   A    Yes, sir.

11   Q    Would it be a fair statement or an accurate statement

12   that back in '97, starting in '97 through today, the NABP

13   was what I would call the spearhead of the regulation body

14   that was governing changes made to Internet pharmacies in

15   the United States and the other jurisdictions covered by

16   NABP?

17   A    Yes, sir.

18   Q    Now you also testified on direct that you'd given

19   statements on CNN, you have testified on Dateline or you

20   have been interviewed by TV at least two dozen times,

21   correct?

22   A    Yes, sir.

23   Q    And you testified before Congress before, isn't that

24   correct?

25   A    Yes, sir.
```

1    Q    And you testified before Congress on issues of

2    Internet pharmacies, correct?

3    A    Yes, sir.

4    Q    And you stated on direct that one of your concerns

5    was initiatives to address illegitimate pharmacies that

6    were running on the Internet, and these concerns that you

7    had with Internet pharmacies had to do with a lot of

8    loopholes in state and federal laws, isn't that correct?

9    A    No, sir.

10   Q    No, sir?

11   A    No.

12   Q    Okay.  So you never testified to the FTC that you

13   were concerned about Internet pharmacies taking advantage

14   of loopholes in state laws and regulations?

15          MS. GABLE:  Objection.  Excuse me.  Objection,

16   Your Honor.

17          THE COURT:  It's cross-examination.  Overruled.

18   BY MR. FISHER:

19   Q    You have never testified before that you were

20   concerned about Internet pharmacies taking advantage of

21   state loopholes?

22   A    Testimony I believe I gave was that the Internet

23   operators were trying to interpret the law and use it as a

24   loophole, but I testified that I felt that the state and

25   federal laws were in place to regulate Internet pharmacy

1  safely.

2  Q    And one of your concerns as the director of the NABP

3  would be customer confusion with what is allowed and what

4  is not allowed with Internet pharmacy, correct?

5  A    Yes, sir.

6  Q    And as the NABP director, you would battle with

7  governors and other legislative bodies in getting them to

8  go along with the uniform standard that would govern the

9  Internet pharmacies, correct?

10 A    In the best interest of the patients, yes, sir.

11 Q    Okay.  And at times as you have been president in the

12 past 10 years, you have been at loggerheads with a lot of

13 different legislative bodies in terms of getting rules and

14 regulations passed, isn't that correct?

15 A    I'm sorry, I didn't understand the first part.

16 Q    As president of the NABP.

17 A    I'm the CEO.

18 Q    CEO.

19 A    I'm sorry.

20 Q    I apologize.

21        THE COURT:  You didn't get your questions

22 answered.  You want to restate your question.

23        MR. FISHER:  That was confusing, I apologize.

24 BY MR. FISHER:

25 Q    Back in '97 it would be accurate that as the

1    president of the -- CEO of the NABP, the Internet pharmacy

2    business -- would you have likened that to something like

3    the wild west?

4    A     Yes, sir.

5    Q     In that there were no real rules and regulations

6    written by the Internet pharmacies?

7    A     Yes, sir.

8    Q     And through time hasn't legislation evolved that you

9    have been central in getting passed?

10   A     I'm sorry?

11   Q     In regulating Internet pharmacy.

12   A     No.  What would have been central -- what we've been

13   trying to get passed by the states is recognition that the

14   laws for mail order pharmacies and traditional practice do

15   apply to Internet pharmacies.

16   Q     Okay.  But that wasn't crystal clear starting in '97,

17   was it?

18            MS. GABLE:  Objection; relevance.

19            THE COURT:  Sustained.

20   BY MR. FISHER:

21   Q     Okay.  Would it also be accurate that one of the most

22   problematic areas of Internet practice with pharmacies

23   that you experienced has been the patient/prescriber

24   relationship?

25   A     Yes.

```
 1  Q    Okay.  And you have been instrumental in mandating
 2  legislation that deals with the patient/prescriber
 3  relationship, isn't that correct?
 4          MS. GABLE:  Objection.
 5          THE COURT:  Read back the question.
 6                (question read back)
 7          THE COURT:  I'm not sure what he means by that.
 8  BY MR. FISHER:
 9  Q    You just stated before one of the most problematic
10  areas of the Internet pharmacy is the patient/prescriber
11  relationship.
12  A    Yes.
13  Q    Isn't that correct?
14  A    Yes.
15  Q    And one of your concerns as the CEO of the NABP is
16  the clarity in what establishes the patient/prescriber
17  relationship as that's called.
18          MS. GABLE:  Objection, Your Honor.
19          THE COURT:  Sustained.
20  BY MR. FISHER:
21  Q    Doctor, were you ever supplied with information on
22  how Jive Network verified medical questionnaires?
23  A    No, sir.
24  Q    Were you ever supplied with information on what was
25  told to doctors that work for Jive, specifically
```

1   Dr. Baranwal, about verification or exams done?

2           MS. GABLE:  Objection.  Assumes facts not in

3   evidence.

4           THE COURT:  Sustained.

5   BY MR. FISHER:

6   Q    Did you ever see any evidence in the documents

7   reviewed, that you reviewed, showing that Dr. Baranwal

8   approved any prescriptions that allowed a refill?

9           MS. GABLE:  Objection; beyond the scope of

10  direct.

11          THE COURT:  You can respond to that if he knows

12  the answer.

13          THE WITNESS:  No, sir.

14          MR. FISHER:  Nothing further for this witness,

15  Your Honor.

16          THE COURT:  Thank you.

17                    CROSS-EXAMINATION

18          MR. NICHOLA:  May it please the Court.

19          THE COURT:  Yes.  Please.

20  BY MR. NICHOLA:

21  Q    Is it Mr. Catizone or Mr. Catizone?

22  A    Either way is fine, sir.

23  Q    Your organization, the National Association of Board

24  of Pharmacies, is it a what I'm going to call a

25  adversary -- I'll restate the question.

1      Is your organization, the National Association of

2  Boards of Pharmacy an organization which advocates

3  positions adopted by your board?

4  A    I think so yes, sir.

5  Q    When you advocate positions, do you go to the United

6  States Congress to advocate positions that have been

7  adopted by your board?

8  A    No, sir.

9  Q    You don't?

10  A    No, sir.

11  Q    Did your organization ever retain the services of

12  former Senator Tom Daschlel?

13  A    As key note speaker, yes.

14  Q    As key note speaker?  Did Tom Daschle explain how to

15  lobby Congress to get your positions accepted by members

16  of Congress?

17  A    Not that I recall, sir.

18  Q    With respect to your address before the Federal Trade

19  Commission, did you commend the sponsors of HR3880?

20          MS. GABLE:  Objection; relevance.

21          MR. NICHOLA:  I'll tie it up, Judge.

22          THE COURT:  Well, I don't know what -- I didn't

23  get -- can you read the question.

24              (question read back)

25          THE COURT:  Do you know what that is.

1          THE WITNESS:  HR?  Yes, sir.  It was a bill that

2     was introduced in the house.

3          THE COURT:  Excuse me?

4          THE WITNESS:  A bill that was introduced into --

5     by the House into Congress.

6          THE COURT:  When?

7          THE WITNESS:  At least five years ago, three to

8     five years ago.

9          THE COURT:  You may answer the question.

10          THE WITNESS:  Yes.

11          MR. NICHOLA:  Thank you, Judge.

12     BY MR. NICHOLA:

13     Q    Now, the reason you commended the sponsors of that

14     bill was because it was an attempt to define a qualifying

15     medical relationship for federal law purposes, was it not?

16          MS. GABLE:  Objection.

17          THE COURT:  Overruled.

18          MS. GABLE:  Your Honor, may -- I need to

19     approach, Your Honor.

20          THE COURT:  Excuse me.

21          MS. GABLE:  We -- may we approach?

22          THE COURT:  No.  Let's go on.

23          MS. GABLE:  Okay.

24          THE WITNESS:  We were commending the responsors

25     for addressing the critical public health issue and that

1    issue was Internet pharmacy practice.

2    BY MR. NICHOLA:

3    Q    Well, my question was --

4            THE COURT:  Well he's answered your question.

5    BY MR. NICHOLA:

6    Q    Well, my question pertained to an attempt to define

7    qualifying medical relationship.  Correct?  That was my

8    question.

9            THE COURT:  Objection?

10           MS. GABLE:  Yes.

11           THE COURT:  Sustained.

12   BY MR. NICHOLA:

13   Q    The term qualifying medical relationship was not

14   adopted at that time, was it?

15           MS. GABLE:  Objection.

16           THE COURT:  Sustained.

17   BY MR. NICHOLA:

18   Q    Has the term qualifying medical relationship recently

19   been adopted by Congress?

20           MS. GABLE:  Objection.

21           THE COURT:  Sustained.

22   BY MR. NICHOLA:

23   Q    Are you a practicing pharmacist?

24   A    Yes, sir.

25   Q    For whom do you practice?

1    A    I work for the National Association of Boards of

2    pharmacy.

3    Q    Okay.  So you don't work behind the counter?

4    A    No, sir.

5    Q    And you don't go out and greet people who are paying

6    for their prescriptions?

7    A    No, sir.

8    Q    And you don't ask these people whether they have any

9    questions about it?

10   A    No, sir.

11   Q    Who formulates the positions adopted by the National

12   Association of Boards of Pharmacy?

13   A    The state agencies that regulate the practice of

14   pharmacy.

15   Q    Do they vote on it?

16   A    Yes, sir.

17   Q    So some states will vote to adopt and some will vote

18   not to adopt, is that correct?

19   A    Yes, sir.

20   Q    So there's not a unanimous vote in order to pass

21   what's being adopted by your organization, correct?

22   A    Yes, sir.

23   Q    Now, as I understand it you're not an attorney,

24   correct?

25   A    Yes, sir.

1   Q     And you're not a professor of law, correct?

2   A     Yes, sir.

3   Q     And you're not a judge, correct?

4   A     Yes, sir.

5   Q     And you're not a member of Congress, right?

6   A     No, sir.

7          THE COURT:  I stated he can testify as an

8   expert, now you want to suggest that he's not qualified,

9   fine, but it's obvious he's not these things.

10          MR. NICHOLA:  I got one more, Judge, if I may,

11  with your permission.

12          THE COURT:  Medical doctor?  Or you got a couple

13  you haven't got:  Obstetrician, pediatrician.

14          MR. NICHOLA:  Are you inquiring?

15          THE COURT:  No.  I want to get on with this

16  case.

17          MR. NICHOLA:  I want to get on too, Judge.

18      You broke my train of thought.

19      Okay, Judge.

20  BY MR. NICHOLA:

21  Q    We left off you're not a member of Congress -- oh,

22  the National Association of Boards of pharmacy, it's not a

23  government agency, is it?

24  A     No, sir.

25  Q    So your organization recommends and advocates

1    positions adopted by the board?

2    A    Yes, sir.

3    Q    I think you may have been mentioned something about

4    VIPPS, VIPs?

5    A    Yes, sir.

6    Q    What is that?

7    A    That's the accreditation program of, voluntary

8    program that we started and operate for Internet

9    pharmacies.

10   Q    Okay.  Now, that's not -- a pharmacy that joins VIPPS

11   is not something where the pharmacy gets a certificate

12   from either a state or federal government for joining

13   VIPPS, correct?

14   A    No, sir.  I mean correct, yes.  Yes.

15   Q    So joining VIPPS would be something like joining the

16   Better Business Bureau, correct?

17   A    No, sir.  Some states require VIPPS in order for the

18   Internet pharmacy to actually be listed.  So they require

19   that accreditation very similarly to how the U.S.

20   government requires accreditation by a joint commission

21   for hospitals to be reimbursed.  In some states it's a

22   requirement.

23   Q    How many different positions have been adopted by the

24   board since 1997?

25             MS. GABLE:  Objection.

```
 1              THE COURT:  Sustained.
 2   BY MR. NICHOLA:
 3   Q    So not at all Internet pharmacies are required to
 4   join VIPPS, is that correct?
 5   A    Yes, sir.
 6   Q    When you used the term earlier during direct
 7   examination the term was red flags.  Red flags is
 8   something that is a matter of your opinion, correct?
 9   A    Yes, sir.
10   Q    When you mentioned that the use of an online
11   questionnaire was not acceptable, that's a matter of your
12   opinion, correct?
13   A    No, sir.
14   Q    When you mentioned a valid doctor/patient
15   relationship with respect to Internet prescribing, that's
16   something that was recently addressed by Congress, is it
17   not?
18   A    No, sir.
19              MS. GABLE:  Objection.
20              THE COURT:  He already answered the question.
21   BY MR. NICHOLA:
22   Q    What do you mean no?
23              MS. GABLE:  Objection.
24              THE COURT:  No means no.  Next question.
25   BY MR. NICHOLA:
```

```
1   Q    When was it addressed by Congress.

2           THE COURT:  That wasn't your question.

3           MR. NICHOLA:  It's a follow-up question.

4           THE COURT:  Next question.

5           MR. NICHOLA:  Can I go with a follow-up

6   question, Judge?

7           THE COURT:  I have no idea what it would be so

8   I'll --

9   BY MR. NICHOLA:

10  Q    When did Congress address the valid doctor/patient

11  relationship?

12          MS. GABLE:  Objection, Your Honor.

13          THE COURT:  Sustained.

14  BY MR. NICHOLA:

15  Q    You indicated that you have a Ph.D.?

16  A    No, sir.  I have a bachelor of science and master of

17  science.

18  Q    So when the prosecutor referred to you as a doctor,

19  that's not correct, is it?

20  A    It's -- it is correct, sir.

21  Q    That's an honorary distinction that was granted to

22  you by the Oklahoma Board of Pharmacy?

23  A    The Oklahoma state classifies pharmacists that

24  practice in the state as doctors of pharmacy, and they

25  awarded me an honorary designation because of my efforts,
```

1    but not to entitle me to practice in Oklahoma.

2    Q    So in Oklahoma pharmacists are called doctors?

3    A    Yes, sir.

4    Q    And that's why you got doctor because you got

5    honorary from Oklahoma?  Okay.

6              MR. NICHOLA:  No further questions, Your Honor?

7              THE COURT:  Okay.

8                        CROSS-EXAMINATION

9              MR. IRVIN:  May I?

10             THE COURT:  Yes.  Please.

11   BY MR. IRVIN:

12   Q    Let me start right there.  So you're actually only a

13   doctor in the state of Oklahoma, correct?

14   A    Yes, sir.

15   Q    So you're not a doctor in the state of Florida?

16   A    No, sir.

17   Q    So referring to you as a doctor was wrong?

18             MS. GABLE:  Objection, Your Honor.

19             THE COURT:  Well, it's simply argumentative.

20   Let's move on, please.  Doctor, not a doctor.  He's

21   qualified as an expert.  He's offered his opinion.  The

22   jury has been instructed they may accept all, part or none

23   of it.  And you may attack his credibility as you deem

24   fit.  But whether he's called doctor or not or not doctor

25   I don't think is going to help us much.  Let's move on,

 1    please.

 2    BY MR. NICHOLA:

 3    Q    You are here in your capacity as an executive

 4    director of the NABP, is that correct?

 5    A    Yes, sir.

 6    Q    So you're currently on the clock, correct, and that's

 7    part of your job is to go around the country giving

 8    testimony, correct?

 9    A    Yes, sir.

10    Q    How much are you paid?

11    A    Nothing, sir.

12    Q    Not your salary?

13    A    As executive director?

14    Q    Exactly.  I'm asking the question?

15    A    Sure.  $400,000 a year, sir.

16    Q    So you're here on $400,000 a year salary.

17         State of Utah, you said you were familiar with the

18    state laws regarding doctors in dealing with

19    doctor/patient relationships, is that your testimony with

20    Ms. Gable?

21    A    Yes, sir.

22    Q    In the state of Utah you are not required to have a

23    face-to-face contact with a patient, aren't you?

24    A    No, sir, that's not correct.

25    Q    What statute, cite it, please.

1   A    I can't cite the particular state but there's been

2   only one exemption issued to one Internet pharmacy that

3   allows them to practice without a face-to-face using the

4   Internet.

5   Q    I'm not dealing with an Internet pharmacy.  I'm

6   talking about medical practice.  In Utah you're not

7   required to have a face-to-face as a doctor with the

8   patient, are you?

9   A    I believe you must have a face-to-face, sir.

10  Q    That's your belief?

11  A    Yes, sir.

12  Q    Not sure, are you?

13  A    Not sure of that.

14  Q    If we could pull up Exhibit 117A as in apple.  I

15  don't have a Bates number.  It was one that Ms. Gable was

16  using.

17       And I believe that you talked about under weight loss

18  there, you were talking about the controlled substance.

19  you say that Xenical was a schedule III controlled

20  substance?

21  A    No, sir.

22  Q    It is not a controlled substance?

23  A    I didn't say that.

24  Q    Is it a controlled substance?

25  A    No, sir.

1    Q      Thank you.

2           Was it your testimony that in conjunction with giving

3    a weight loss pill the patient needed to be instructed

4    with respect to their diet, exercise, and what foods to

5    eat?

6    A      Yes, sir.

7    Q      And you felt that the only way that that could happen

8    was a face-to-face?

9    A      No, sir.  I said a face-to-face was required to make

10   the initial diagnosis.

11   Q      Ms. Gable asked you about the national -- she asked

12   you questions -- you talked about your familiarity or

13   working with the national, federal, state medical boards,

14   did I get that correct?

15   A      Yes, sir.

16   Q      As well as the AMA, is that correct?

17   A      Yes, sir.

18   Q      Your testimony said that they offered guidance, is

19   that correct?

20   A      Yes, sir.

21   Q      It's not law, it's guidance, correct?

22   A      Yes, sir.

23   Q      You were asked about -- you decided that you would

24   talk about some of your testimony or some of your -- about

25   House Resolution 3880 and you said that purpose of your

1    involvement was that you brought to the attention that it

2    was to deal with the -- excuse me -- to deal with the

3    critical Internet pharmacy issues, is that correct?

4    A    Yes, sir.

5    Q    Okay.  And you stated that that's all that your

6    involvement before Congress dealt with was solely with the

7    critical Internet pharmacy issue.  Is that correct?

8    A    Yes, sir.

9    Q    You have no specific recollection as you sit there

10   today about that testimony from Congress talking about the

11   efforts to define a bona fide medical relationship and

12   loopholes that existed in current congressional law?

13   A    I recall that statement, sir.

14   Q    So you did tell them that there was a loophole with

15   respect to the definition of a bona fide medical

16   relationship in House Resolution 3880, correct?

17        MS. GABLE:  Excuse me, Your Honor I object, and

18   I would like to approach.

19        THE COURT:  All right.  You may approach.

20             (Bench conference)

21        MS. GABLE:  Your Honor, we filed a motion in

22   limine to keep out any evidence that somehow the law is

23   confusing or not defined.  You granted that motion.

24        Second, is that this Brian Haight bill was a subject

25   of a motion to dismiss they filed which was denied.  And

```
 1    they made their arguments as to the Ryan Haight bill, that

 2    the law was confusing and so forth.  The Court denied it,

 3    and now they're trying to get this issue before the jury

 4    by referring to the statute not by --

 5              THE COURT:  What was the purpose of the

 6    question?

 7              MR. IRVIN:  Judge, number one, his credibility

 8    is always an issue.  He testified that he only limited his

 9    discussion in Congress to matters which I presume had been

10    presented to him.  That was not true.  I questioned his

11    credibility by raising a --

12              THE COURT:  Do you have a transcript of his

13    testimony.

14              MR. IRVIN:  I got his testimony yes, I do.  I

15    have his testimony.

16              THE COURT::  Well, bring it up here and let me

17    look at it.

18              MR. IRVIN:  It's thick.  If I can tell you where

19    to look, Judge.  If you turn -- that's the testimony.  If

20    you turn to this third page, I believe.  I highlighted it.

21    He's providing testimony.  And if you go to the back --

22              THE COURT:  This is back in 2004.

23              MR. IRVIN:  All the way in the back, Judge.

24              THE COURT:  I can see it.

25              MR. IRVIN:  Cross-examination.  It's right here,
```

1    Your Honor, on page 66.

2              THE COURT:  Okay.  Now did this bill get passed?

3              MR. IRVIN:  Did the bill get passed?  Not that

4    I'm aware of, Judge.

5              THE COURT:  And the motion to dismiss is

6    anchored in here, and Judge Conway dismissed that

7    argument.

8              MR. IRVIN:  Judge, that wasn't the basis of my

9    question.  The basis of my question was on his answers, on

10   his examination of what it was all about.  That goes --

11   I'm questioning his credibility.  That's what I'm

12   questioning.

13             THE COURT:  What is it he said that you think is

14   inconsistent with this testimony?

15             MR. IRVIN:  Judge, he testified the only thing

16   he dealt with was the Internet pharmaceutical -- I forgot

17   my wording of it, Judge.  That's not all what he did.

18             THE COURT:  How do we know this is his

19   statement?

20             MR. IRVIN:  Public record, Judge.

21             THE COURT:  It didn't say he's talking --

22             MR. IRVIN:  Judge, how about he already answered

23   the question yes, he did.  I took his word when he said

24   under oath, yes, I did discuss that, so --

25             THE COURT:  He didn't prepare this.  This is not

1    his -- this is what somebody else believes he said.

2            MR. IRVIN:  I asked him.

3            THE COURT:  No.  Listen to me.  Is this a

4    statement?  Is this a verbatim statement?  It doesn't look

5    like a verbatim statement to me.  This is somebody's

6    summary.

7            MR. IRVIN:  He wrote the letter.  It's his

8    letter.  He wrote the letter.

9            THE COURT:  What do you mean?

10           MR. IRVIN:  Wrote a letter.  He did that.  His

11   letter was entered into the record.  It's a prepared

12   statement by him.  That's why he even answered yes when I

13   asked him the question.  He answered yes.  So I don't

14   think he's questioning whether or not I'm telling the

15   truth.  He's already said, yes, you are telling the truth.

16   Yes, my testimony also included what you just asked me,

17   Mr. Irvin.  So he's not questioning it.  Ms. Gable just

18   doesn't like it.  With all due respect, I don't mean to be

19   sarcastic.

20           MS. GABLE:  It's not Ms. Gable doesn't like it.

21   That fact that Ms. Gable objected when it was -- when the

22   question was phrased in terms of 3558.

23           THE COURT:  I think it comes within the frame of

24   my previous ruling.  So the motion of the government are

25   sustained.

```
 1                  (Bench conference concluded)

 2   BY MR. IRVIN:

 3   Q    Mr. Catizone, the National Board -- the National

 4   Association of Boards of Pharmacies, are those state or

 5   government agencies?

 6   A    Yes, sir.

 7   Q    They are state and government agencies?

 8   A    Yes, sir.

 9   Q    Are pharmacies a part of that?

10   A    They are regulated by but they're not members of the

11   state per se.

12   Q    Not members of your organization?

13   A    No, sir.

14        MR. IRVIN:  Nothing further, Your Honor.

15   Nothing further.

16        THE COURT:  Thank you.

17                  CROSS-EXAMINATION

18        MR. PHILLIPS:  Thank you, Your Honor.

19        THE COURT:  You may proceed.

20   BY MR. PHILLIPS:

21   Q    Good afternoon.

22   A    Good afternoon, sir.

23   Q    You were retained by the government in this case to

24   serve as its expert witness on the pharmacy issues,

25   correct?
```

1    A    Yes, sir.

2    Q    In addition to your $400,000 a year salary, you

3    receive no additional compensation for the work, do you?

4    A    My salary is for all the other activities I engage

5    in, but no salary or no reimbursement except for travel

6    spent for my testimony.

7    Q    Understood.

8         You don't get paid just for the work you do in this

9    case; it's part of your annual salary?

10   A    Correct, sir.

11   Q    Okay.  You prepared, did you not, a written report of

12   your opinion as part of your duties as an opinion witness?

13   A    Yes, sir.

14   Q    You transmitted to the government?

15   A    Yes, sir.

16   Q    What is your understanding of the scope of your

17   retention?  What were you retained to do?

18            MS. GABLE:  Objection, relevance.

19            MR. PHILLIPS:  He didn't allow us to voir dire.

20            THE COURT:  Well, I'm not sure what retained

21   means.  Is there any written communication between you and

22   the government that you provided a report of your summary

23   of your anticipated summary.  Is that correct?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  And I believe that's been delivered

1    to counsel for the defendants?

2            MR. PHILLIPS:  Absolutely, Your Honor.

3            THE COURT:  All right.  What preceded the

4    preparation of that report?  What happened that caused you

5    to produce the report?

6            THE WITNESS:  There was a phone conversation

7    with the U.S. attorney that I asked that if I would

8    comment on a case which they had and whether or not I

9    would be able to serve as expert witness if the case went

10   to trial.

11           THE COURT:  Did they provide you with certain

12   materials?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Go ahead.  That's the potential

15   basis.

16   BY MR. PHILLIPS:

17   Q    You were to review materials, prepare reports,

18   testify if appropriate?

19   A    Yes, sir.

20   Q    Okay.  Let's talk about the materials you reviewed.

21   You reviewed a summary of total drug orders for doctors

22   working for Jive Network?

23   A    Yes, sir.

24   Q    You reviewed a summary of drug orders for pharmacies

25   working for Jive Network?

1    A     Yes, sir.

2    Q     Was that the chart that you saw on direct examination

3    by Ms. Gable for Family Health Pharmacy?

4    A     One of the pharmacies, yes, sir.

5    Q     You saw other charts from other pharmacies?

6    A     Yes, sir.

7    Q     Fair enough.

8          You reviewed spreadsheets of online questionnaires

9    used by Jive Network?

10   A     Yes, sir.

11   Q     Would you describe those for the jury, please?

12   A     They were photo shots of what the screens were, and

13   also some of the responses for those questionnaires.

14   Q     I think you misunderstood a word I used.  That's --

15   I'll ask you again.

16         You reviewed spreadsheets of online questionnaires

17   used by Jive Network?

18   A     Yes, sir.

19   Q     Would you describe those to you the jury?

20   A     Those were an accounting of how long it took for the

21   questionnaires to be reviewed by the doctors and how many

22   of those histories were reviewed per day or per hour by

23   the doctors.

24   Q     This was presented to you in a tabular form?

25   A     Yes, sir.

1    Q    Screen shots now of an undercover -- an undercover

2    purchase from Jive Network?

3    A    Yes, sir.

4    Q    You also reviewed a summary of undercover purchases

5    from Jive Network?

6    A    Yes, sir.

7    Q    Would you describe that to the jury, please?

8    A    Again, those were the step by step screen shots and

9    actions of the undercover agent as they purchased

10   medications from the websites.

11   Q    So what is the difference between screen shots of an

12   undercover purchase and summary of undercover purchases?

13   A    The screen shots were the steps and the summaries

14   were the actual statements or reports by the undercover

15   agents.

16   Q    So you reviewed the agent's reports of their

17   undercover purchases?

18   A    They're narratives.

19   Q    They're narratives?

20   A    Yes.

21   Q    I see.  Those narratives focused exclusively on what

22   those agents did for those unique undercover purchases?

23   A    Yes, sir.

24   Q    You also reviewed computer printouts of purchases and

25   distributions of drugs by Jive Network?

```
1    A    Yes, sir.

2    Q    Give us a little more detail on that.

3    A    One of the graphs was shown today that shows the

4    distribution of controlled substances versus non

5    controlled substances.

6    Q    That's the graphs like that pie chart you saw on

7    direct examination?

8    A    Yes, sir.

9    Q    Screen shots from Internet sites used by Jive

10   Network, saw those?

11   A    Yes, sir.

12   Q    Like pills?

13   A    Yes, sir.

14   Q    You reviewed correspondence between Jive Network and

15   doctors working for Jive Network?

16   A    Yes, sir.

17   Q    What correspondences did you see?

18   A    Correspondences set out what the payment would be to

19   doctors based upon the number of questionnaires they

20   reviewed.

21   Q    You seen any other correspondence between jive and

22   doctors?

23   A    No, sir.

24   Q    You reviewed -- I guess listened to recorded calls

25   with Jive Network customers?
```

1    A    Yes, sir.

2    Q    How many of those did you listen to?

3    A    I believe three, sir.

4    Q    Three.  And then you reviewed the indictment in this

5    case?

6    A    Yes, sir.

7    Q    Apart from those materials that we have just covered,

8    did you review any other materials supplied to you by

9    government?

10   A    Yes, sir.

11   Q    What else did you review?

12   A    I reviewed all of the relevant information from the

13   Controlled Substances Act, from the Food, Drug and

14   Cosmetics Act.

15   Q    Hold on.  What the government supplied you?

16   A    Yes.

17   Q    Not what else you reviewed generally, we'll get to

18   that in a second.  What did the government supply you that

19   you reviewed in addition to those 10 categories of things?

20   A    Relevant section of Controlled Substances Act, state

21   medical acts, statements of the federation of state

22   medical boards and the statements of the American Medical

23   Association.

24   Q    And these with supplied to you by prosecution?

25   A    Yes.

1   Q    What else did you review apart from the materials

2   supplied first by they government, the 10 items, those

3   things you just listed.  What else did you review?

4   A    I reviewed all of the reference terms that I have

5   compiled which included a statement by state review what

6   the statements are for Internet pharmacies and pharmacists

7   in the states, I reviewed the CFR, the code for

8   regulations, the relevant sections of Controlled

9   Substances Act.  I reviewed the Food Drug and Cosmetic Act

10  which defines what a valid prescription is, and then I

11  went back and reviewed prior testimony in cases that I

12  testified in to look at other references that might be

13  available.

14  Q    You wrote your report in June of '08?

15  A    Yes, sir.

16  Q    You reviewed all these materials before you wrote

17  your report?

18  A    Yes, sir.

19  Q    For what time frame did you conduct that research?

20  A    I don't understand the question.  I'm sorry.  Are you

21  asking how long did it take me?

22  Q    No, sir.

23       THE COURT:  When did you start and when did you

24  conclude, is that your question?

25       MR. PHILLIPS:  No.  I'm not asking about the

1    amount of time he put in on it.  I want to know what time

2    frame he was reviewing the CFRs and all other things, the

3    state laws and whatnot, because you weren't reviewing them

4    as they existed in '08 one would hope, but rather in '04

5    and '05.

6              MS. GABLE:  Objection, Your Honor.  Relevance.

7              THE COURT:  Well, I'm not sure where we are now.

8    Proceed with your questioning.  I'm not sure you and I are

9    on the same path.

10             MR. PHILLIPS:  I'll endeavor get us there, Your

11   Honor.

12   BY MR. PHILLIPS:

13   Q    Mr. Catizone, when you were doing your research,

14   right?  You understood that the facts that you were being

15   asked to assess, the drug orders and the questionnaires

16   and the screen shots and the printouts, occurred at a

17   specific point in time.  Do you understand that?

18   A    Yes.

19   Q    Over a period of time, but a finite period of time.

20   A    Yes, sir.

21   Q    Did you focus your research efforts when you looked

22   at the code and the CFR, all the state laws and the

23   seminars all your backgrounds on that statement period of

24   time?

25   A    I did both, sir.  I looked back at what was relevant

1    during that time period as well as what was current.

2    Q    Okay.  Good.

3         Since the start of this trial have you been supplied

4    any further information by the United States with respect

5    to your opinion testimony?

6    A    Not that I recall, sir.

7    Q    You testified on direct examination that you had

8    spoken or -- I'm sorry -- testified as a witness in four

9    federal cases of Internet pharmacies.  Were those civil or

10   criminal.

11   A    Criminal.

12   Q    All four?

13   A    Yes, sir.

14   Q    Who did you testify for?

15            MS. GABLE:  Objection; relevance.

16            THE COURT:  Sustained.

17   BY MR. PHILLIPS:

18   Q    By whom were you called in those four cases?

19   A    The United States Attorney's Office.

20   Q    This was all within the scope your annual salary and

21   compensation?

22   A    Part of my responsibilities, yes, sir.

23   Q    Was it in the last 10 years while you were at the

24   National Association of Boards of Pharmacy?

25   A    Yes, sir.

1    Q    Okay.  The two to three DEA hearings in which you say

2    you testified, who called you to the witness stand in

3    those cases?

4    A    The DEA, sir.

5    Q    You testified on direct examination that you need a

6    government ID to pick up certain pharmacies -- certain

7    controlled substance.

8    A    Yes.

9    Q    That's schedule II only, isn't that, you need a state

10   issued photo ID?

11   A    I believe I testified that the Internet pharmacies

12   require government IDs to validate the patient, not that

13   they pick up the prescriptions using that ID.

14   Q    Does a brick and mortar pharmacy have to go through

15   the same step?

16   A    No.

17   Q    But for schedule II they have to?

18   A    Yes.

19   Q    I see.

20        Are Maryland and California members, if you will, of

21   the National Association of Boards of Pharmacy?

22   A    The state boards are, yes, sir.

23   Q    For the state board of pharmacies of California and

24   state --

25   A    Yes, sir.

1  Q     -- and the state board pharmacy of Maryland are both

2  members?

3  A     Yes, sir.

4  Q     You indicated that the National Association of Boards

5  of Pharmacy serve as a clearinghouse for disciplinary type

6  matters?

7  A     Yes, sir.

8  Q     How long has the National Association served that

9  function?

10 A     Since 1908, sir.

11 Q     Since 1908.  Looking back to the categories of

12 information you reviewed in forming the opinion that you

13 have given the jury here, what specific information did

14 you review that relates to Family Health Pharmacy?

15 A     I reviewed the documents that showed distribution of

16 medications and --

17 Q     That was the tabular chart we saw on your direct

18 examination?

19 A     Yes.

20 Q     What else?

21 A     I can't recall specifically, but the other documents

22 pertained in terms of operation of Jive Network and I

23 looked at those documents as well.

24 Q     Okay.  So if any of the things you saw touched and

25 concerned Family Health Pharmacy, you would say that falls

1    within the ambit of what you reviewed?

2    A    Yes, sir.

3    Q    Pharmacist has the final check and balance was your

4    language from your direct examination.  The pharmacist's

5    duties include -- make sure I get this correct -- making

6    sure that it's the appropriate medication for that disease

7    or patient.  Right?

8    A    Yes, sir.

9    Q    That's one of the pharmacist's duties?

10   A    Yes.

11   Q    One does not give -- trying to think of a good

12   example -- one does not give sugar to a diabetic or

13   something like that it.  If the drug doesn't match the

14   need of the patient, the pharmacist is supposed to stop

15   it.

16   A    Yes, sir.

17   Q    Okay.  I'm sorry.  Refuse to dispense it.

18   A    Yes, sir.

19   Q    The pharmacist's second duty was to make sure there

20   were no interactions and that the dosage was correct?

21   A    Yes, sir.

22   Q    It was for five milligrams, they got five milligrams

23   not 500 milligrams?

24   A    Yes, sir.

25   Q    And to ensure that with respect to other medications

1   the patient may be taking that there was no interaction?

2   A    Yes, sir.

3   Q    You said a third thing a pharmacist has to do is make

4   sure that the prescription is legitimate, to prevent

5   fraud?

6   A    Yes, sir.

7   Q    People stealing a scrip pad and forging names and

8   that sort of thing?

9   A    Yes, sir.

10  Q    And then you said number four which was they have a

11  duty to report to the DEA or their local board of pharmacy

12  circumstances where they believe there may be abuse.

13  Remember saying that?

14  A    I said fraud, sir.

15  Q    Fraud.  My apologies.  Okay.  And in your report you

16  echo that, do you not?

17  A    Yes, sir.

18  Q    The pharmacist should contact the State Board of

19  Pharmacy or the local DEA diversion field office.

20  A    Yes, sir.

21  Q    Was your opinion of what the pharmacist should do

22  when they suspect there's a problem?

23  A    It's a restatement of what the DEA says in their

24  guidance to pharmacist.

25  Q    Absolutely.  Absolutely.

1        You indicated that you have opined or concluded that

2   the behaviors of Jive Network do not meet the standard

3   that you believe is appropriate for these types of

4   activities?

5   A    Yes, sir.

6   Q    You gave us some reasons for that.  Specifically said

7   it was high volume of prescriptions.

8   A    High volume of controlled substances.

9   Q    Of controlled substances.  I'm sorry.  Is that in and

10  of itself sufficient to indicate that there's some sort of

11  abuse or fraud or impropriety?

12  A    No, sir.

13  Q    You noted that the doctors were in states different

14  than the patients.  Again, in and of itself --

15  A    No, sir.

16  Q    -- not a problem?

17       You noted -- you stated that the pharmacists had

18  little or no contact with the patients.  In and of itself

19  a problem?

20            MS. GABLE:  Objection, Your Honor.

21            THE COURT:  Overruled.

22            THE WITNESS:  No, sir.

23  BY MR. PHILLIPS:

24  Q    Are you familiar with a company Medco Containment?

25  A    Yes.

Cross-examination – Catizone                    239

```
 1   Q    A big pharmacy that ships all over the place?

 2   A    Yes, sir.

 3   Q    If I get drugs from Medco I have never seen that

 4   pharmacist, have I?

 5   A    With Medco they have an entire system in place where

 6   they validate the patient and the prescriber and there is

 7   contact with that patient through one of Medco

 8   representatives and a pharmacist if need be.

 9   Q    I wouldn't debate with you at all.  My point is I

10   have had no contact with the Medco folks.  But contact in

11   and of itself is not dispositive.

12        Is that fair?

13   A    Yes, sir.  Whatever dispositive means.

14   Q    Okay.  That's a fair point.  That's a fair point.

15   That -- that -- that the -- that the pharmacist had a

16   little or no contact with the patients isn't the only

17   basis for your opinion.

18   A    Yes.

19   Q    Okay.  It doesn't make up your mind one way or the

20   other.

21   A    No, sir.

22   Q    You indicated that there was -- one of the other

23   bases for your opinion was that the pharmacist did not

24   verify the validity of the prescriptions.  How do you mean

25   verify?
```

1    A    For controlled substances the pharmacist had a

2    responsibility to check that that doctor was actually

3    licensed in the state to prescribe, that he had a DEA

4    registration, and that there was a legitimate

5    patient/doctor relationship.

6    Q    Let's talk about the first half of that response.

7    The pharmacist had a duty to ensure that the doctor in

8    essence is licensed.  Right?

9    A    Yes, sir.

10   Q    Would it be appropriate for a pharmacist to call the

11   physician on that issue?

12   A    Yes.

13   Q    Would that be sufficient in your mind for the

14   pharmacist to discharge that element of his or her duty?

15   A    In some circumstances, sir, yes.

16   Q    Okay.  You say in some circumstances.  I'm thinking

17   that perhaps you mean that the more rigorous the control

18   of the substance the more inquiry the pharmacist might

19   need to make?

20   A    That would be one.  But if they notice a pattern

21   where a doctor kept prescribing controlled substances for

22   a patients located outside the doctor area, that would be

23   a reason to go beyond calling the doctor.

24   Q    I hate to use this analogy, but a podiatrist

25   prescribing Viagra or something like that would be an

1    issue?

2    A    Yes, sir.  Outside their scope of their practice as

3    well.

4    Q    Understood.

5         Would it be sufficient to your mind for the

6    pharmacist to secure from the physician a fax copy of

7    their medical license?

8    A    Not if they suspected fraud, sir.

9    Q    But going back to the issue what -- the pharmacist

10   has a duty, they can call the doctor, sometimes that's

11   enough, right?

12   A    Yes, sir.

13   Q    How about if they call the doctor and have the doctor

14   fax a copy of their medical?

15   A    If a pharmacist had that concern they actually asked

16   the doctor to fax their medical license, then the

17   pharmacist should call the medical board to verify that

18   that license was actually true.

19   Q    And if they find fraud, should call their own board

20   of pharmacy?

21   A    Yes, sir.

22   Q    Absolutely.

23        All right.  Now you said the pharmacist also has a

24   duty to verify what was the validity of the

25   physician/patient relationship?

1    A    Yes, sir.

2    Q    To your mind this requires the pharmacist to do what?

3    A    In the case of the pharmacy that we have accredited

4    or operation such as Medco that I'm familiar with, what

5    the pharmacy has to do is establish that the doctor is

6    licensed, that he's practicing within his or her scope of

7    practice, and that there's a relationship or a physical

8    examination has occurred between the patient and the

9    doctor.

10   Q    So the pharmacist has to call the doctors and say,

11   did you see this patient?

12   A    Yes.

13   Q    That's what to your mind is minimally required for

14   the pharmacist to discharge their corresponding

15   responsibility as the CFR calls it?

16   A    If there's a question, yes.

17   Q    If there's a question.  If there is no question, none

18   of this need to occur?

19   A    As long as the pharmacist then takes full

20   responsibility that that prescription is valid and

21   whatever consequences occur if it's not a valid

22   prescription.

23   Q    Absolutely.  Absolutely.

24        Now, in your direct examination Ms. Gable showed you

25   a tabular chart that indicated at the bottom that the

1    Family Health Pharmacy had zero rejections.  You stated

2    that was highly unusual.

3    A    Yes, sir.

4    Q    If a pharmacist receives 100 percent legitimate

5    prescriptions, would you expect to see their number be

6    anything other than 100 percent?

7    A    If they dispensed or received orders for one or two

8    prescriptions, perhaps, but with a volume of 23,000 and a

9    million or so dosage units, based upon my experience,

10   something usually occurs to decline a prescription,

11   whether it was written wrong or something occurred for a

12   pharmacist not to be able to dispense it.

13   Q    And you're referring to the roughly 21,000

14   prescriptions Family Health Pharmacy issued during the

15   August to March time frame of '04, '05?

16   A    Yes, sir.

17   Q    Your data that you reviewed doesn't include the other

18   pharmacy prescriptions that Family Health Pharmacy filled,

19   did it?

20           MS. GABLE:  Objection.  Assumes facts not in

21   evidence.

22           MR. PHILLIPS:  Goes to the scope of his

23   expertise, bases of his opinion.

24           THE COURT:  I don't think he was inquired about

25   that, though.

1          Did you learn anywhere along the line in your study

2     as the number of prescriptions that were written on

3     customers that came in with prescriptions handed to a

4     pharmacist?

5               THE WITNESS:  No, sir.

6               THE COURT:  He doesn't have any information

7     about that.

8     BY MR. PHILLIPS:

9     Q    You weren't supplied that information by the

10    government, were you?

11    A    No, sir.

12    Q    You indicated on direct examination by Ms. Gable or

13    questioned along the lines of, if this Internet

14    questionnaire I think is the term, were the sole basis

15    that the doctor used to issue a prescription, would you

16    fill it.  Your answer was no.

17    A    Yes, sir.

18    Q    What if you didn't know that was the sole basis,

19    would you fill it then?

20    A    No, sir.

21              MS. GABLE:  Objection, Your Honor.

22              MR. PHILLIPS:  It continues her hypothetical.

23              THE COURT:  Go ahead.

24    BY MR. PHILLIPS:

25    Q    You said, no, you wouldn't know even if you didn't

1   know that was the sole basis.  Right?

2   A    Yes, sir.

3   Q    If we take it a step further, if you were familiar

4   with a physician, knew the physician's scope of practice,

5   licensure, knew the patient, where do you get comfortable

6   filling that prescription?

7   A    If the physician had conducted a physical examination

8   of the patient or a relationship existed.

9   Q    Okay.  And if they haven't to your mind -- no

10  relationship exists -- I'm sorry -- no relationship exists

11  therefore the script is invalid?

12  A    I think the question was would I dispense it.  The

13  answer would have been no.

14  Q    In cross-examination by Mr. Nichola you indicated you

15  were still a practicing pharmacist.  Remember that?

16  A    Yes, sir.

17  Q    You're not a dispensing pharmacist.

18  A    Correct.  I still hold an active license and still

19  consult patients.

20  Q    And but it's been a while since you were behind a

21  counter?

22  A    Yes, sir.

23  Q    Pill counting machines, are you familiar with them?

24  A    Yes, sir.

25  Q    Are they perfect in any way?

1    A      In terms of their accuracy?

2    Q      In terms of their accuracy of pill counting.

3    A      Fairly reliable, 99.9 percent depending on the

4    vendor.  There's some problems with contamination with

5    some of the products, but overall they're very reliable.

6    Q      Tablet breaks or something like that?

7    A      Yes, sir.

8    Q      You have to calibrate the machine periodically?

9    A      Yes, sir.

10          MR. PHILLIPS:  I have no further questions.

11          THE COURT:  Thank you.

12    Mr. LaCour?

13                        CROSS-EXAMINATION

14    BY MR. JUDE LACOUR:

15    Q      Good afternoon, Mr. Catizone.

16    A      Good afternoon, sir.

17    Q      How are you?

18    A      Fine, thank you.

19    Q      Were you ever interviewed by agents in relation to

20    this investigation?

21    A      I had discussions with them.

22    Q      What agency were they with?

23    A      The U.S. Attorney's office.

24    Q      So U.S. attorney, not law enforcement agencies; is

25    that correct?

```
 1   A      Right.

 2   Q      Not -- no FBI, DEA?

 3   A      No, sir.

 4   Q      And you testified that you have extensive experience

 5   in pharmacy, correct?

 6   A      Yes, sir.

 7   Q      And is this an industry that's -- you really just

 8   don't like?

 9   A      No, sir.

10   Q      As far as the online pharmacy issue?

11   A      No, sir.

12   Q      And you're -- the association that you work for,

13   correct me if I'm wrong, the National Association of

14   Boards of pharmacy, is that correct?

15   A      Yes, sir.

16   Q      Is that essentially a government agency?

17   A      No, sir.

18   Q      Is it a pseudo-government agency?

19   A      Technically it's a charitable and educational

20   organization and we help the states -- states are our

21   members.  We have no government standing or authority.

22   Q      But you work hand in hand with government whether

23   they be state or federal, is that correct?

24   A      Yes, sir.

25   Q      And you have your agency and you have worked
```

```
 1   extensively with all the states developing law and

 2   regulations in relation to pharmacy, correct?

 3   A    Yes, sir.

 4   Q    And so every state has their own laws, correct?

 5   A    Yes, sir.

 6   Q    And then they would -- if they wanted to they could

 7   take what you suggest and implement a system for all those

 8   aspects, is that correct?

 9   A    Yes, sir.

10   Q    And does the -- is it your understanding that the

11   state boards of pharmacy typically are the regulatory

12   agencies for pharmacists?

13   A    Yes, sir.

14   Q    So when does this issue become a federal issue?

15           MS. GABLE:  Objection.

16           THE COURT:  Sustained.

17   BY MR. JUDE LACOUR:

18   Q    I believe you testified that you taught a course or

19   multiple courses at the DEA on Internet pharmacies.  What

20   was the time frame of that, of those courses?

21   A    The most recent one was I think six weeks ago in

22   Virginia.  The other times have been at DEA headquarters

23   over the years.  So probably been in four lectures to DEA

24   personnel and those have been in Washington, D.C.

25   Q    Over what time frame would those four lectures occur?
```

```
 1   A    They would have occurred between the years 2002 and

 2   2006.

 3   Q    And during that time frame, 2002 to 2006, have the

 4   state and/or federal laws changed or evolved?

 5              MS. GABLE:  Objection; relevance.

 6              THE COURT:  Sustained.

 7   BY MR. JUDE LACOUR:

 8   Q    What was the -- what was the content of the course

 9   that you taught at the DEA in '09 concerning Internet

10   pharmacies?

11   A    It was a discussion of our accreditation program and

12   also our findings in researching Internet sites, how many

13   identified as not being in compliance with state and

14   federal laws, and then information for DEA agents as to

15   what to look for to distinguish between accredited or

16   traditional pharmacy and Internet pharmacy that may be

17   operating out of compliance with state and federal laws.

18   Q    And the accreditation that you're talking about,

19   that's the VIPS certification?

20   A    Yes, sir.

21   Q    I'm not sure you said this -- I want to ask even if

22   you did.  I apologize.  What does VIPS actually stand for?

23   A    Verified Internet Commerce Practice Site.

24   Q    You also stated that you have compiled a list of

25   sites that have no compliance, is that correct?
```

1    A    Yes, sir.

2    Q    Have all of those sites been prosecuted?

3              MS. GABLE:  Objection.

4              THE COURT:  Sustained.

5    BY MR. JUDE LACOUR:

6    Q    As far as your agency is concerned, what is the next

7    step in dealing with the sites that are not in compliance?

8    A    What we presently do is once we identify a site we

9    post it on our website to let the customers know.  Then we

10   notify the states in which the pharmacy is operating as

11   well as the FDA and DEA that they may be involved in

12   illegal activity.

13   Q    Your first step is to notify the state board?

14   A    The first step is post it on our website so customers

15   are made aware.

16   Q    After you've done your internal extent as far as

17   regulatory goes, first step is notify the states?

18   A    Yes, sir.

19   Q    And of four federal cases that you testified as

20   expert witness, were any of those sites selling

21   Hydrocortone?

22   A    Yes, sir.

23              MS. GABLE:  Objection.

24              THE COURT:  Sustained.

25   BY MR. JUDE LACOUR:

```
 1   Q     Was Jive Network selling Hydrocortone?

 2           MS. GABLE:  Objection; relevance.

 3           THE COURT:

 4   BY MR. JUDE LACOUR:

 5   Q    Isn't the biggest issue --

 6           THE COURT:  Well, wait a minute.  If there's an

 7   objection you ought to wait until I rule.

 8       What was the last question?

 9                   (Question read back)

10           THE COURT:  Overruled.  You may answer if you

11   know.

12           THE WITNESS:  Not that I know of.

13   BY MR. JUDE LACOUR:

14   Q    Isn't the biggest issue with online pharmacies the

15   sales of Hydrocortone?

16   A    No, sir.

17   Q    It's not the biggest concern?

18   A    The biggest concern that we have is the distribution

19   of all controlled substances via the Internet.

20   Q    Isn't Hydrocortone the most abused prescription

21   medication sold?

22           MS. GABLE:  Objection.

23           THE COURT:  Sustained.

24   BY MR. JUDE LACOUR:

25   Q    You testified that you don't believe that an online
```

1    questionnaire which results in a prescription meets the

2    standard of care.  Is that correct?

3    A    Yes, sir.

4    Q    But it is still medical care, correct?

5    A    No, sir.

6    Q    Do you know how long Phentermine has been on the

7    market?

8    A    No, sir.

9    Q    Has it been in existence or -- I'm sorry.  Let me

10   rephrase the question.

11        When you started in the pharmacy industry was

12   Phentermine available?

13            MS. GABLE:  Objection; relevance.

14            THE COURT:  Well, it might lead somewhere.

15   Overruled.

16            THE WITNESS:  Yes, sir.

17   BY MR. JUDE LACOUR:

18   Q    And you started approximately how long ago?

19   A    1983.

20   Q    Are you familiar with a death being attributed to

21   Phentermine?

22            MS. GABLE:  Objection.  Relevance.

23            THE COURT:  Sustained.

24   BY MR. JUDE LACOUR:

25   Q    Are you familiar with a death being attributed to

1   Hydrocortone?

2            MS. GABLE:  Objection.  Relevance.

3            THE COURT:  Sustained.

4   BY MR. JUDE LACOUR:

5   Q    I believe you testified that you work closely with

6   federation of state and medical boards also, is that

7   correct?

8   A    Yes, sir.

9   Q    Are you aware that at one time their opinion was that

10  doctor/patient relationship could be established via

11  online questionnaire?

12  A    No, sir.

13  Q    I believe you testified that almost all or all of the

14  laws in various states are essentially the same, is that

15  correct?

16  A    Regarding qualifications for a pharmacy and

17  pharmacist, sir?

18  Q    I'm sorry, repeat that.

19  A    Regarding the qualifications for a pharmacy and a

20  pharmacist?

21  Q    Qualifications, what do you mean by qualifications?

22  A    For example, all the states require for a pharmacist

23  that they pass our national examination, they graduate

24  from an accredited college program, and that they provide

25  experience or demonstrate experience in the pharmacy

1    practice and they pass a law exam.  And the pharmacist,

2    what they're required to do as part of their

3    responsibilities is fairly uniform across all states:

4    Drug use review before medication is dispensed, and what I

5    described earlier, the pharmacist making sure the

6    appropriate medication for the patient.

7    Q    But there are differences in the state law.  They

8    have their specific wording and different laws concerning

9    different topics, is that correct?

10   A    Yes, sir.

11   Q    Are you familiar -- I believe you said you're

12   familiar with the Utah situation.  I guess you're familiar

13   with that, correct?

14   A    Yes, sir.

15   Q    When you stated that one of the online pharmacies is

16   certified by the state of Utah to operate without any

17   in-person medical exam, is that correct?

18   A    Yes, sir.

19   Q    And you know the name of that company?

20   A    I know the pharmacy at one time was called QuickMed

21   but I'm not sure what the parent company is that actually

22   operates that.

23   Q    So QuickMed -- does QuickMed, the fact that they have

24   been able to be approved by the state of Utah to dispense

25   medications based on online questionnaire, are they in

1    violation of your agency or NABP standards?

2    A    They don't just use online questionnaire.  They have

3    another process in place that the states have approved,

4    but they have been found in violation of all the other

5    state laws and requirements.  In fact, their actions by

6    the other states Arkansas, Kentucky against QuickMed and

7    their operations seeking to prove that they violated state

8    law in regard to the online use of questionnaires.

9    Q    Are they still in existence?

10   A    As far as I know, sir, yes.

11   Q    And so their violations have been state violations,

12   correct?

13             MS. GABLE:  Objection.  Relevance.

14             MR. JUDE LACOUR:  He just stated it was a state

15   law -- state actions.

16             THE COURT:  Well, the indictment in this case,

17   it's a second superseding indictment but it arises from

18   laws that the Congress has passed and has consequences

19   that are a federal prosecution.  To the extent that state

20   law may have some affect is a matter that I'll have to try

21   to cover in instructions.  But bear in mind this is a

22   federal prosecution.  This is not a state prosecution.

23   There are 50 states and there's only one federal

24   government.  So there are 51 separate governing agencies

25   that make up the United States of America.

1           Next question, please.

2                   MR. JUDE LACOUR:  Was the objection sustained,

3       Your Honor?

4                   THE COURT:  I forgot what the question was but I

5       think I did.  Yes.

6                   MR. JUDE LACOUR:  You probably did but I just

7       want to clarify.

8                   THE COURT:  Well, I appreciate the fact that

9       it's getting late in the day so I don't remember.  What I

10      was just trying to respond to was the general subject

11      matter.

12                  MR. JUDE LACOUR:  Can I rephrase the question?

13                  THE COURT:  Sure.  Try it.

14      BY MR. JUDE LACOUR:

15      Q   Okay.  The violations that you mentioned with

16      QuickMed were state violations, correct?

17                  THE COURT:  There's no objection, you can answer

18      if you know the answer.

19                  THE WITNESS:  Yes.  Yes, sir.

20      BY MR. JUDE LACOUR:

21      Q   And is that because the state typically regulates

22      medicine?

23                  MS. GABLE:  Objection, Your Honor.

24                  THE COURT:  Well, I think you need to qualify

25      the answer to the question.  Objection is overruled.  You

 1    understand the question?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  You may answer it.

 4              THE WITNESS:  There are federal laws that govern

 5    the practice of medicine and pharmacy.  And those federal

 6    laws that refer to state laws where the actual licensure

 7    of a pharmacy, pharmacist or doctor occur and therefore

 8    violation of federal law can be actionable by a state and

 9    the states act then to enforce federal law as well as

10    state law.

11    BY MR. JUDE LACOUR:

12    Q    So how often does -- sorry -- how often does the

13    federal government get involved in helping the states

14    regulate medicine?

15              MS. GABLE:  Objection.

16              THE COURT:  Sustained.

17    BY MR. JUDE LACOUR:

18    Q    I believe you testified that there is many different,

19    I guess, acts and laws in which this practice is regulated

20    including but probably not limited to the CFR, the CSA,

21    FDA which is FD and C Act, correct?  And various house

22    HR3880.  I believe I heard you talk about that.  Does that

23    sound familiar, that sound right?

24    A    Yes, sir.

25    Q    And with all of these different regulations and/or

1    acts to look at, wouldn't it be confusing as far as the

2    Internet pharmacy goes, the Internet is a new invention

3    basically?

4              MS. GABLE:  Objection to this question, Your

5    Honor.  The defendant is testifying.

6              THE COURT:  Well, I think his question boils

7    down to is the so called Internet pharmacy a fairly new

8    creature, is that accurate?

9              THE WITNESS:  The concept, but the laws applying

10   to it aren't, sir.

11             THE COURT:  All right.  Very well.

12             THE WITNESS:  In fact, the pharmacist is taught

13   throughout their education what the law is, and the

14   applicability of that law to all these different

15   situations.  Although the Internet just came on the scene,

16   the state boards and the medical boards have said Internet

17   practice is akin to traditional practice and mail order

18   pharmacies, therefore all the laws apply.

19   BY MR. JUDE LACOUR:

20   Q    Now, when you say that there were taught the law in

21   relation to their licensing, I guess, were they taught

22   about, specifically about the Internet?

23             MS. GABLE:  Objection.

24             THE COURT:  Sustained.

25   BY MR. JUDE LACOUR:

1    Q    Are you aware that Jive Network ceased operation

2    somewhere around April of 19, 2005?

3              MS. GABLE:  Objection, assumes facts not in

4    evidence.

5              THE COURT:  He can answer if he knows the

6    answer.  Do you know the answer?

7              THE WITNESS:  I think it did.  I'm not sure,

8    though.

9    BY MR. JUDE LACOUR:

10   Q    Have any of the laws of any of the states changed

11   since 2005?

12             MS. GABLE:  Objection.

13             THE COURT:  Sustained.

14   BY MR. JUDE LACOUR:

15   Q    I believe you testified that you believed this

16   activity to be outside of the usual course of professional

17   practice, is that correct?

18             THE COURT:  I don't think you defined "this

19   activity."  That's the problem with that question.  Define

20   "this activity" and then maybe he can respond to it.

21             MR. JUDE LACOUR:  Yes, Your Honor.

22   BY MR. JUDE LACOUR:

23   Q    Do you believe that prescribing a controlled

24   substance based on an online questionnaire is outside of

25   the usual course of professional practice?

1    A      Yes, sir.

2    Q      And if a doctor was prescribing 90 percent of his

3    prescriptions online, would it become his usual course of

4    professional practice?

5              MS. GABLE:  Objection, Your Honor.

6              THE COURT:  Well, I think he's already on that

7    subject.  He can answer the question.

8              THE WITNESS:  Repeat the question.

9                    (question read back)

10             THE WITNESS:  To the best I understand the

11   question, with all those patients there still have to be a

12   physical examination.  So if he prescribed online, and

13   that was the basis for transmitting that prescription,

14   there would be a requirement that there had to be a

15   physical examination and medical history.

16   BY MR. JUDE LACOUR:

17   Q      Does the usual course of professional practice, is

18   that -- is it defined somewhere that that requires a

19   physical examination?

20   A      Not the usual course, but what is a valid patient

21   relationship is defined as requiring a physical

22   examination and medical history.

23   Q      So the usual course does not anywhere state that that

24   requires a physical examination, is that correct?

25             MS. GABLE:  Objection.

1            THE COURT:  Sustained.

2   BY MR. JUDE LACOUR:

3   Q    Were you aware of states where online prescriptions

4   were not specifically prohibited at any time over the last

5   five years?

6            MS. GABLE:  Objection; relevance.

7            THE COURT:  Sustained.

8   BY MR. JUDE LACOUR:

9   Q    Are you aware of a law that was passed by the state

10  of Florida on July 1, 2004, that specifically prohibited

11  doctor and pharmacies from engaging in online

12  prescriptions?

13           MS. GABLE:  Objection.

14           THE COURT:  Well, it's being stated as a fact.

15  Whether or not it's a fact is another matter.  Are you

16  aware of any legislation passed by Florida in 2004

17  regarding the subject?

18           THE WITNESS:  I don't think it was legislation.

19  I think the board issued a clarification of their

20  regulation that proposed that.  I'm not aware of any

21  legislation.  It was the board clarifying what the

22  regulation meant.

23  BY MR. JUDE LACOUR:

24  Q    You're not aware that was passed by Florida senate?

25  A    No, sir.

1    Q    And if the state of Florida felt it necessary to

2    clarify and/or pass a law, does that imply that it was not

3    illegal prior to that?

4               MS. GABLE:  Objection.

5               THE COURT:  Sustained.

6    BY MR. JUDE LACOUR:

7    Q    Have other states passed laws specifically

8    prohibiting online prescriptions?

9               MS. GABLE:  Objection, Your Honor.

10              THE COURT:  Sustained.

11   BY MR. JUDE LACOUR:

12   Q    In your job as the -- I'm sorry -- as CEO, correct?

13   Of NABP?

14   A    Yes, sir.

15   Q    Are you required to stay on top of the law?

16   A    Yes, sir.

17   Q    And do you get legal briefings on the law as it

18   changes?

19              MS. GABLE:  Objection; relevance.

20              THE COURT:  Well, he's been qualified as an

21   expert and he's testified as an expert, so objection is

22   overruled.

23              THE WITNESS:  Yes, sir.

24   BY MR. JUDE LACOUR:

25   Q    And who gives you those legal briefings?

1    A    There are a number of sources either from my own

2    reading, my maintenance of my license for education, or

3    through my staff or through direct contact with the

4    states.

5    Q    And do you have your own legal department at the

6    NABP?

7    A    Yes, sir.

8    Q    And you just stated that some of it is from your own

9    reading, is that correct?

10   A    Yes, sir.

11   Q    And do you come to conclusions based on your own

12   reading?

13   A    I read the material to learn as to what the new laws

14   are adopted.  I'm not sure what conclusions I could reach

15   based on that, sir.

16   Q    Do you use your own reading to come to legal

17   conclusions?

18            MS. GABLE:  Objection, Your Honor.

19            THE COURT:  Sustained.

20   BY MR. JUDE LACOUR:

21   Q    How often do you receive your legal briefings from

22   your in-house legal department?

23            MS. GABLE:  Objection.

24            THE COURT:  Sustained.

25   BY MR. JUDE LACOUR:

Cross-examination – Catizone

1    Q    And these legal briefings verbal, any of them?

2              MS. GABLE:  Objection.

3              THE COURT:  Sustained.

4    BY MR. JUDE LACOUR:

5    Q    Are the legal briefings in writing?

6              MS. GABLE:  Objection, Your Honor.

7              THE COURT:  I'm going to sustain all the

8    objections about legal advice, so it's sustained.  Can you

9    move to another subject, please?

10   BY MR. JUDE LACOUR:

11   Q    Is it standard for laws to change over time?

12             MS. GABLE:  Objection.

13             THE COURT:  I don't think that's within his

14   expertise any more than anybody else in the room.

15   Objection sustained.

16             MR. JUDE LACOUR:  I believe I'm done.  I just

17   need one minute?

18             THE COURT:  Very well.

19   BY MR. JUDE LACOUR:

20   Q    Are you familiar with recent amendments to the

21   Controlled Substances Act that deal with online

22   prescription industry?

23             MS. GABLE:  Objection, Your Honor.

24             THE COURT:  Sustained.

25             MR. JUDE LACOUR:  No further questions.  Thank

```
 1   you.
 2            THE COURT:  Any redirect.
 3                    REDIRECT EXAMINATION
 4            MS. GABLE:  Yes.
 5   BY MS. GABLE:
 6   Q    Dr. Catizone, you have been asked on
 7   cross-examination about all of these -- the rules and
 8   regulations, state and federal governing the practice of
 9   medicine and the practice of pharmacy.  Why is the
10   practice of medicine so regulated?
11   A    It's regulated because medications are dangerous and
12   it's important to protect the patient from people that may
13   not be competent to practice.
14   Q    Why is the practice of pharmacy regulated?
15   A    Same explanation:  Medicines are dangerous and the
16   patient needs to be protected from people that don't know
17   what they're doing or are incompetent.
18   Q    And Dr. Catizone, you were asked about this Utah
19   consent order with QuickMed.  Do you remember that?
20   A    Yes.
21   Q    Under that consent order does that only apply to that
22   one organization?
23   A    That one organization only in the state of Utah for
24   practitioners, pharmacists and doctors licensed in Utah
25   and patients residing in Utah.
```

1    Q    And does it only apply to four specific drugs?

2    A    Yes.

3    Q    And are those drugs controlled substances?

4    A    No.

5    Q    I mean no controlled substances?

6    A    No.

7    Q    Let me ask that again because I confused that.  And

8    the drugs that are covered under that specific order with

9    the state of Utah, are they controlled substances?

10   A    No.

11   Q    Are you familiar with the Utah physicians' licensing

12   board's rules regarding Internet prescribing?

13   A    Yes.

14   Q    And what does the Utah physicians' licensing board

15   provide?

16   A    That requires a physical examination and also medical

17   history and discussion with the patient about their

18   treatment and care.

19   Q    And does the Utah physician licensing board

20   specifically provide that it is unlawful and

21   unprofessional conduct for a physician licensed in Utah to

22   prescribe based only on an Internet questionnaire?

23   A    Yes.

24            MS. GABLE:  I have no further questions.  Thank

25   you.

```
 1              THE COURT:  Anything further from anybody?  Go
 2    ahead.
 3                        RECROSS-EXAMINATION
 4    BY MR. IRVIN:
 5    Q    Ms. Gable just talked to you about the state of Utah.
 6    Those were only recently enacted, isn't that true?
 7              MS. GABLE:  Objection.  It's vague.
 8              THE COURT:  Well, he -- she used the phrase
 9    recently.  He used the phrase recently --
10              MR. IRVIN:  He.  I am a he.
11              THE COURT:  I corrected myself.
12        It's late in the day.
13        Did you get the question?
14                   (question read back)
15              THE WITNESS:  The exemptions for QuickMed were
16    recently enacted within the last few years.  The
17    prohibitions against, or the definition of what constitute
18    a legitimate patient/prescriber relationship I believe
19    have been in effect for some time in Utah.
20    BY MR. IRVIN:
21    Q    You are not certain of that, are you?
22    A    No, sir -- I'm certain of the QuickMed exemption
23    being only very recently.  The Medical Practice Act I'm
24    fairly certainly, but not all the way, sir.
25    Q    And last several years, 2008, perhaps 2007, correct?
```

1   Several years?

2   A     For the QuickMed it was recently in 2007 and I

3   believe with the exemption was granted.

4   Q     In 2007?

5   A     I believe.

6   Q     Is that fair?

7              MR. NICHOLA:  May I?

8              THE COURT:  Go ahead.

9                          RECROSS-EXAMINATION

10  BY MR. NICHOLA:

11  Q     Prosecutor asked you that the regulations that are

12  advocated by your organization were for the purpose of

13  protecting patients, and you agreed with that.  Is that

14  only part of the purpose of regulation, would you agree to

15  that?

16  A     We support legislation, that's the only reason.

17  Q     Well, one of the reasons to support regulations

18  pertains to the protection of the financial interests of

19  doctors and pharmacists, is it not?

20  A     No, sir.

21             MR. NICHOLA:  No further questions.

22             THE COURT:  Appears to be no other requests for

23  recross-examination.  You may step down.

24       And we're going to recess until 9:00 tomorrow

25  morning.  Please recall the Court's instructions:  Do not

1    discuss this case among yourselves or don't let anyone

2    discuss the case with you.  See you 9:00 tomorrow morning.

3         Counsel remain, please.

4                     (Jury out 4:46 p.m.)

5              THE COURT:  Let the record show that the jury's

6    departed the courtroom.

7         It's my understanding that the government believes

8    they might be able to conclude tomorrow.  Have you revised

9    that estimate?

10             MS. GABLE:  Your Honor, it's tomorrow --

11   tomorrow or the next day.

12             THE COURT:  All right.

13             MS. GABLE:  I do believe this week.

14             THE COURT:  This week.  All right.  Well, as

15   soon as the government's rested its case in chief, we're

16   going to move to the defense, and I wanted to alert

17   counsel to the fact they're going to need to be going

18   forward fairly soon.  I'm also concerned -- I have gotten

19   the impression there have been no reciprocal discovery.

20   Have you been provided anything?

21             MS. GABLE:  I did get some exhibits from

22   Mr. Leventhal on the first day of trial.  I think I got

23   two exhibits from Mr. Nichola.  I got some exhibits from

24   Mr. Phillips on the first day of trial.  Other than that,

25   I have haven't received anything.

1          THE COURT:  All right.  Now, the question that I

2     want to address is the order to be followed by the

3     defendants in presenting their individual defenses.  Each

4     defendant, of course, has the right to present whatever he

5     or she wishes to present.  No defendant has any obligation

6     to testify.  And I might say that over the years I

7     followed the practice of letting, especially if there's

8     only one defendant, elect how that defendant wishes me to

9     cover the fact that non testimony by the defendant, and I

10    always said it's the defendant's choice as to how I

11    address it.  Some defendants prefer that I indicate that

12    the fact that the defendant has not testified should not

13    be considered, even discussed in deliberations.  Other

14    defendants say we don't even want to you touch the

15    subject, not even to talk about the fact the defendant did

16    not testify.

17         And I have always indicated that it's the defendant's

18    choice, not mine.  But it gets more complicated when I got

19    five defendants.  Let's say two testify and three don't,

20    then it's a different instruction issue.

21         So that issue is out there as to how that should be

22    addressed.  But more importantly is the issue of what

23    order we go in presenting the defenses.  And I don't know

24    if that's been discussed.  What the practice has been so

25    far has been for Mr. LaCour to come last.  Now I don't

1    know whether he wants to continue that or whether he wants

2    to go first.  And so I kind of like defendants to address

3    that and be able to tell me tomorrow if you reached any

4    conclusion as to the order in which you wish to go.

5         But once the case has been submitted by government, I

6    don't expect to waste much time before we start with the

7    defendant's case.  Now, if the government doesn't conclude

8    tomorrow and it goes into Thursday, then I might possibly

9    decide that we will, once the government rests, send the

10   jury home, listen to any motions, any Rule 29 motions the

11   defendants may wish to address, but to delay defense

12   testimony until Monday.  That's another way to pursue it.

13   So talk among yourselves how you want to go, and what

14   order you want to go.

15             MR. LEVENTHAL:  Judge, all of us were together,

16   other than Mr. LaCour, over the lunch hour, and I don't

17   know if anybody sitting over at this side has talked to

18   him, but the lawyers that -- rest of the lawyers that have

19   discussed that if Mr. LaCour wanted to go first, that was

20   fine.  I didn't want to go first for reasons that I

21   discussed with the other lawyers and I'd rather not

22   discuss in front of the government, but --

23             THE COURT:  You don't have to discuss it in

24   front of me either.  I want to see if we can come to some

25   conclusion.

```
 1              MR. LEVENTHAL:  I don't know if Mr. LaCour has a
 2     position.
 3              THE COURT:  Maybe Mr. LaCour wants to think
 4     about it over night too.  I haven't addressed this subject
 5     in his presence.  So this is the first time he's heard me
 6     discuss the situation.  And looks to me like we will start
 7     defense testimony at the latest on Monday.  So Mr. LaCour,
 8     you need to think about that, and I don't need to have an
 9     answer now.  But as far as I know you have engaged in no
10     reciprocal discovery, so it may be drastically limit what
11     you can do in your own case.  You can't produce exhibits,
12     for instance, in your case that you haven't already made
13     available to the government.
14              MR. JUDE LACOUR:  There's also still the issue,
15     Your Honor, of which witnesses I'm able to recall and I
16     guess I need to handle that with you.  Is that correct?
17              THE COURT:  Well, you have got a long way to go
18     before I recall any witnesses that's already testified and
19     that you had the opportunity to cross-examine.  So there
20     has to be a pretty good explanation for that.
21              MR. JUDE LACOUR:  I believe, Your Honor, that
22     you explained to the jury that I have an opportunity to
23     impeach the witnesses.
24              THE COURT:  Well, you don't call that witness.
25     You call somebody else to do the impeachment.
```

1           MR. JUDE LACOUR:  I'm sorry?

2           THE COURT:  Well, you have got to set up the

3    impeachment first.  You have got to -- I forgot now who

4    the witness was.  Can somebody remind me?

5           MS. GABLE:  I think may have been an agent.  Was

6    it an agent?

7           MR. PHILLIPS:  Was Agent Groeschner.

8           MR. JUDE LACOUR:  I don't believe you limited

9    when you explained to the jury I had an opportunity to

10   impeach the witnesses, did not say the specific witness.

11   And I don't believe that we have been given the

12   opportunity to impeach the witnesses.

13          THE COURT:  Well, you've always got the

14   opportunity to impeach.  You just ask the witness if he

15   said or did something, and if he disagrees, then you call

16   the witness that impeaches.  But you have to set up the

17   impeachment to begin with, with the witness.  You can't do

18   it backwards.

19       But, in any event, you need to think through what you

20   want to do by way of presenting your case and in what

21   order you wish to go.  And if I get an agreement by all of

22   the defendants, then I don't care which order you go.

23       But if there's a disagreement, then I'm going to have

24   to hear everybody out.  That's all.

25          MR. JUDE LACOUR:  Is it Your Honor's ruling I

1    will not be able to supply reciprocal discovery?

2            THE COURT:  You haven't done it?  Deadline has

3    well since passed.

4            MR. JUDE LACOUR:  Well, I supplied many -- much

5    of the reciprocal discovery my attorney.  He chose not to

6    do it.  So that's outside of my control.

7            THE COURT:  Well, no, it wasn't outside your

8    control.  You could have immediately demanded the

9    information and supplied it to the government.

10           MR. JUDE LACOUR:  I was not aware that I could

11   do that at the time.

12           THE COURT:  It's one of the risks of

13   representing yourself.

14           MR. JUDE LACOUR:  And I believe under Hains

15   versus Crooner, Your Honor, which is a Supreme Court case

16   that I'm to be held to a less stringent standard.

17           THE COURT:  Not when it comes to the trial; not

18   when you've elected to be your own lawyer.

19           MR. JUDE LACOUR:  I didn't exactly elect to.  I

20   didn't have much of a choice.

21           THE COURT:  Well --

22           MR. JUDE LACOUR:  I even asked for a continuance

23   to be able to prepare for trial, which was denied.

24           THE COURT:  Well, you're also the one that's

25   moving to dismiss the case because of speedy trial.  So

1    you have been riding two horses on that one.

2          MR. JUDE LACOUR:  Well, the speedy trial motion

3    was denied.

4          THE COURT:  Well, in any event, I expect to hear

5    from you all tomorrow as to what you want to do, that's

6    all.  I wanted to raise the issue.

7       Anything further I need to talk about with anybody

8    tonight?

9          MS. GABLE:  Your Honor, I just want to alert you

10   to the fact that this evening we're going to be filing a

11   motion in limine.  On Friday -- I'm sorry -- I'm trying to

12   -- I'm losing track of time here.  I believe it was Friday

13   Mr. Leventhal sent me a letter announcing to me that he

14   intended to call an expert.  I think her last name is Lee,

15   and we will be filing motion to limine, Your Honor,

16   because it is long overdue to be calling an expert and

17   sandbagging the government in the middle of trial with a

18   new expert.

19         THE COURT:  Well, that's true.  You filed, as I

20   understand the record, you gave notice of your expert a

21   long time ago.

22         MS. GABLE:  We did.  And I have received no

23   report of this expert, I have received a resume.  That's

24   all I got.

25         MR. LEVENTHAL:  You got materials and stack of

1    materials regarding information that I thought would be

2    helpful to the government that she has sent me.  I just

3    received those materials about four days ago.

4              THE COURT:  I haven't seen the motion yet.  I'm

5    not going to rule on it tonight.

6              MS. GABLE:  Thank you, Your Honor.  I just

7    wanted to alert you to the fact that it was coming.

8              THE COURT:  Okay.

9              MR. IRVIN:  Judge, in advance of tomorrow, it

10   was my understanding that Mr. LaCour was wanting to go

11   first.  I don't know if that is changed.

12             MR. JUDE LACOUR:  That's not true.

13             MR. IRVIN:  That's not true?  Well, fine.

14             THE COURT:  Well, I just wanted to have -- if

15   I've got an agreement, I don't care what order you go.

16             MR. IRVIN:  It can wait until tomorrow.

17             THE COURT:  Yeah, it can.

18             MR. LEVENTHAL:  Can we come in at a quarter to

19   and let you know?

20             THE COURT:  I'll see you all at a quarter to

21   nine.

22             MR. PHILLIPS:  Could we get the government's

23   witnesses to avoid the sandbag thing?

24             THE COURT:  Two people we didn't get to today

25   that were on the list were Share and Torres.

1          MS. GABLE:  That's correct, Your Honor.  And we

2    also have Dr. Weinberg.

3          THE COURT:  How do you spell that?

4          MS. GABLE:  W-E-I-N-B-E-R-G.

5       And we will provide the Court with a copy of his

6    report tomorrow if you would like.

7          THE COURT:  Experts?

8          MS. GABLE:  Okay.  We have Bradley Share, Arthur

9    Forester, Tina Morris, Mitch Dobbins, and Special Agent

10   Metzger.

11         THE COURT:  Is that your summary witness?

12         MS. GABLE:  Yes.  Agent Metzger.

13         THE COURT:  What was his name again?

14         MS. GABLE:  Donald Metzger.  M-E-T-Z-G-E-R.

15      And for the record, Your Honor, Dr. Weinberg's report

16   was provided to defense months and months ago.

17         THE COURT:  Did you have a copy of

18   Dr. Weinberg's?

19         MR. JUDE LACOUR:  No, Your Honor.

20         THE COURT:  Let's get him a copy.

21         MS. GABLE:  We will do that, Your Honor.  We're

22   providing Arthur Forester's 302 right now.  We have

23   already provided a while back Tina Morris' 302 and her

24   grand jury testimony.  We provided Mr. Dobbin's 302, and I

25   will provide Agent Metzger's grand jury testimony this

1    evening.

2           THE COURT:  Very well.

3           MR. LEVENTHAL:  Your Honor, if the government

4    rests tomorrow, do you intend to send the jury home and

5    immediately move into Rule 29 motions?

6           THE COURT:  Well, if they rest tomorrow, then I

7    may want to go with defense cases on Thursday.  I don't

8    want to waste Thursday.

9           MR. LEVENTHAL:  There's still no court on Friday

10   no matter what?

11          THE COURT:  No court Friday.

12          MR. LEVENTHAL:  Okay.

13          THE COURT:  That's why it's kind of important

14   for you to come to an agreement on how you're going to do

15   things.  My guess is as long as you took with Catizone,

16   will take a long time with Weinberg too.  Weinberg is the

17   expert on doctors as I understand it.

18       In any event, I'll see you tomorrow morning at

19   quarter of nine.

20       Have a good evening.

21                  (End at 4:59 a.m.)

22

23

24

25

1                    C E R T I F I C A T E

2         I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6    s\Sandra K. Tremel    July 7, 2009

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25